**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VIATECH TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 1:14-cv-01226-RGA** |
| v. | ) | |
| | ) | |
| MICROSOFT CORPORATION, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

James D. Taylor, Jr. (#4009)
Allison J. McCowan (#5931)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19899
Telephone:  (302) 421-6800
Facsimile:  (302) 421-6813
Email: jtaylor@saul.com
Email: amccowan@saul.com

Michael J. Lennon (Admitted *pro hac vice*)
Sheila Mortazavi (Admitted *pro hac vice*)
KENYON & KENYON LLP
One Broadway
New York, NY 10004-1007
Telephone:  (212) 425-7200
Facsimile:  (212) 425-5288
Email: mlennon@kenyon.com
Email: smortazavi@kenyon.com

Attorneys for plaintiff and
counterclaim-defendant
VIATECH TECHNOLOGIES, INC.

FISH & RICHARDSON P.C.
Martina Tyreus Hufnal (#4771)
222 Delaware Avenue, 17th floor
P.O. Box 1114
Wilmington, DE 19801
Tel: (302) 652-5070
hufnal@fr.com

Frank E. Scherkenbach
Kurt L. Glitzenstein
Steven R. Katz
Chet D. Campbell
One Marina Park Drive
Boston, MA 02210
Tel:  (617) 521-7883
scherkenbach@fr.com
glitzenstein@fr.com
katz@fr.com
cycampbell@fr.com

Attorneys for defendant and
counterclaim-plaintiff
MICROSOFT CORPORATION

# TABLE OF CONTENTS

**Page**

PLAINTIFF VIATECH'S U.S. PATENT NO. 6,920,567 ..............................................1

A.     AGREED CONSTRUCTIONS .................................................................................1

B.     DISPUTED CONSTRUCTIONS ............................................................................2

     1.     "embedded" / "embedded in the digital content file" (claims 1, 3, 4, 28, 31, 32).........................................................................................................................2

     2.     "dynamic license" (claims 1, 2, 3, 5, 6, 13, 14, 15, 28, 29, 30, 31).....................12

     3.     "database" (claims 1, 2, 3, 5, 6, 13, 14, 15, 28, 29, 30, 31, 32)...........................16

     4.     "dynamic license database" (claims 1, 2, 3, 5, 6, 13, 14, 15, 28, 29, 30, 31).......17

     5.     "associated with" (claims 1, 28, 29, 31) .............................................................20

     6.     "file" (claims 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 28, 29, 30, 31, 32) ..........................23

     7.     "file access control mechanism" (claims 1, 28, 29, 31, 32) .................................28

     8.     "license monitor and control mechanism" terms (claims 1, 2, 3, 5, 6, 14, 15, 28, 31)......................................................................................................................37

     9.     "monitoring use" (claims 1, 28) ..........................................................................49

     10.     "license control utility" terms (claims 1, 28, 31).................................................52

     11.     "license control mechanism" (claims 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 28, 29, 30)......................................................................................................................60

     12.     "license functions mechanism" (claims 1, 4, 5, 28, 31) .......................................63

     13.     "adaptive fingerprint" (claims 5, 28, 31)............................................................65

     14.     "adaptive fingerprint security mechanism" terms (claims 5, 28, 31) ..................68

     15.     "purchase information" (claim 14) .......................................................................73

     16.     preambles (claims 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 28, 29, 30, 31)..........................73

     17.     "license information controlling licensed use of the digital content" (claims 1, 28, 31)......................................................................................................................76

     18.     "information controlling operations of the file access control mechanism" (claims 1, 28, 31) ............................................................................................................76

COUNTERCLAIM-PLAINTIFF MICROSOFT'S U.S. PATENT NO. 6,243,468 ..................82

A.     AGREED CONSTRUCTIONS ...............................................................................82

B.     DISPUTED CONSTRUCTIONS ............................................................................82

1.      Term 1: "product ID" (Claims 18, 23) ..................................................82

2.      Term 2: "hardware ID" (Claims 18, 23)...............................................97

3.      Term 3: "registration ID" (Claims 18, 23) .......................................102

4.      Term 7: "registration authority remote from the computer" / "registration authority" (Claims 18, 23) ....................................................108

5.      Term 11: "substantially similar" (Claim 38) ....................................114

6.      Term 22: "registering the software product for use with a first computer having a first set of hardware components" (Claim 38).....................................126

7.      Term 23: "detecting the different set of hardware components" (Claim 38) ....135

8.      Term 24: "discerning whether the second computer is substantially similar to the first computer" (Claim 38) .......................................141

9.      Term 4: "test ID" .............................................................144

10.     Term 5: "computing … by applying an operation to" / "computing" / "computed" / "apply the operation to" ..............................................145

11.     Term 9: "substantially matches" / "substantially match"  Term 10: "substantially different" Term 12: "substantially the same"  Term 13: "substantially changed" Term 14: "more like a new computer" / "more like the specific computer" / "more like the original computer" Term 20: "new computer" ...............................................................147

12.     Term 16: "original registration ID" / "original registration IDs"  Term 17: "original set of hardware components" Term 18: "original computer" .............151

13.     Term 19: "new set of hardware components" ...................................153

14.     Term 21: "code segment" (Claims 10, 11–15).................................154

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*3M Innovative Properties Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013) ...................................................................................... 134

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) ........................................................................................ 86

*ACQIS LLC v. Alcatel-Lucent USA Inc.*,
    Nos. 6:13–CV–638, –638, 2015 WL 1737853 (E.D. Tex. Apr. 13, 2015) ..................... 124

*ADCO Products, Inc. v. Carlisle Syntec Inc.*,
    110 F. Supp. 2d 276 (D. Del. 2000) ............................................................................... 117

*Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*,
    Nos. 6:11–CV–011, –391, 2012 WL 2872121 (E.D. Tex. July 12, 2012) ...................... 151

*Affymetrix, Inc. v. Hyseq, Inc.*,
    132 F. Supp. 2d 1212 (N.D. Cal. 2001) ..................................................................... 30, 46

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
    340 F.3d 1298 (Fed. Cir. 2003) ................................................................................. 85, 98

*Ancora Techs., Inc. v. Apple, Inc.*,
    744 F.3d 732 (Fed. Cir. 2014) ................................................................................ 129, 137

*Apex Inc. v. Raritan Computer, Inc.*,
    325 F.3d 1364 (Fed. Cir. 2003) ................................................................................. 31, 44

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014) ............................................................... 44, 95, 99, 108

*Apple Inc. v. Samsung Elecs. Co.*,
    786 F.3d 983 (Fed. Cir. 2015) ............................................................................... 115, 118

*Aristocrat Technologies Australia Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) ........................................................................................ 57

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
    216 F.3d 1042 (Fed. Cir. 2000) ........................................................................................ 50

*Augme Techs., Inc. v. Yahoo! Inc.*,
    755 F.3d 1326 (Fed. Cir. 2014) .......................................................................... 4, 6, 9, 12

ii

*Beneficial Innovations, Inc. v. Blockdot, Inc.*,
   No. 2:07–cv–263, 2010 WL 1441779 (E.D. Tex. Apr. 12, 2010)...................31, 39, 53, 69

*Beneficial Innovations, Inc. v. Blockdot, Inc.*,
   No. 2:07–cv–263, 2010 WL 2246291 (E.D. Tex. June 03, 2010).....................................31

*Cadence Pharm. Inc. v. Exela PharmSci Inc.*,
   780 F.3d 1364 (Fed. Cir. 2015) ...............................................................passim

*CallWave Communications LLC v. AT&T Mobility, LLC*,
   Nos. 12–1701, –1702, –1703, –1704, –1788–RGA, 2014 WL 7205657
   (D. Del. Dec. 17, 2014) ........................................................................passim

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
   296 F.3d 1106 (Fed. Cir. 2002) .........................................................46, 58, 72

*Carnes Co. Inc. v. Penn Ventilation, Inc.*,
   No. 99–C–0650–C, 2000 WL 34235985 (W.D. Wisc. July 27, 2000).........................88, 95

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed.Cir.2002) .......................................................................74

*Chef America, Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) ....................................................................20

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch. LLC*,
   748 F.3d 1134 (Fed. Cir. 2014) ...............................................................47, 72

*Cree, Inc. v. SemiLEDs Corp.*,
   No. CIV.A. 10-866-RGA, 2012 WL 975697 (D. Del. Mar. 21, 2012) ...................116, 118

*Creo Products, Inc. v. Presstek, Inc.*,
   305 F.3d 1337 (Fed. Cir. 2002) ...............................................................46, 58

*CVI/Beta Ventures, Inc. v. Tura LP*,
   112 F.3d 1146 (Fed. Cir. 1997) ....................................................................35

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ...........................................................117, 120

*DealerTrack, Inc. v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012) ..................................................................150

*Deere & Co. v. Bush Hog, LLC*,
   703 F.3d 1349 (Fed. Cir. 2012) .....................................................115, 118, 149

*Delaware Display Group LLC v. Lenovo Group Ltd.*,
   Nos. 13-2108, -2109, -2112-RGA, 2015 WL 6870031 (D. Del. Nov. 6, 2015)..........passim

ii

*E2E Processing, Inc. v. Cabela's Inc.*,
No. 2:14–CV–36–JRG–RSP, 2015 WL 4051423 (E.D. Tex. July 2, 2015) ...............passim

*Eaton Corp. v. Rockwell Int'l Corp.*,
323 F.3d 1332 (Fed. Cir. 2003) ........................................................................74

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
508 F.3d 1366 (Fed. Cir. 2007) ......................................................................134

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) ...................................................................passim

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
766 F.3d 1338 (Fed. Cir. 2014) ................................................................85, 98

*Exxon Research & Eng'g Co. v. United States*,
265 F.3d 1371 (Fed. Cir. 2001) ......................................................................116

*Fairfield Industries, Inc. v. Wireless Seismic, Inc.*,
No. 4:14–CV–2972, 2015 WL 1034275 (S.D. Tex. Mar. 10, 2015)........118, 123, 124, 125

*Farstone Technology, Inc. v. Apple, Inc.*,
No. 8:13–cv–1537–ODW(JEMx), 2015 WL 5898273 (C.D. Cal. Oct. 8, 2015)..............42

*Fractus, S.A. v. Samsung Elecs. Co.*,
No. 6:09CV00203, 2010 WL 5287531 (E.D. Tex. Dec. 17, 2010).................116, 118, 122

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ......................................................................128

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) ...................................................................passim

*Greenberg v. Ethicon Endo–Surgery, Inc.*,
91 F.3d 1580 (Fed. Cir. 1996) ...................................................................31, 46

*Halliburton Energy Services, Inc. v. M-I, LLC*,
514 F.3d 1244 (Fed. Cir. 2008) ................................................................126, 150, 151

*Hand Held Products, Inc. v. Amazon.com*,
No. 12–768–RGA–MPT, 2014 WL 5779416 (D. Del. Nov. 5, 2014) ...................76, 77, 80

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
527 F.3d 1379 (Fed. Cir. 2008) ...................................................................10, 77

*HTC Corp. v. IPCom GmbH & Co., KG*,
667 F.3d 1270 (Fed. Cir. 2012) ........................................................................60

*IMS Tech., Inc. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000) ................................................................ 58

*Industrial Engineering & Development, Inc. v. Static Control Components, Inc.*,
No. 8:12–cv–691–T–24–MAP, 2013 WL 2406267 (M.D. Fla. June 3, 2013) ................. 46

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
783 F.3d 1262 (Fed. Cir. 2015) ............................................................ 3, 49

*Inline Plastics Corp. v. EasyPak, LLC*,
799 F.3d 1364 (Fed. Cir. 2015) ............................................................ 91

*Intel Corp. v. VIA Techs., Inc.*,
319 F.3d 1357 (Fed. Cir. 2003) ............................................................ 60

*Intellectual Ventures I LLC v. Check Point Software Techs. Ltd.*,
No. 10–1067–LPS, 2012 WL 6200337 (D. Del. Dec. 12, 2012) .............................. 23, 25

*InterDigital Communications, Inc. v. ZTE Corp.*,
Nos. 1:13–cv–00009–RGA, –00010– RGA, 2014 WL 1620733
(D. Del. Apr. 22, 2014) .................................................................... 89, 94

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ....................................................... passim

*Inventio AG v. ThyssenKrupp Elevator Americas Corp.*,
649 F.3d 1350 (Fed. Cir. 2011) ............................................................ 44

*Joao Control & Monitoring Systems, LLC v. Protect America, Inc.*,
No. 1–14–CV–134–LY, 2015 WL 4937464 (W.D. Tex. Aug. 18, 2015) ......................... 42

*Kara Tech. Inc. v. Stamps.com Inc.*,
582 F.3d 1341 (Fed. Cir. 2009) ............................................................ 129

*KLA-Tencor Corp. v. Xitronix Corp.*,
No. A–08–CA–723–SS, 2011 WL 318123 (W.D. Tex. Jan. 31, 2011) ..................... passim

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
No. 2:12–cv–800–WCB, 2014 WL 3735222 (E.D. Tex. July 28, 2014) ........................ 80

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ............................................................ 128

*M2M Solutions LLC v. Sierra Wireless America, Inc.*,
Nos. 12-30, 12-32, 12-33-RGA, 2015 WL 5826816 (D. Del. Oct. 2, 2015) ................ 45, 48

*Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*,
462 F.3d 1344 (Fed. Cir. 2006) ............................................................ 41

*McClain v. Ortmayer*,
  141 U.S. 419 (1891) ................................................................................... 7

*Media Rights Techs. Inc. v Capital One Financial Corp.*,
  No. 2014–1218, 2015 WL 5166358 (Fed. Cir. Sept. 4, 2015) ...................... 31, 42, 48, 55

*Mesh Comm, LLC v. PEPCO Energy Services*,
  No. RDB–09–2804, 2010 WL 5463934 (D. Md. Dec. 29, 2010) ..................................... 31

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
  194 F.3d 1250 (Fed. Cir. 1999) ................................................................... 49

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998) ................................................................... 86

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S.Ct. 2120 (2014) ........................................................................... passim

*Netgear, Inc. v. Ruckus Wireless, Inc.*,
  5 F. Supp. 3d 592 (D. Del. 2013) ............................................................. passim

*Nike Inc. v. Wolverine World Wide, Inc.*,
  43 F.3d 644 (Fed.Cir.1994) ...................................................................... 10

*Noah Sys., Inc. v. Intuit Inc.*,
  675 F.3d 1302 (Fed. Cir. 2012) ................................................................. 55

*Noah Systems Inc. v. Intuit Inc.*,
  No. 06–cv–00933, 2010 WL 3191844 (W.D. Pa. Aug. 11, 2010) .............................. 88, 95

*Noah Systems Inc. v. Intuit Inc.*,
  No. 06–cv–00933, 2010 WL 9096712 (W.D. Pa. May 7, 2010) ................................. 87, 95

*NTP, Inc. v. Research In Motion, Ltd.*,
  418 F.3d 1282 (Fed.Cir.2005) .................................................................... 74

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
  442 F.3d 1331 (Fed. Cir. 2006) ................................................................ 111

*Parallel Networks, LLC v. Abercrombie & Fitch Co.*,
  704 F.3d 958 (Fed. Cir. 2013) ................................................................... 21

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................. passim

*Playtex Products, Inc. v. Procter & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005) ................................................... 115, 118, 122

*Prism Techs. LLC v Verisign Inc.*,
    512 F. Supp. 2d 174 (D. Del. 2007) ................................................................. 58

*Process Control Corp. v. Hydreclaim Corp.*,
    190 F.3d 1350 (Fed. Cir. 1999) ....................................................................... 20

*Prolifiq Software Inc. v. Veeva Systems Inc.*,
    No. C 13–03644 SI, 2014 U.S. Dist. LEXIS 108630 (N.D. Cal. Aug. 6, 2014) ...... 126, 150

*Prolitec, Inc. v. Scentair Techs., Inc.*,
    807 F.3d 1353 (Fed. Cir. 2015) ............................................................... 91, 113

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ....................................................................... 20

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) ................................................................. 35, 51

*Ruckus Wireless, Inc. v. Netgear, Inc.*,
    No. C-08-2310, 2013 WL 6627737 (N.D. Cal. Dec. 16, 2013) ...................... 115, 118, 122

*Select Retrieval LLC v. Amerimark Direct LLC*,
    No. 1:11–cv–00812–RGA, 2014 WL 1092387 (D. Del. Mar. 14, 2014).......................... 17

*Serrano v. Telular Corp.*,
    111 F.3d 1578 (Fed. Cir. 1997) ....................................................................... 49

*Single Touch Interactive Inc. v. Zoove Corp.*,
    No. 12–cv–831 YGR, 2013 WL 3802805 (N.D. Cal. July 17, 2013) ...................... 88, 95

*Skyhook Wireless, Inc. v. Google, Inc.*,
    No. 10–11571–RWZ, 2014 WL 898595 (D. Mass. Mar. 6, 2014)...................... 126, 151

*Smartflash LLC v. Apple Inc.*,
    77 F. Supp. 3d 535 (E.D. Tex. 2014)............................................................. 30, 46

*Smartflash LLC v. Apple Inc.*,
    No. 6:13cv447, -448, 2015 WL 4208754 (E.D. Tex. Jul. 7, 2015) ...................... 30, 46

*Software Tree, LLC v. Red Hat, Inc.*,
    No. 6:09–CV–097, 2010 WL 2232809 (E.D. Tex. June 1, 2010)...................................... 31

*SourceProse Corp. v. AT & T Mobility, LLC*,
    No. A-11-CV-117-LY, 2014 WL 2879694 (W.D. Tex. June 24, 2014) ................ 115, 118

*Southco, Inc. v. Fivetech Tech. Inc.*,
    611 Fed. Appx. 681 (Fed. Cir. 2015)............................................................. 3, 49

*Stambler v. RSA Security, Inc.*,
No. 01–065–SLR, 2003 WL 252122 (D. Del. Jan. 29, 2003) ........................... 21

*TecSec, Inc. v. International Business Machines Corp.*,
731 F.3d 1336 (Fed. Cir. 2013) ..................................................... passim

*Thomas Swan & Co. Ltd. v. Finisar Corp.*,
No. 2:13–cv–00178–JRG, 2014 WL 2885296 (E.D. Tex. June 25, 2014) ......................... 3

*TomTom, Inc. v. Adolph*,
790 F.3d 1315 (Fed. Cir. 2015) ..................................................... 74, 75

*Toyota Motor Corp. v. Cellport Sys., Inc.*,
No. IPR2015-00633, 2015 WL 4934778 (P.T.A.B. Aug. 14, 2015) ......................... passim

*Transcenic, Inc. v. Google Inc.*,
7 F. Supp. 3d 405 (D. Del. 2013) ..................................................... 115

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
659 F.3d 1376 (Fed. Cir. 2011) ..................................................... 47, 72

*United Carbon Co. v. Binney & Smith Co*.,
317 U.S. 228 (1942) ..................................................... 126

*Veracode, Inc. v. Appthority, Inc.*,
No. 12-10487-DPW, 2015 WL 5749435 (D. Mass. Sept. 30, 2015) ................................. 80

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ..................................................... 35, 52

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*,
520 U.S. 17 (1997) ..................................................... 99

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ..................................................... passim

*York Prod., Inc. v. Cent. Tractor Farm & Family Ctr.*,
99 F.3d 1568 (Fed. Cir. 1996) ..................................................... 30

**Statutes**

35 U.S.C. § 112 ..................................................... passim

## PLAINTIFF VIATECH'S U.S. PATENT NO. 6,920,567

Plaintiff ("ViaTech") filed this lawsuit against defendant ("Microsoft") on September 24, 2014, alleging infringement of claims 1–7, 13–15, and 28–32 of U.S. Patent No. 6,920,567 by product activation features in Microsoft Windows and Office software products. D.I. 1. On August 11, 2015, the parties filed a Joint Claim Construction Chart proposing constructions for eighteen disputed claim terms. D.I. 40.

The '567 patent issued on July 19, 2005 from App. No. 09/544,682 filed April 7, 2000, which claims the priority date of April 7, 1999 of Prov. App. No. 60/128,152.[1] The '567 patent claims a system and embedded license control mechanism for the creation and distribution of digital content files, and the enforcement of licensed use of the digital content files.

### A.    AGREED CONSTRUCTIONS

| Term | Agreed Construction |
|------|---------------------|
| Preamble (claim 31 only) | The preamble is a limitation of the claim |
| "database"[2] (claims 1, 2, 3, 5, 6, 13, 14, 15, 28, 29, 30, 31, 32) | "a record containing data" |
| "purchase information"[3] (claim 14) | plain and ordinary meaning (i.e., information related to a purchase) |

---

[1]  Copies of the '567 patent and its USPTO prosecution history are attached to the parties' Joint Claim Construction Statement (D.I. 40). The intrinsic evidence relied on by ViaTech in support of its proposed claim term constructions is excerpted in the attached Appendix (A1).

[2]  Microsoft initially proposed a different construction for the term "database" ("a persistent collection of data structured or organized in a manner that facilitates retrieval"), but then agreed to ViaTech's proposed construction in its answering brief. For the reasons stated below (*see* Term 3 *infra*), the court should adopt the construction proposed by ViaTech.

[3]  Microsoft initially proposed a different construction for the term "purchase information" ("information defining the terms of purchase of at least one license available to a user"), but then agreed to ViaTech's proposed construction in its answering brief. For the reasons stated below (*see* Term 15 *infra*), the court should adopt the construction proposed by ViaTech.

1

**B.     DISPUTED CONSTRUCTIONS**

**1.  "embedded" / "embedded in the digital content file" (claims 1, 3, 4, 28, 31, 32)**

| Term | ViaTech Construction | Microsoft Construction |
|------|----------------------|------------------------|
| "embedded" / "embedded in the digital content file" | "functionally included" | "code that is part of the digital content file, rather than being linked or otherwise 'functionally embedded'" / otherwise, indefinite |

Plaintiff ViaTech's Opening Position

Claims 1, 3, 4, 28, 31, and 32 describe "file access control mechanism," "license functions mechanism," and/or "license monitor and control mechanism" software components "embedded" in a "digital content file" (a file including, e.g., computer program code or digital data).  The specification states that the file access control mechanism FACM 12, license functions mechanism LicMech 16, and license monitor and control mechanism LMCM 18 can be "embedded functionally at runtime into the DCF 10" as well as "directly and physically into the DCF 10" and "encapsulated" in the digital content file DCF 10, so that the contents of the digital content file DCF 10 cannot be accessed without executing the licensing and access control functions of the embedded components, for "controlling the licensed use of digital content."  *See, e.g.,* col. 3:55–61, 10:45–53, 15:15–62, 16:5–32, 19:41–20:29; *see also* Declaration of Dr. Benjamin F. Goldberg in Support of Plaintiff ViaTech Technologies, Inc.'s Opening Claim Construction Brief (the "Goldberg Decl.") (A244) ¶¶ 3–5 (A245–46).[4]  This claim term is properly construed as "functionally included" and the court should accordingly reject Microsoft's proposed construction.  *Compare, e.g., id.*, *with Southco, Inc. v. Fivetech Tech. Inc.*,

---

[4]  The citations in the form "A___" are to the parties' Joint Appendix, filed herewith.

611 Fed. Appx. 681, 689 (Fed. Cir. 2015), *Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783

F.3d 1262, 1266–68 (Fed. Cir. 2015), *and Thomas Swan & Co. Ltd. v. Finisar Corp.,* No. 2:13–

cv–00178–JRG, 2014 WL 2885296, at *10–11 (E.D. Tex. June 25, 2014) ("[T]he Court is not

persuaded by Defendants' argument that because the term 'hologram' has different meanings in

different contexts, the scope of alleged invention unascertainable to one of skill in the art.").

<u>Defendant Microsoft's Answering Position</u>

The asserted claims of the '567 patent all require a "file access control mechanism" (the

construction of which is addressed *infra*) that is "embedded" in a "digital content file" (also

discussed below).[5]  The central dispute with regard to the "embedded terms" is whether the code

that implements the file access control mechanism must be a part of the digital content file, as

Microsoft proposes.  While the meaning and scope of ViaTech's proposed construction is far

from clear, it apparently hopes to encompass implementations where the file access control

mechanism is not part of the digital content file, but rather part of some other file and merely

linked somehow to or otherwise referenced or called on by the digital content file.

As discussed below, Microsoft's proposed construction is compelled by the intrinsic

record, which expressly distinguishes between code that is a part of the digital content file, which

the specification labels "embedded," and code from some other file that is combined in memory

with the digital content at the time of execution, which the specification describes as being

"functionally embedded" or "embedded functionally at runtime."  Indeed, and as also discussed

below, the Federal Circuit has on similar facts concluded that the ordinary meaning of

---

[5]   Claim 1: "an embedded file access control mechanism embedded in the digital content file"

Claim 28: "a licensable digital content file, containing … an embedded file access control
mechanism"

Claim 31: "wherein the digital content file includes an embedded file access control mechanism"

"embedded" is code that is written into the code of another file, rather than code that is merely linked from another file. *Augme Technologies, Inc. v. Yahoo! Inc.*, 755 F. 3d 1326, 1333 (Fed. Cir. 2014). By contrast, there is nothing in the intrinsic record to support ViaTech's proposed construction.

Turning first to the specification, the patent describes the "License Functions Mechanism" starting at 14:34. It states that there are "several possible implementations" of the mechanism. (14:60-61) To put these into context, it is helpful to consider the three different states of a software program. A program is first written in human-understandable language, called "source code." Generally, source code is then compiled into a computer-understandable language, called "object code." When a user "runs" the program, the object code is loaded into memory and executed, where it becomes a "process." (Wicker Decl. at ¶30) (A370)

As noted, the asserted claims of the '567 patent are directed to a "digital content file," which, in the case of an executable file, is the object code state of the program.

The first implementation of the license functions mechanism is the one that tracks the claim language, in that the license functions mechanism is "embedded" into the digital content file (the object code) itself. Specifically, at 15:12-24, the '567 patent describes implementing the license mechanism as an "API (Application Programming Interface) library wherein the routines of the library are linked into the compiled code of the executable DCF 10."[6] As Dr. Wicker explains, what this means is that when the source code of the original file is being compiled, the compiler inserts into the executable DCF, the license mechanism source code from the API library. The resulting compiled code—the object code that is the executable digital content file—therefore includes the object code from the both the original file and the license mechanism

---

[6] The linking happens at the time the executable DCF file is created by the compiler.

4

API. (Wicker Decl. at ¶30) (A370)  As the specification explains, "the API functions embedded in the executable code of the DCF 10" will be "automatically executed as an **_integral_** operation with the execution of the original executable DCF 10 code." (15:26-28; emphasis added)

The '567 patent contrasts this approach with a second implementation, in which the license mechanism is not embedded in the digital content file, but is instead incorporated into the code at runtime, when the program is loaded into memory to create the process that is executed to run the program.  With this approach, the license functions mechanism is separately compiled from the digital content file to create a "dynamic link library" ("DLL") file, which is object code separate from the digital content file. (15:34-37)  Only "links" are "embedded" into the DCF, not the licensing code. (16:16-30)  When the digital content file is executed, the operating system loads both the object code of the digital content file and the object code of the license functions mechanism DLL into memory, such that the combined program resides in the memory of the computer as a single integrated process. (Wicker Decl. at ¶¶32-34) (A371–72)  The specification clearly distinguishes this approach from the first implementation in which the license functions mechanism is embedded in the digital content file (DCF) itself: "Where the AP[I] library comprising the LicMech 16 functions are linked into a digital wrapper dll (dynamic link library), **_rather than into the controls of the DCF_**." (15:34-37; emphasis added; sentence fragment in original)

Continuing, the specification underscores the point by clearly delineating between embedding the license functions mechanism code "directly and physically" into the digital content file, and "functionally embedding" the license functions mechanism into the digital content file by combining the two at runtime: "As a consequence, the LicMech 26 mechanisms are **_embedded functionally at runtime_** into the DCF 10, **_rather than directly and physically into_**

***the DCF 10***. (15:42-44; emphasis added)

In short, the patent specification expressly distinguishes between "embedded" code and "functionality embedded" code, and the claims are directed only to the former. Just as being "virtually present" in a meeting room is fundamentally different from being "present" in the room, so too must "embedded" be construed in such a way that it does not encompass "functionally embedded."

This comports as well with the ordinary meaning of the term "embedded," both in the computer software field and in laypersons' terms. The Federal Circuit in *Augme* was confronted with a claim construction issue with remarkable parallels to the one presented here. Each asserted claim there recited a first code module that is "embedded" or "configured to be embedded" in a second module, in the context of HTML web pages. *Augme*, 755 F. 3d at 1333. In holding that "[t]he plain and ordinary meaning of embedded code is code written into the HTML code of the web page," the Federal Circuit rejected the patent owner's argument that the term should be construed broadly enough to encompass "[c]ode that is merely referenced for future insertion ...." *Id.* This is likewise the ordinary lay meaning of "embedded:" "to make something an integral part of" (Ex. 1, Merriam Webster's Collegiate Dictionary, 10th Edition (the dictionary used by ViaTech in its brief)) (A430).[7]

There is nothing in the intrinsic record that redefines this term as meaning something other than its ordinary meaning. The Federal Circuit recently reiterated the longstanding rule that "[a] patentee can act as his own lexicographer, but, to do so, 'a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning' and must 'clearly express an intent to redefine the term.'" *Cadence Pharm. Inc. v. Exela PharmSci Inc.*,

---

[7]   Exhibits are attached to the concurrently-filed Declaration of Chet Campbell (A424).

780 F.3d 1364, 1369 (Fed. Cir. Mar. 23, 2015).  Not only is there nothing in specification to redefine the term, but the specification uses the term precisely in its ordinary sense.

ViaTech's proposed construction is incorrect, for numerous reasons.  First, with regard to the word "functionally" in ViaTech's construction, as discussed above, the specification plainly distinguishes "embedded" from "functionally embedded," and ViaTech's construction is an improper effort to erase that distinction.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) ("This court and its predecessors have long emphasized the importance of the specification in claim construction.").

Second, with regard to the word "included" in ViaTech's construction, the specification uses "embedded" and "included" to mean different things, in the same sentence: "Finally, it must be noted that once the FACM 12 is prepared and ***bonded with*** a DCF 10 as described herein, the DCF 10 with the ***embedded*** FACM 12 may be ***included*** in a installation kit in the same manner as a conventional, unprotected file or executable program … ." (19:6-10; emphasis added) ViaTech cannot rewrite the claim term "embedded" to the very different, and broader, word "included" under the guise of claim construction.  *See McClain v. Ortmayer*, 141 U.S. 419, 423-24 (1891).

Third, and with regard to the collective words that ViaTech proposes as its construction, the term "functionally included" is not even used in the specification, let alone explained.  It fails to delimit the metes and bounds of the term for a person of skill in the art. (Wicker Decl. at ¶37) (A373–74) Adopting ViaTech's construction "functionally included" would therefore fail "to inform, with reasonable certainty, those skilled in the art about the scope of the invention," rendering all asserted claims invalid as indefinite under §112, ¶2.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

Plaintiff ViaTech's Reply Position

Microsoft seeks to construe "embedded" so it is limited to only one of the embodiments described in the '567 patent: "code that is part of the digital content file, rather than linked or otherwise 'functionally embedded,'" because the patent "expressly distinguishes between" these embodiments and "the claims are directed only to the former." *See supra* pp. 3–7.

In fact, however, the patent makes no such distinction. Both code that is linked at the time it is compiled to become physically part of the digital content file (the "first implementation" identified by Microsoft), and code that is linked dynamically at the time it is run (the "second implementation" identified by Microsoft), are described as "functionally embedded,"[8] or "embedded functionally."[9] In either case, the code is "embedded" because it is invoked and executed along with the code of the digital content file DCF 10, to ensure that the license monitoring and access control functions are performed in order to implement the invention. *See* Declaration of Dr. Benjamin F. Goldberg in Support of Plaintiff ViaTech Technologies, Inc.'s Reply Claim Construction Brief (the "Goldberg Reply Decl.") (A539) ¶¶ 2–4 (A539–40).[10]

ViaTech's proposed construction of "functionally included" includes each

---

[8]   Col. 15:23–30 ("The API functions are therefore **functionally embedded** in the executable code of the DCF 10 by the links to the API functions embedded in the executable code of the DCF 10 and will be automatically initiated and executed as an integral operation with the execution of the original executable DCF 10 code that is normally executed when the DCF 10 is accessed or initialized." (emphasis added))

[9]   Col. 15:37–45 ("The API function calls for the necessary LicMech 16 mechanisms are performed from the digital wrapper d1 and the FACM 12 mechanisms are used to access the contents of the DCF 10, thereby ensuring that the FACM 12 functions performing the license checking functions must likewise be present and executed. As a consequence, the LicMech 16 mechanisms are **embedded functionally** at runtime into the DCF 10, rather than directly and physically into the DCF 10.").

[10]   Since both implementations are described as including "functionally" embedded code, they would be excluded from the scope of the claims under Microsoft's proposed construction.

implementation described in the '567 patent as an example of how the functions of a software component can be "embedded" in a digital content file in order to control access and implement the terms of a license.  The specification states that the "preferred embodiment" of the invention includes both of these implementations, and a third implementation for digital content files comprised of data, "each of which conforms to the present invention."  Col. 14:60–66, 15:56–16:4.  And both it and the claims describe the file access control mechanism FACM 12 components as "embedded" even when they are implemented as a dynamic library of code, or .DLL, that is linked at run time, rather than directly and physically part of the "digital content file."  Col. 9:31–34, 15:55–16:29, 43:56–44:17, 44:43–45:21; Goldberg Reply Decl. ¶ 3 (A539–40).[11]

Microsoft, and its expert Dr. Wicker, argue that, if "embedded" were construed as "functionally included" it would be indefinite, because "functionally included" is "not even used in the specification, let alone explained."  *See supra* p. 7 (citing Wicker Decl. ¶ 37 (A373–74)).  However, there would be no ambiguity as to the scope of the claims under ViaTech's construction, which has the same meaning as "functionally embedded."  *See* Goldberg Reply Decl. ¶ 4 (A540).  The specification describes, and Dr. Wicker states (*see* Wicker Decl. ¶¶ 30, 34 (A370, A372)), that under each implementation described in the patent, the functions of the "embedded" software components are invoked and executed by the functions of either the digital content file itself (when it is a program) or the program attempting to access the digital content

---

[11]  Microsoft's reliance on *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326 (Fed. Cir. 2014), for excluding linked code from the definition of "embedded" is misplaced.  In *Augme*, the claims at issue recited "a first code module" that was "embedded," and a "second code module" that was "retrieved" or "downloaded."  *Id.* at 1333.  The Federal Circuit found that this distinction in the claim language, which was reinforced by the specification, created a presumption that "embedded" has a different meaning than "retrieved" or "downloaded."  *Id.* at 1333–34.  In the '567 patent, however, there is no such distinction.

file (when it is data).  *See* col. 15:23–30; 15:48–54; Goldberg Reply Decl. ¶ 4 (A540).  There is no ambiguity as to the scope of this construction, which is consistent with the purpose of the invention: to ensure that a software program or digital data cannot be accessed without executing the license monitoring and access control functions of the "embedded" software components. *See id.*

Defendant Microsoft's Sur-Reply Position

There is no genuine dispute that for a file access control mechanism to be "embedded" in a digital file, as that term is used in its ordinary and customary manner, it must be written into the digital file.  The Federal Circuit has so held, and the patent specification explains embedded code as code that is "directly and physically" in the digital file.  ViaTech has not identified anything in the intrinsic record that reflects an intent to depart from this ordinary meaning.

In its Reply, ViaTech tacitly concedes that its proposed construction of "functionally included" is wholly unsupported, and it thus seeks to change its construction to "functionally embedded." (*See supra* p. 8)  It is little wonder that ViaTech did not propose this construction at the outset, since it is plainly improper to rewrite the claim term "embedded" to be "functionally embedded."  *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) (claim term "partially hidden from view" does not mean "generally hidden from view" despite specification's disclosure of "generally hidden from view" because "[c]ourts cannot rewrite claim language."); *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647 (Fed.Cir.1994) (rejecting proposed construction of "inflated" with a gas to mean "containing" a gas because such a construction would "in effect, rewrite its patent claims to suit [the patentee's] needs in this litigation").

ViaTech's assertion that its construction is justified because the patent allegedly refers to both literal embedding and functionally embedding as "functionally" embedding is both factually

incorrect and legally irrelevant.  Literal embedding is described in the paragraph at column 15, lines 12-30.  Links that point to API libraries are "embedded" in the executable code of the DCF (meaning that they are written into the DCF itself).  As Dr. Wicker explains, upon compilation, the original DCF code is combined with the API library code to make a new DCF that has the API functions "embedded" within the DCF, meaning that the code from the API functions is, post-compilation, written directly into the DCF.

By contrast, the patent describes "another example" in which code is functionally embedded in the file at column 15, lines 31-44.  In that alternative approach, the code is stored in a DLL (dynamic linked library).  That DLL is not embedded in the DCF, but rather is combined with the DCF content at runtime—which the patent contrasts with the code being "directly and physically" in the DCF itself. (15:42-44)  The patent thus clearly delineates between "embedded" code that is written directly into the DCF, and "functionally embedded" code, which is code that is not combined with the digital content until runtime.

Moreover, in order to justify departing from the ordinary meaning, ViaTech bears the burden of showing that the intrinsic record "clearly express[es] an intent to redefine the term." *Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015).  Nothing that ViaTech identifies reflects any intent—let alone a clear intent—to do so.

A wholly separate failing of ViaTech's construction is that it fails to define the metes and bounds of the term.  In its opening brief, ViaTech was far from clear with regard to the scope of its term "functionally included."   Although the scope of ViaTech's construction remains amorphous, ViaTech now contends that it is so broad as to encompass not just the DLL implementation described in the specification, but anything that is "invoked and executed along with the code of the digital content DCF." (*See supra* p. 8)  ViaTech did not claim any file access

11

control mechanism that is executed "along with the code" by any technique imaginable. Indeed, the '567 Patent distinguishes prior art licensing mechanisms that "are separate and independent from a licensed program" even though they run along with the protected software. (3:37-41) In addition, the claims specifically require the file access control mechanism to be "embedded" in the DCF—that is what is claimed, and that is what the Patent Examiner examined for patentability. ViaTech's construction thus fails "to inform, with reasonable certainty, those skilled in the art about the scope of the invention," and if adopted would render all asserted claims invalid as indefinite under § 112, ¶ 2. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

*Augme Technologies, Inc. v. Yahoo! Inc.*, 755 F. 3d 1326, 1333 (Fed. Cir. 2014), which ViaTech purports to distinguish in a footnote, is directly on point. The *Augme* holding was based on the ordinary meaning of the term "embedded," and not (as ViaTech posits) on a unique distinction between embedding and downloading in the claims at issue. In the context of a web page, the Federal Circuit held that the "plain and ordinary meaning of embedded code is code written into the HTML code of the web page." *Id.* at 1333. *Augme* further held that "[c]ode which is incorporated into the web page from another location is not embedded, it is linked." *Id.* Consistent with *Augme*, the ordinary meaning of embedded code is code that is "directly and physically" in the digital content file.

## 2. "dynamic license" (claims 1, 2, 3, 5, 6, 13, 14, 15, 28, 29, 30, 31)

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| "dynamic license" | "modifiable file access control and licensed use information" | "a license that can be modified by the file access control mechanism, and is not fixed or static" |

<u>Plaintiff ViaTech's Opening Position</u>

The asserted claims describe a "dynamic license database" which is associated with the digital content file.  Because the claims do not separately describe a "dynamic license," these terms should be addressed in the context of the complete claim term, and, for the same reasons stated with respect to Term 4 ("dynamic license database") below, construed as "modifiable file access control and licensed use information."

<u>Defendant Microsoft's Answering Position</u>

There are two central disputes with regard to this term.  The first is that ViaTech improperly attempts to broaden the narrow, and well-understood, claim term "license" to the generic word "information."  The second is that ViaTech's proposed construction is also generic as to what can modify the license and how the license can be modified.  There is also a latent ambiguity with ViaTech's construction with regard to the dynamic aspect of the license.  While its proposed construction for this term certainly suggests that it accepts that the license itself must be dynamic, it later asserts in connection with the construction of "dynamic license database" that "[t]he specification describes the 'database,' not the 'license,' as 'dynamic.'"  *See* last sentence of ViaTech's opening argument for "dynamic license database."

Microsoft's construction clearly comports with the specification.  In discussing the prior art, the background section of the patent criticizes prior art licenses because they were "static" and thus could not be modified:

> "The license manager [in the prior art] … provides only a fixed, static form of license." (2:10-19)

> "In addition, the licenses are static, that is, cannot be subsequently modified … ." (2:58-61)

> "In addition, the systems of the prior art are essentially static, that is, they do not allow a license to be subsequently modified at need, and frequently provide only one-time protection." (3:44-47)

13

"As described, the terms and provisions of an eLicense implemented by an eLicense System 24 of the present invention are not static but are dynamic and change with, for example, time, the choices of the user, and the controls and constraints selected by the publisher." (37:1-5)

ViaTech's purported innovation was to instead use "dynamic" licenses that can be modified by the local machine. For example, the license may include "days remaining" and "current count" fields reflecting the remaining time on a license, or number of executions left under a license. As time passes, or as the software is executed, the file access control mechanism modifies the license by decrementing or increasing, respectively, those values in the license, so that the license is up-to-date with regard to the remaining usage. (21:57-64) In a similar vein, the license can also include a value ("the System ID") that reflects the current hardware configuration of the computer on which the digital content file is installed, which serves as a system "fingerprint" that locks the file to that specific computer. (22:45-46) If the computer hardware is changed, the file access control mechanism can modify the license to reflect the new fingerprint value, so that the license is up-to-date with regard to that information as well. (26:1-4)

Given this disclosure, ViaTech's construction, as noted, is overbroad in two key respects: attempting to rewrite "license" to "information," and failing to specify how the modification occurs.[12] To the former point, the "license" in the patent is much more specific than "information." To that latter point, it is clear from the claim language itself that modification is done by the file access control mechanism. For example, claim 1 states that the database stores information "controlling operation of the file access control mechanism and license information

---

[12] ViaTech's construction is infirm as well in its use of the language "file access control and licensed use information." That is a shorthand for other claim language ("information controlling operations of the file access control mechanism and license information controlling licensed use of the digital content") that, as explained *infra*, is indefinite.

controlling licensed use of the digital content." Clearly, for the file access control mechanism to control licensed use, it must control any modifications to the dynamic license, since that is the thing that defines the permissible scope of use of the digital content file.

Plaintiff ViaTech's Reply Position

Although Microsoft asks the court to construe the term "dynamic license" in isolation, that term appears only as part of Term 4 below ("dynamic license database"). The parties agree that the licenses in the "dynamic license database" are "modifiable" because they can be changed or replaced. They disagree (1) whether the term "license" should be further construed, and (2) whether the construction should specify which software components modify the database.

First, Microsoft is wrong that ViaTech's construction would "broaden the narrow, and well-understood, claim term 'license' to the generic word 'information.'" *See supra* p. 13. ViaTech's construction properly reflects that a "license" consists of "file access control and licensed use information," in accordance with the definition provided in the patent for a "license" or "eLicense" stored in the dynamic license database Dldb 14. *See, e.g.,* col. 10:38–45, 20:31–41, 20:59–21:46, 26:66–27:62, 41:20–24, 48:1–6.

Microsoft also argues that ViaTech's construction is "generic as to what can modify the license and how the license can be modified." *See supra* p. 13. That is appropriate, however, because the claims themselves describe which software components modify the license information residing in the "dynamic license database." In addition, contrary to Microsoft's argument, it is not "clear from the claim language itself that modification is done by the file access control mechanism." *See supra* p. 14. Both the claims and the specification state that the "license monitor and control mechanism" LMCM 18 primarily performs this function. *See, e.g.,* col. 10:53–61, 41:6–10, 41:28–37, 41:41–44, 42:11–20, 43:14–19, 43:27–30, 43:39–42, 43:50–55 47:51–56, 48:25–29.

15

Defendant Microsoft's Sur-Reply Position

A license is dynamic if it can be modified (*i.e.*, changed).[13]   While ViaTech does not disagree that a "dynamic" license is one that can be modified by the file access control mechanism (FACM), it nebulously adds that "the claims themselves describe which software components modify the license."   In particular, ViaTech states that the "license monitor and control mechanism" (LMCM) "primarily performs this function." (*See supra* p. 15) However, the LMCM is part of the FACM, and so this observation if anything supports Microsoft's proposed construction.[14]

Microsoft further proposes that the license "is not fixed or static."   As Microsoft explained in its Answering Brief, the '567 Patent distinguishes prior art static licenses from the "dynamic" license of the patent.  For example, the '567 Patent states: "In addition, the [prior art] licenses are static, that is, cannot be subsequently modified…." (2:58-61) Microsoft therefore requests that this distinction be explicitly recited in the claim construction.

3.   **"database" (claims 1, 2, 3, 5, 6, 13, 14, 15, 28, 29, 30, 31, 32)**

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| "database" | "a record containing data" | "a persistent collection of data structured or organized in a manner that facilitates retrieval" |

Plaintiff ViaTech's Opening Position

The asserted claims describe the "dynamic license database" Dldb 14 as "storing"

---

[13]   ViaTech suggests that a license is "modifiable" if it can be replaced.  That is incorrect because to "modify" means to change, not to replace.  A static license (which cannot be modified) can be replaced with an entirely new static license.

[14]   If ViaTech is attempting to say that Microsoft's construction is too broad, to resolve this issue Microsoft would have no objection to the construction: "a license that can be modified by the ~~file access control mechanism~~ license monitor and control mechanism, and is not fixed or static."

specified information and permitting other components of the invention to read and write that information.  The specification describes the dynamic license database Dldb 14 as a "record" containing the "information" or "data" referred to in the claims.  *See* col. 20:35–58, 21:25–28, 26:66–27:3; *see also* '152 application at VIATECH0001947.[15]  The term "database" should be construed, consistent with its ordinary meaning (Ex. 1 at 136 (A269)), as "a record containing data."  *See Select Retrieval LLC v. Amerimark Direct LLC*, No. 1:11–cv–00812–RGA, 2014 WL 1092387, at *1 (D. Del. Mar. 14, 2014).

The court should reject Microsoft's proposed construction because there is no support in either the language of the claims or in the specification for adding the "a persistent collection of data structured or organized in a manner that facilitates retrieval" limitation.

Defendant Microsoft's Answering Position

In order to reduce the number of terms in dispute, Microsoft accepts ViaTech's construction.

**4.  "dynamic license database" (claims 1, 2, 3, 5, 6, 13, 14, 15, 28, 29, 30, 31)**

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| "dynamic license database" | "a modifiable record into which file access control and licensed use information can be written" | "a database that resides in the digital content file and that contains modifiable licenses" |

Plaintiff ViaTech's Opening Position

As discussed above with respect to Term 3 ("database"), the "dynamic license database" is a "record containing data," i.e., "information controlling operations of the file access control

---

[15]  The '567 patent describes other components of the claimed digital content file and methods as compatible "with several database models" (i.e., database management systems, *see, e.g.,* Ex. 1 at 136, 143 (A269–70)), but these databases are not the dynamic license database Dldb 14.  *See* col. 39:1–12.

mechanism and license information controlling licensed use of the digital content." *See* col. 3:62–4:1, 41:20–25, 48:1–6, 49:34–38.  Because the "terms and provisions of an eLicense" saved in the Dldb 14 "are not static but are dynamic," data can be "written back into the Dldb 14 as appropriate." *See* col. 37:1–9.  Term 4 ("dynamic license database") should be construed as "a modifiable record into which file access control and licensed use information can be written."

The court should reject Microsoft's proposed construction because the claims explicitly state which components are (and are not) "embedded" or "include[d]," and describe the "dynamic license database" as being merely "associated with" the digital content file. *See infra* Term 5 ("associated with").  In addition, there is no support for including the limitation of "contains modifiable licenses."  The specification explains that the database does not necessarily contain a license. *See, e.g.,* col. 13:24–58.  In addition, although other components of the claimed digital content file and methods may modify the license information in the database (*e.g.*, col. 37:18–55), the claims terms and specification refer exclusively to a "dynamic license database" Dldb 14 as a single component.  The specification describes the "database," not the "license," as "dynamic."

<u>Defendant Microsoft's Answering Position</u>

Apart from the disagreements associated with the term "dynamic license," the principal dispute on this term is whether, as Microsoft proposes, the database must reside in the digital content file.  This requirement is plain from the claim language itself.  However, it appears from ViaTech's infringement contentions that it is interpreting the claim in a manner that omits this requirement, so Microsoft submits that there is a dispute of claim scope that requires that this term be construed.

The asserted claims plainly require the database to be part of the digital content file. Claim 1 recites "a digital content file … comprising: a digital content, and … the dynamic

license database … ." (40:65-41:20)  Claim 28 recites "preparing a licensable digital content file,

containing a digital content, … and the dynamic license database … ." (47:46-48:1)  Claim 31

recites: "wherein the digital content file includes … a dynamic license database … ." (49:26-35)

The specification also emphasizes the claimed relationship between the file and the database,

stating that each file will have its own database. (20:42-47)

Therefore, Microsoft requests that the term be construed by the Court to require the

database to be in the file.[16]

Plaintiff ViaTech's Reply Position

Microsoft states that it is "plain from the claim language" that the dynamic license

database "must reside in the digital content file."  *See supra* p. 18.[17]  In fact, the claim language

describes the dynamic license database as "associated with" the digital content file.  *See* col.

41:20–21, col. 48:1–3, col. 49:34–36.  Microsoft's construction of this term, like its construction

of Term 1 ("embedded"), Term 5 ("associated with"), and Term 6 ("file"), reflects its litigation

strategy to narrow the claim scope beyond what is required by the claim language, so that every

element must reside within a single file in a file system.[18]

In addition, the '567 patent shows the dynamic license database Dldb 14 as residing

outside the digital content file DCF 10, and states that the file access control mechanism FACM

12 components communicate with the dynamic license database Dldb 14, e.g., "through

interprocess communication methods and remote procedure calls."  *See* col. 23:7–28, 23:36–47

---

[16]  ViaTech asserts that the database could conceivably contain no licenses.  To allay this hypertechnical concern, Microsoft's construction could be modified as follows: "a database that resides in the digital content file and that ***is programmed to accept*** ~~contains~~ modifiable licenses."

[17]  If that were true, there would be no need to import the additional limitation requiring "a database that resides in the digital content file" into the claims, as Microsoft proposes.

[18]  The claims clearly identify the structure of the invention by stating which components are "embedded," "include[d]," or "associated with" which other components.  *See supra* p. 18.

& Fig. 1A.[19]  If, as Microsoft claims, the dynamic license database must "reside" in the same file as these components, the "interprocess" and "remote" communication methods described in the patent would not be necessary.

<u>Defendant Microsoft's Sur-Reply Position</u>

The claims expressly require the database to be part of the file.  For example, claim 1 recites "a digital content file … comprising: a digital content, and … the dynamic license database …." (40:65-41:20)  Without even addressing the actual claim language, ViaTech argues that Microsoft is seeking to "narrow the claim scope beyond what is required by the claim language . . ." (*See supra* p. 19)  That argument is based solely on the patent specification, not the claim language.  ViaTech points only to Figure 1A as an example of the DLDB 14 residing outside the DCF.  Where the claims are drawn more narrowly than the disclosure, the scope of the claims is what governs.  *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998) ("the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim"); *Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350, 1357 (Fed.Cir.1999) ("The district court's attempt to use the written description to circumvent the plain language of the claim and the clear definition of the disputed claim language found therein was inappropriate."); *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F. 3d 1371, 1374 (Fed. Cir. 2004) ("Thus, in accord with our settled practice we construe the claim as written, not as the patentees wish they had written it.").

5. **"associated with" (claims 1, 28, 29, 31**)

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| "associated with" | "communicating with and | no construction necessary |

---

[19]  As described above with respect to Term 1 ("embedded"), those DLLs are code libraries residing in separate files that are linked at run time.

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
|  | operating in conjunction with" |  |

Plaintiff ViaTech's Opening Position

Claims 1, 28, 29, and 31 describe the "dynamic license database" as "associated with" the "digital content file."[20]   The specification explains that the dynamic license database Dldb 14 is "associated with" the digital content file DCF 10 by "communicating with and operating in conjunction with" it.   *See* col. 10:38–61; 14:44–49, 24:3–9, 24:17–25, 26:8–13.   The term "associated with" should accordingly be construed as "communicating with and operating in conjunction with."

Defendant Microsoft's Answering Position

The term "associated with" is a well-understood non-technical term that requires no construction.   In other cases, this Court has declined to construe the phrase "associated with." *See, e.g., CallWave Communications LLC v. AT&T Mobility, LLC*, 2014 WL 7205657 (D. Del. 2014); *Stambler v. RSA Security, Inc.*, 2003 WL 252122 (D. Del. 2003) (no construction necessary for "information associated with a first party").

Moreover, this term need not be construed because the required association is specified in the independent claims—namely, that the database be included within the file.   *See Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958 (Fed. Cir. 2013) ("Notwithstanding the potential breadth of the phrase 'associated with' . . . the claims characterize the applets as consisting of two 'constituent systems . . . .'").

Finally, ViaTech's construction for "associated with" conflicts with the now agreed construction for "database."   A database is a "record."   A "record" does not "operate" and cannot

---

[20]  The court should construe "associated with" to differentiate it from the term "embedded."

"communicate with" the file.  Rather, a record is data in the file which the file may access and modify.

Plaintiff ViaTech's Reply Position

Microsoft states that "'associated with' is a well-understood non-technical term that requires no construction," but it later contradicts this assertion by arguing that there is a specific "required association," i.e., "that the database be included within the file."  *See supra* p. 21.  As described for Term 1 ("embedded"), Term 4 ("dynamic license database"), and Term 6 ("file"), the court should reject this attempt to artificially limit the claims to a single file in the file system, because the specification contradicts this narrow interpretation of the claims.

Microsoft does not dispute that ViaTech's proposed construction of "associated with" as "communicating with and operating in conjunction with" is supported by the specification.  *See supra* pp. 21–22.  Instead, Microsoft argues, incorrectly, that this construction "conflicts with the now agreed construction for 'database'" as "a record containing data."  *See supra* pp. 21–22 ("A 'record' does not 'operate' and cannot 'communicate with' the file.  Rather, a record is data in the file which the file may access and modify.").  But there is no conflict, because both the specification and the claims state that the file access control mechanism FACM 12 components of the digital content file DCF 10 communicate and operate in conjunction with dynamic license database Dldb 14, even though it is a "local, resident database record."  *See, e.g.,* col. 10:38–61; 14:44–49, 20:31–38, 24:3–9, 24:17–25, 26:8–13.

Defendant Microsoft's Sur-Reply Position

Even though Microsoft explained in its Answering brief why ViaTech's construction is incorrect, ViaTech inexplicably asserts that "Microsoft does not dispute" ViaTech's construction.  The term "associated with" has a well understood meaning and does not require "communication."  Moreover, a "record" (part of the agreed construction for database) cannot

"communicate." ViaTech's citations do not refer to the DLDB as "communicating."

**6. "file" (claims 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 28, 29, 30, 31, 32)**

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| "file" | Plain and ordinary meaning (i.e., "a set of information on a computer") | "an element of data storage in a file system, which has a name which is used by a file manager for operations on the data (e.g., .exe files for executable files, .doc files for Word files, .xls for Excel spreadsheet files)" |

Plaintiff ViaTech's Opening Position

In the context of a computer and computer software, the ordinary meaning of "file" is simply "a set of information on a computer." *See, e.g.,* Ex. 2 at 434 (A276); Ex. 1 at 218 (A271); *Intellectual Ventures I LLC v. Check Point Software Techs. Ltd.*, No. 10–1067–LPS, 2012 WL 6200337, at *3–4 (D. Del. Dec. 12, 2012) ("The Court will construe 'data file(s)' to mean 'a collection of any type of text or binary data that retains cohesion when presented to a user.'").  Microsoft proposes a narrower construction limiting the term to a single entity in a file system, e.g., one icon in a folder in Windows with an extension such as .exe, .doc, .xls.  Such a narrow construction is inconsistent with the specification, which states that embedded components can be implemented as separate entries, such as code libraries linked to an executable digital content file.  *See* discussion of Term 1 ("embedded"), *supra*; *see also* col. 6:49–53, 16:5–25.[21]

---

[21] The specification also states that the claimed methods are intended for "creating and distributing files containing digital content, such as computer programs and data and information of all forms."  Those "forms" include the Microsoft Windows and Office software products even though they may consist of hundreds or thousands of individual file system entries.  *See, e.g.,* col. 9:49–67, 14:60–15:11.

Defendant Microsoft's Answering Position

The parties agree that the ordinary meaning of "file" to a person skilled in the computer art should control, but disagree on what that ordinary meaning is.  Microsoft's construction comes from both the intrinsic and extrinsic evidence, and is further supported by at least one Federal Circuit decision construing this term.  It appears from ViaTech's construction, and its infringement contentions, that it intends to argue that the term "file" can be read so broadly as to encompass a collection of hundreds of individual computer files.

The '567 patent explains that a "file" may be either an executable file, "whose primary content is executable program code of some form" (15:2-4), or a data file, including "for example, document, image, spreadsheet or database files and files containing digitally formatted audio and image information, such as video and audio files, music and movies." (15:6-12)  Common file types in the Microsoft Windows environment are, for example, executable files (.exe files), Word files (.doc or .docx files), and Excel spreadsheet files (.xls or .xlsx files). (Wicker Decl. at ¶¶22-23) (A368)

The '567 patent also refers to "conventional file input/output processes" (23:20-24) within a Microsoft Windows environment, such as Windows 95, 98, and NT (23:37-38), further confirming that the term "file" is being used in its ordinary sense in the context of software to mean a discrete, named item.  The specification also references Microsoft Windows "file tree structure" (24:14-18), in which, for example, there are folders (also called directories) that contain one or more "files," each with a "file size" that will vary depending on how much information is contained in the file. (Wicker Decl. at ¶21) (A367)  This reference to the Windows "file tree structure" thus further confirms that the term "file" is being used in its ordinary technical sense as a discrete named item.

The Free Online Dictionary of Computing likewise supports Microsoft's construction.  It

explains that a "typical file" has a name that can be referenced in file operations and exists in a directory. (Ex. 2) (A434)

As purported support for its construction, ViaTech relies on a technical definition in a non-technical dictionary. Even that dictionary supports Microsoft's construction more than ViaTech's. Merriam Webseter's Collegiate Dictionary, 10th ed. provides the following definition: "a complete collection of data (as text or a program) treated by a computer as a unit esp. for purposes of input and output." Ex. 1 (A431). A "file" is treated as a unit by having a file name that is used to open a file for reading or writing. (Wicker Decl. at ¶21-22) (A367–68)

ViaTech's construction would also effectively read the term "file" out of the claims and replace it with the vague language "set of information." A mere "set of information" is not necessarily a file. The contents of a computer hard drive (or the contents of the entire Internet, for that matter) are a "set of information" but plainly not a "file." (Wicker Decl. at ¶27) (A369)

ViaTech's reliance on *Intellectual Ventures LLC v. Check Point Software Techs. Ltd.*, No. 10–1067–LPS, 2012 WL 6200337 (D. Del. Dec. 12, 2012) on this issue is misplaced. In that case, the term "data files" was construed as "a collection of any type of text or binary data ***that retains cohesion when presented to a user***." (emphasis added). Similar to ViaTech here, the patentee in that case requested a construction of "plain and ordinary meaning," which it asserted was "any type of text or binary data." The Court rejected that construction because it failed to account for the structure of a "file." The ordinary technical meaning of "file" is not arcane or nuanced. It is a simple and well-known term of art used to describe discrete named elements of data storage, usually with file extensions such as .doc, .txt, .xls, and .pdf.

Nor does the specification support ViaTech's construction. The specification never suggests that a collection of files should be considered a single "file." The passage cited by

ViaTech discusses an approach where the license mechanism (stored in a DLL file) is given a "randomly generated file name." (6:49-53)  If anything, this supports Microsoft's construction, by reiterating that a "file" is a discrete named element.[22]

Plaintiff ViaTech's Reply Position

Microsoft's construction of "file" is intended, like its constructions of Term 1 ("embedded"), Term 4 ("dynamic license database"), and Term 5 ("associated with"), to limit the scope of the claims so that every element of the claimed invention must reside in a single "file."

Microsoft states that the intrinsic evidence supports its narrow construction of this term because "[t]he specification never suggests that a collection of files should be considered a single 'file.'"  *See supra* pp. 25–26.  In fact, the specification clearly states that the claimed digital content "file" DCF 10 can consist of multiple, separate files.  For example, as described with respect to Term 1 ("embedded"), the file access control mechanism FACM 12 components of the digital content file can reside in separate dynamic libraries of code (.DLL files).  In addition, the patent states that in a "preferred embodiment" these components have distinct "randomly generated file names."  *See* col. 6:49–53, 16:5–10, 17:8–10 & claim 19.  And, furthermore, the '567 patent describes the purpose of the invention as enabling the distribution and licensing of digital content "files" such as, e.g., computer programs (*e.g.,* col. 9:49–62), which would typically consist of many executable programs, code libraries, data files, and configuration files in various folders of the file system.[23]  *See* Goldberg Reply Decl. ¶ 6 (A540–41).

_____

[22]  ViaTech also cites to 16:5-25. However, the word "file" is not used in the passage, let alone used in a manner that either supports ViaTech's position, or refutes Microsoft's.

[23]  Microsoft's concern that ViaTech's construction "can be read so broadly as to encompass a collection of hundreds of individual computer files," including "[t]he contents of a computer hard drive (or the contents of the entire Internet, for that matter)" (*see supra* pp. 24–25) is not warranted.  The claims are directed to a specific "digital content file" with defined elements that limit the scope of the claims, not to any undefined "file" or "set of information."

The intrinsic evidence is thus consistent with ViaTech's proposed definition of "file" as a "set of information on a computer," rather than Microsoft's definition of a single "discrete, named item" in a file system.  *See supra* p. 24.  The extrinsic evidence Microsoft relies on to support its construction, *see id.* (discussing Wicker Decl. ¶¶ 14–27 (A364–69)), cannot override the intrinsic evidence, and in any event does not support Microsoft's proposed narrow construction.[24]  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317, 1324 (Fed. Cir. 2005) (en banc).

Defendant Microsoft's Sur-Reply Position

Microsoft is seeking a construction that captures the plain and ordinary meaning of the term "file" in the computer field.  As with the term "embedded," ViaTech has failed to identify anything in the intrinsic record "clearly express[ing] an intent to redefine the term."  *Cadence Pharm.*, 780 F.3d at 1369.

ViaTech's principal argument is that the specification allegedly describes the DCF as being composed of multiple files.  Actually, the specification never suggests that multiple files should be considered collectively as a single "file," let alone clearly express an intent to so significantly depart from the ordinary meaning.  ViaTech does not even provide a citation for this (erroneous) proposition.  ViaTech next cites to the passage in the '567 Patent referring to "randomly generated file names."  This passage confirms Microsoft's construction, by reiterating that a "file" is a discrete named element.  Different "files" (plural) may have different file names.

---

[24]  The testimony of Microsoft's expert Dr. Wicker that a "file" always refers to a single "element of data stored in a file system" with one icon, name, and extension is incorrect.  There are many examples of collections of data that are simultaneously a single "file" (as Dr. Wicker uses that term) and multiple "files," including an archive (e.g., .zip) file of compressed files and folders, an application (e.g., .app) file that comprises the executable files, data files, and folders that make up the application, and other "packages" or "bundles" of "files."  Goldberg Reply Decl. ¶ 5 (A540).  Even the Microsoft Word document file (.docx) that both Microsoft and Dr. Wicker cite as an example of a single "file" is in fact a collection of multiple "files" and file folders.  *Id.*

ViaTech makes two new arguments in its Reply.  First, ViaTech argues that "computer programs" typically comprises many files.  For example, a single ".EXE" file (the main computer program file) may access many ".DLL" files.  Even assuming *arguendo* this is true, it is entirely irrelevant.  The claims do not recite a "program."  They recite a "file," and ViaTech's extrinsic evidence if anything makes clear that the two are different things.  A computer program may or may not be divided among several files.  Notably, Dr. Goldberg does not equate the term "computer program" with "file."  Moreover, ViaTech ignores the specification's statement that "executable files" are "files" such as "application programs *or* object libraries." (15:1-4) (emphasis added).  This passage confirms that application programs and their libraries are separate files.  As Dr. Wicker explains, a "file" is treated as a unit by having a file name that is used to open a file for reading or writing. (Wicker Decl. at ¶21-22 (A367–68))[25]  Dr. Goldberg offers the *ipse dixit* assertion that he disagrees with Dr. Wicker, but Dr. Goldberg does not explain why he believes Dr. Wicker's understanding of "file" is wrong.

### 7. "file access control mechanism" (claims 1, 28, 29, 31, 32)

| Term | ViaTech Construction | Microsoft Construction |
|------|----------------------|------------------------|
| "file access control mechanism" | "software component that controls access to the contents of the digital content file" | "a mechanism that includes a dynamic license database and a license function mechanism and that is not dependent upon access to a clearinghouse to perform its file access control functions" |

Plaintiff ViaTech's Opening Position

The '567 patent claims each describe a "file access control mechanism" embedded in the

---

[25]  In footnote 24 of its Reply, ViaTech refers to "bundles" or "packages."  These are not "files" but directories of files.  ViaTech also refers to a "zip" file.  A "zip" file is a file because it is treated as a unit and has a file name used to open the file for reading and writing.  That a "zip" file has data that may be extracted to generate other files via an "unzip" program is immaterial.

digital content file.  *See* col. 40:65–41:3, 47:47–49, 31:26–30.  The "file access control mechanism" includes a "license functions mechanism," which in turn includes a "license monitor and control mechanism," a "license control utility," and (in claims 5, 28, and 31) an "adaptive fingerprint security mechanism."  *See* col. 41:2–19, 59–64, 47:49–67, 49:28–34.  Figure 1A illustrates the structure of the digital content file DCF 10.  Each of the claimed software mechanisms and utilities (the file access control mechanism FACM 12, the license functions mechanism LicMech 16, license monitor and control mechanism, LMCM 18, and license control utility LCU/eLCU 20) is "an integral part or component of the DCF 10."  *See* Goldberg Decl. ¶ 7 (A246–47); col. 10:10–11:20, 11:33–34, 12:28, 14:38–43, 15:15–30, 15:52, 19:3–4, 20:5, 26:7–12, 39:20–23 & Fig. 1A.  The specification specifically describes the software architecture of the claimed digital content file DCF 10 and the functions of its components, how the functions are performed, the interfaces between the components, and the information communicated through the interfaces, as well as "further aspects and details of the components and processes," and "implementations" of this software architecture, including a detailed description of Application Programming Interface (API) libraries, Dynamic Link Library (DLL) code files, data structures, encryption techniques, communication protocols, and graphical user interfaces of the software components,[26] which are described as "discrete software structures" in the provisional application leading to the '567 patent.  *See* Goldberg Decl. ¶¶ 2, 5, 7–11 (A244–49); '152 application at VIATECH0001945–1954.[27]

---

[26] *See generally* col. 14:31–27:67 & Figs. 1A–D, 2, 3A–B ("Having described the general components and processes of an eLicense System 24 and the FACM 12 of the present invention, the following will discuss and describe further aspects and details of the components and processes of an eLicense System 24 and the FACM 12 of the present invention.").

[27] Software architectures for performing access control, license monitoring and communication, and fingerprint security functions were known at the time the '567 patent was applied for. *See, e.g.,* col. 1:33–58; col. 11:62–64; col. 25:28–29; '682 application at VIATECH0001877; Ex. 3

Term 7 ("file access control mechanism"), as well as Terms 8 ("license monitor and control mechanism"), 10 ("license control utility"), 11 ("license control mechanism"), 12 ("license functions mechanism"), and 14 ("adaptive fingerprint security mechanism"), *see infra*, are properly construed as structure, not as means-plus-function claim elements.  *See, e.g., TecSec, Inc. v. International Business Machines Corp.*, 731 F.3d 1336, 1347–48 (Fed. Cir. 2013) (the term "digital logic means" is not means-plus-function terminology because "the claims do not recite a function" but instead "recite[] that the digital logic means is comprised of structural elements, including a system memory and specific modules and subsystems"); *Toyota Motor Corp. v. Cellport Sys., Inc.*, No. IPR2015-00633, 2015 WL 4934778, at *3–6 (P.T.A.B. Aug. 14, 2015) (the term "controller means" is not means-plus-function terminology "because the claim language does not link the 'controller means' to a specific recited function" (citing *York Prod., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1574 (Fed. Cir. 1996)); *E2E Processing, Inc. v. Cabela's Inc.*, No. 2:14–CV–36–JRG–RSP, 2015 WL 4051423, at *3–8 (E.D. Tex. July 2, 2015) (terms "selector component," "adapter component," and "integration component" are not means-plus-function terms because they are "particular software structures"); *Smartflash LLC v. Apple Inc.*, 77 F. Supp. 3d 535, 540–42, 2014 WL 6873161, at *2–4 (E.D. Tex. 2014), *reconsideration denied* No. 6:13cv447, -448, 2015 WL 4208754, at *2–4 (E.D. Tex. Jul. 7, 2015) ("code" and "processor" terms are not means-plus-function terms because of the "substantial additional language describing the operation of the components at issue and their interaction with other components" claimed); *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001) ("computer code" is not means-plus-function

(U.S. 6,289,458, assigned to Microsoft) at col. 1:31–41 (A285); Ex. 4 (U.S. 7,313,512, assigned to Microsoft) (A294); Ex. 5  (WO 0109756 A2) at 14:1–7 (A320), 30:7–17 (A336); Ex. 6 (EP 0613073 A1), at col. 1:3–5 (A353).

terminology because it "[recites] structure that is understood by those of skill in the art").[28]

Consistent with the technical meaning of the term "file access control mechanism," the specification states that file access control mechanism FACM 12 "controls access to the contents of the" digital content file DCF 10.  *See* col. 10:24–32.  Term 7 "file access control mechanism" accordingly should be construed as a "software component that controls access to the contents of the digital content file."

Microsoft agrees that Term 7 ("file access control mechanism") is not a means-plus-function claim element, but its proposed construction improperly imports limitations into the claims.  The '567 patent claims clearly state that the dynamic license database is "associated with," and not "included" or "embedded" in, the digital content file.  *See* the discussion of Terms 1, 4 and 5, *supra*.  There is also no support for construing Term 7 "file access control mechanism" as "not dependent upon access to a clearinghouse."  The specification does not describe a "clearinghouse" as an element of the claimed methods.  *See, e.g.,* col. 10:10–11:20, 14:31–20:29.  The statements Microsoft cites from the USPTO prosecution history of the '567 patent (*see* '682 application at VIATECH0001877) related to application claims which are not

---

[28] *See also Mesh Comm, LLC v. PEPCO Energy Services*, No. RDB–09–2804, 2010 WL 5463934, at *1–3, *8, *10–11 (D. Md. Dec. 29, 2010) ("event naming module," "event management module," and "communication management module"); *Beneficial Innovations, Inc. v. Blockdot, Inc.*, No. 2:07–cv–263, 2010 WL 1441779, at *1–2, *15–16 (E.D. Tex. Apr. 12, 2010) ("user response processing modules"), *modified on other grounds* 2010 WL 2246291 (E.D. Tex. June 03, 2010); *Software Tree, LLC v. Red Hat, Inc.*, No. 6:09–CV–097, 2010 WL 2232809, at *3, *7–8 (E.D. Tex. June 1, 2010) ("database interface unit"); *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1373–75 (Fed. Cir. 2003); *Greenberg v. Ethicon Endo–Surgery, Inc.*, 91 F.3d 1580, 1581–84 (Fed. Cir. 1996) ("detent mechanism").  The '567 patent provides a far more detailed description of the structure of the software components than the patents found to include means-plus-function claim terms in *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349–51 (Fed. Cir. 2015), and *Media Rights Techs. Inc. v Capital One Financial Corp.*, No. 2014–1218, 2015 WL 5166358, at *4–5 (Fed. Cir. Sept. 4, 2015).

asserted, and describe a different embodiment of the claimed invention.[29]

Defendant Microsoft's Answering Position

The independent claims recite a "file access control mechanism" ("FACM") that has at least two components: a "dynamic license database" and a "license functions mechanism." The components work together to make licensing decisions without being dependent on access to a clearinghouse (an external system that must provide license information). The principal dispute on this term is whether it can properly be construed and applied so broadly as to include "mechanisms" that are dependent upon access to a clearinghouse to perform file access control functions.[30] In light of the claims, the specification, and the prosecution history, Microsoft submits that the term cannot be so broadly construed.

Turning first to the claims, they require that the "file access control mechanism" is embedded in the file. Thus the function of "control" must be carried out by code in the digital content file itself, a structure that necessarily precludes any dependence on a clearinghouse to perform file access control.

The specification also supports Microsoft's construction.

---

[29] Claim 23 describes a method of constructing "an installable executable" for downloading and installing a "file access control mechanism" which "includes" a "license functions mechanism," a "decryption mechanism," "and" a "dynamic license database" on a user system. After installation, as described in, e.g., claim 1, the database is "associated with" the digital content file. The asserted '567 patent claims were found patentable by the examiner before the statements Microsoft cites were presented to the USPTO. *See, e.g.*, '682 application at VIATECH0001876.

[30] Although this term standing alone is wholly functional, Microsoft is not contending that it is subject to construction under 35 U.C.C. §112, ¶6 (Pre-AIA) because the term includes constituent terms, that, as explained below, are themselves properly construed as subject to §112, ¶6. Specifically, the claim recites that the FACM has a licenses functions mechanism that includes the following subcomponents: a license monitor and control mechanism, a license control utility, graphical user interface, and a database. To the extent that any or all of the "license functions mechanism," "license monitor and control mechanism," and "license control utility" are not construed as subject to §112, ¶6, then Microsoft submits that the FACM would have to be construed as subject to §112, ¶6.

A central theme of the patent is the importance of local control.  The background section criticizes prior art systems that depended on a remote license server or external clearinghouse to enforce license restrictions:

> Again, this system protects a package of products, rather than the products themselves, and ***requires a license server that is separate from the user systems*** to receive license requests and to issue licenses and ***to enforce the license restrictions***, which further requires that all license records reside in the license server. (2:52-56; emphasis added)

> The system is thereby based upon the use of an authentication certificate transmitted ***from a license clearing house to a user system, and that thereby has no functional relationship to the licensed program.  Another disadvantage of this system is that the only trusted entity in the distribution chain to the user is the license clearing house***, so that no other entity in a distribution chain is capable of affecting the authentication of a user, thereby severely limiting the means by which the programs may be distributed. (2:24-32; emphasis added)

The patent further distinguishes prior art that required activation from an enterprise system, where the system is "dependent upon license checking functions that are independent of and separate from the licensed program." (2:5-19)

In order to avoid any dependence on a clearinghouse to perform file access control functions, the preferred embodiment embeds the necessary control functions in the digital content file: "FACM 12 is comprised of a resident Dynamic License Database (Dldb) 14 and a License Functions Mechanism (LicMech) 16." (10:32-34)  These components control access to the digital content based on evaluation of information in the dynamic license database, and do not depend on a clearinghouse. (4:63-6:3)

The prosecution history further compels Microsoft's construction.  Although the asserted claims were found allowable on the first office action, other claims that require a FACM were rejected over the prior art.  For example, claim 22 claimed a "digital content file" that "includes an embedded file access control mechanism for controlling licensed use of the digital content." In rejecting claim 22, the Examiner found that the prior art "Gruse" patent, U.S. Patent No.

6,389,538 (filed Oct. 22, 1998) (Ex. 3 (A438)), disclosed, among other things, digital content, and an embedded file access control mechanism.

The Gruse patent disclosed a user system with a "secure container processor" and "license DB [database]" that would provide access control for digital content stored in a "secure container."   In Gruse's system, the secure container is unlocked by obtaining a decryption key from a remote clearinghouse. (*See* Gruse at col. 10:21-27 (A465); Fig. 1D (A443)):



**FIG. 1D**

In response, ViaTech argued that Gruse did not disclose the invention because Gruse was dependent upon access to a clearinghouse to get decryption keys, and thus file access control was split between the local machine and a remote key server.   Per ViaTech, this ostensibly distinguished the claimed invention from Gruse, because "all file content access and license control functions"—i.e., the functions of the FACM—are performed locally in the user's computer:

> For example. and ***in complete and fundamental contrast from the present invention as recited in claim 22*** and thus in claim 23, the Gruse at al. '538 system not only includes not only a distributor site and the end user site, but further relies

upon the use of a third "clearinghouse" site to which the end user site must refer in order to determine and obtain access to the licensed file contents and where the licensing and file access control operations are in fact carried out.  ***In complete contrast from the Gruse et al. '538 system, the method of the present invention as recited in claims 22 and 23 does not use and is not dependent upon access to a clearinghouse site but instead performs all file content access and license control functions locally, that is, solely within the end user site.***

(Ex. 4 at 21 (A534))

In short, ViaTech distinguished Gruse on the grounds that the FACM is not dependent upon access to a clearinghouse to perform file access control functions, and that argument informs the meaning that claim term not only in claim 22, but in all other claims in which it appears:

> Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.  Vitronics, 90 F.3d at 1582. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997).

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).

As to ViaTech's proposed "construction," that is in reality a non-construction.  ViaTech merely rearranges the words in the claim, and fails to address the critical difference between the claimed "file access and control mechanism" and the various file access and control mechanisms known in the prior art.

Plaintiff ViaTech's Reply Position

Microsoft admits that the claim term "file access control mechanism" describes a software "component" having "code" that is a "structure," and not a means-plus-function term. *See supra* p. 32.  The parties' dispute, once again, is whether the court should read an additional limitation ("not dependent upon access to a clearinghouse to perform its file access control functions") into the claims, as Microsoft proposes.

Microsoft argues that the claim language supports its construction by stating that the file access control mechanism components "make licensing decisions without being dependent on access to a clearinghouse (an external system that must provide license information)." *See supra* p. 32.[31]   The claims, however, do not discuss a clearinghouse, and expressly state that these components communicate license information to and from external systems. *See* col. 41:12–14, 43:14–30, 47:60–63, 49:40–50:30.

Microsoft also relies on the discussion in the specification of two prior-art systems that utilize a "license clearing house" or "license server" residing on an external system to store licenses and permanently grant access to a program residing on a user system, as well as to arguments made by the applicants distinguishing one of those systems during the prosecution of other '567 patent claims that are not asserted in this case. *See supra* pp. 32–35.[32]   ViaTech agrees that these prior-art systems do not include the embedded file access control mechanism components operating in conjunction with a dynamic license database, which perform the functions recited in the patent claims.   But that is not a basis for construing the claims so that a system which does include these embedded components and functions would not infringe, merely because it also accesses a "clearinghouse," i.e., "an external system that must provide license information," as Microsoft proposes. *See supra* p. 32.   This construction would be inconsistent with the language of the claims and should be rejected by the court.

---

[31]   Microsoft's argument that "embedded" code must reside "in the digital content file itself" (*see id.*) is addressed *supra* with respect to Term 1 ("embedded"), Term 4 ("dynamic license database"), Term 5 ("associated with"), and Term 6 ("file").

[32]   The Gruse et al. patent distinguished by the applicants during prosecution describes a system with the same features—a clearinghouse site which provides a decryption key to unlock licensed content residing in a container file on the user system—that are discussed in the specification. *Compare* '567 patent, col. 2:20–36, *with* Response Br., Ex. 3 (Gruse et al.), col. 10:4–27 (A465).

Defendant Microsoft's Sur-Reply Position

Both the specification and the prosecution history require that the "file access control mechanism" be able to make licensing decisions without being dependent on a clearinghouse or license server.  During prosecution, ViaTech distinguished the "embedded file access control mechanism" from prior art.  While the argument was made with respect to claim 22, the same term is found in all asserted claims and thus the argument is applicable to all asserted claims as well.  *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

In its Reply, ViaTech argues that the claims requires the ability to communicate with an external system.  Microsoft has never suggested otherwise.  The claims require a communication "utility," but the claims *also* require a FACM that can operate independently of a clearinghouse or license server.  *Both* aspects of the claims must be found in an accused device.

The claims thus require the *ability* to obtain licenses from external sources, but exclude the *necessity* of doing so (because an allegedly novel aspect of the invention is a FACM that can operate independently of clearinghouses).  This is precisely the point made by the applicant to distinguish Gruse during prosecution of the application: "In complete contrast from the Gruse et al. '538 system, the method of the present invention as recited in claims 22 and 23 does not use and *is not dependent upon access to a clearinghouse site but instead performs all file content access and license control functions locally*, that is, solely within the end user site." (Answering Brief, Ex. 4, at 21 (A534)) (emphasis added).[33]

8. **"license monitor and control mechanism" terms (claims 1, 2, 3, 5, 6, 14, 15, 28, 31)**

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| | | |

---

[33] ViaTech confuses a FACM that *may* communicate a clearinghouse (which the claims permit) with a FACM that is "dependent" upon the clearinghouse (which the claims exclude).  The lack of dependency on a clearinghouse was a key distinction over the prior art mechanisms.

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| "license monitor and control mechanism" terms[34] | "software component that implements the terms and provisions of an electronic license" | means-plus-function[35] |

Plaintiff ViaTech's Opening Position

The specification describes the license functions mechanism LicMech 16 as including the license monitor and control mechanism LMCM 18 as one component. *See* col. 41:4–11, 28:50–56, 49:31–32. It also states that the license monitor and control mechanism LMCM 18 "implements the terms and provisions of the eLicense by communicating with and operating in conjunction with the associated resident [dynamic license database] Dldb 14. . . ." *See* col. 10:32–38, 10:45–49, 10:53–61, 10:65–67. Term 8 ("license monitor and control mechanism") should accordingly be construed as a "software component that implements the terms and provisions of an electronic license."

Microsoft argues that Term 8 should be construed as a means-plus-function claim element, but improperly ignores claim 31 of the '567 patent, in which "license monitor and control mechanism" is used without an associated description of any corresponding function. *See, e.g., TecSec*, 731 F.3d at 1347–48; *Toyota Motor Corp.*, 2015 WL 4934778, at *3–6;

---

[34] The "license monitor and control mechanism" terms are "license monitor and control mechanism communicating with a dynamic license database [and / for] monitoring use of the digital content by a user to determine whether a use of the digital content by a user compiles with the license defined in the dynamic license database" (claims 1 and 28), and "license monitor and control mechanism" (claim 31).

[35] Microsoft identifies the claimed functions as "(1) control access to the digital content file" (claims 1, 28, and 31), "(2) monitor use of the digital content by a user" (claim 31) "to determine whether a use of the digital content by a user compiles [sic] with the license defined in the dynamic license database" (claims 1 and 28), and "where (3) the license monitor and control mechanism communicates with a dynamic license database" (claims 1 and 28), and the corresponding structure as being found at col. 13:59–65, 16:10–25, 17:18–23, 17:46–61, 18:61–19:5, and 19:40–20:3.

*Beneficial Innovations*, 2010 WL 1441779, at *14–15 ("[T]he term 'program element' is recited in another limitation of claim 53 without any implications of a means-plus-function limitation, implying that the terms 'program element' and 'programmatic element' should not be construed under § 112, ¶ 6."). The specification of the '567 patent also describes the structure of the license monitor and control mechanism LMCM 18 which implements the functions of communicating with the dynamic license database Dldb 14 and monitoring use of the digital content to determine whether it complies with a license described in the asserted claims. *See* Goldberg Decl. ¶¶ 2, 7–11 (A244–49); *see also, e.g.,* col. 10:32–38, 10:53–61, 10:65–67, 14:31–20:29, 23:8–67 ("The Wdll 48 is then loaded into the user system for execution, and a WdllMain 52 is called. The WdllMain 52, in turn, determines whether a valid eLicense exists in the user system and, if so, calls the Wdll 48 LicMech 16 functions which interoperate with the DLDB 14 and the user system to determine whether the terms and conditions of the eLicense are satisfied, as will be described in further detail in a following discussion."). Term 8 ("license monitor and control mechanism") describes structure and the court should accordingly reject Microsoft's proposed construction. *See also* discussion of Term 7 ("file access control mechanism"), *supra*.[36]

   Defendant Microsoft's Answering Position

| ViaTech Construction | Microsoft Construction |
| --- | --- |
| software component that implements the terms and provisions of an electronic | Means-plus-function<br><br>Functions: (claims 1 & 28) (1) control access to the digital content file and (2) monitor use of the digital content by a user to determine whether a use of the digital content by a user compiles with the license |

---

[36] Microsoft's proposed construction of Term 8 refers to the '567 patent specification but does not identify what it contends is the structure performing the claimed function. The structure implementing the functions of the license monitor and control mechanism LMCM 18 is described at, e.g., col. 3:55–5:46, 8:7–9:37, 10:1–67, 11:21–54, 12:21–47, 13:25–28:67, 29:48–34:41, 35:44–36:64, 37:1–40:63, and is illustrated in Figs. 1A–D and 2.

| ViaTech Construction | Microsoft Construction |
|---|---|
| license | defined in the dynamic license database, where (3) the license monitor and control mechanism communicates with a dynamic license database (Claim 31) "(1) control access to the digital content file and (2) monitor use of the digital content by a user<br><br>Corresponding Structure: 13:59-65, 16:10-25, 17:18-23 and 46-61, 18:61-19:5, and 19:40-20:3 |

The central dispute here is whether this term must be construed in accordance with 35 U.S.C. § 112, ¶6. Microsoft submits that it must be so construed, because it is claimed by its function without the recitation of structure to perform the function. Section 112 governs the construction of claim terms that (1) recite one or more functions, and (2) fail to recite sufficient structure to perform that function.

Although the statute refers to the words "means for," those words are not required for a term to be subject to §112, ¶6. Rather, the absence of these words triggers a rebuttable presumption that §112, ¶6 does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*). The Federal Circuit, sitting *en banc*, held that the "essential inquiry" is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* The presumption is overcome, and §112, ¶6 applies, "if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (internal quotations omitted).

The *Williamson* Court applied this principle and found that the term in that case, which used the word "module," must be construed as required by §112, ¶6. *Williamson*, 792 F.3d at 1351. The Federal Circuit explained in Williamson that terms such as "mechanism" "module" "element" and "device," are "tantamount to using the word 'means' because they 'typically do

not connote sufficiently definite structure' … ."  *Id.* at 1350.  *See also, Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) (holding presumption overcome and §112, ¶6 applies to the term "colorant selection mechanism" and recognizing that "a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure [] is simply a substitute for the term 'means for.'").

The vast majority of the cases cited by ViaTech predate *Williamson*, and apply the standard rejected in that case.  The few post-Williamson cases that ViaTech cites are distinguishable.  In *Toyota Motor Corp. v. Cellport Sys., Inc.*, No. IPR2015-00633, 2015 WL 4934778, at *3–6 (P.T.A.B. Aug. 14, 2015), the term "controller means" was not subject to §112, ¶6 because the term "controller" connoted structure, not merely function, and the claim recited components of the controller that provided definite structure.  The Board noted that the components, however, were subject to §112, ¶6 because the necessary structure for the components was only found in the specification: "[T]he processor means and the first standard network communication means are means-plus-function claim limitations that are defined in terms of specific structures disclosed in the specification."

In *E2E Processing, Inc. v. Cabela's Inc.*, No. 2:14–CV–36–JRG–RSP, 2015 WL 4051423, at *3–8 (E.D. Tex. July 2, 2015), the parties agreed that the "selector component" was not subject to §112, ¶6.  Two other terms were disputed: "adapter component" and "integration component."[37]  In holding that these terms were not subject to §112, ¶6, the court referred to numerous places in the specification where an "adapter" was used to describe structure.  The Court's analysis regarding the "integration component" is not as clear, but the Court concluded

---

[37]  Merriam-Webster's Collegiate dictionary states that the term "adapter" is a noun, and is thus understood to connote structure. (Ex. 1 (A429)  The term "license monitor and control," on the other hand, is not a noun and connotes function.

that the term connoted structure and not function.[38]  Here, in contrast, the term "license monitor and control" is used in the specification of ViaTech's patent to describe a function of the alleged invention, and not as structure.

On the other hand, in *Media Rights Technologies, Inc. v. Capital One Financial Corp.*, 2015 WL 5166358 (Fed. Cir. 2015), the Court held that a "compliance mechanism" was a means-plus-function limitation because "compliance" connoted function and not structure. Other courts likewise have applied *Williamson* to find functional terms subject to §112, ¶6.  *See Farstone Technology, Inc. v. Apple, Inc.*, 2015 WL 5898273 (C.D. Cal. Oct. 8, 2015) ("backup/recovery module" subject to §112, ¶6), *Joao Control & Monitoring Systems, LLC v. Protect America, Inc.*, 2015 WL 4937464 (August 18, 2015) ("monitoring device," "video recording device," and "communication device" were subject to §112, ¶6).

Regarding claims 1 and 28, ViaTech concedes that the "license monitor and control mechanism" is recited with corresponding functions in the claims.  ViaTech also asserts that the specification describes the structure of the license monitor and control mechanism.  Clearly, the extensive structure in the specification is not also recited in the claims. §112, ¶6 therefore applies.

Therefore, the only remaining dispute is whether the same term in claim 31 is likewise subject to §112, ¶6.  Like claims 1 and 28, claim 31 is claimed in functional terms.  The function precedes the nonce word "mechanism."  The "license monitor and control mechanism" is a "mechanism" for license monitoring and control.  The claim recites no structure for performing these two functions. (Wicker Decl. at ¶40) (A375)  Indeed, if ViaTech were correct that one

---

[38] The *E2E Processing* Court misapplied Williamson by looking to the *specification* for structure instead of the claim, as *Williamson* requires.  If the Court must resort to the specification for structure, then—by definition—§112, ¶6 applies because the claim lacks the required structure.

could avoid the application of §112, ¶6 by including broad functional language before the nonce word, and then no functional language after the nonce word, that would return §112, ¶6 law to the form over substance framework expressly rejected in *Williamson*.  Functional claim terms with less detail are more susceptible to construction under §112, ¶6, not less as ViaTech urges here.  Claim 31 recites the functions of "license monitor and control," which breaks down to: (1) control access to the digital content file and (2) monitor use of the digital content by a user.  The corresponding structure is found in the following sections of the specification which describe the detailed operation of the LMCM: 13:59-65, 16:10-25, 17:18-23 and 46-61, 18:61-19:5, and 19:40-20:3.[39]

Finally, as to ViaTech's proposed construction, that construction fails to apply §112, ¶6, as it is wholly functional.

<u>Plaintiff ViaTech's Reply Position</u>

Microsoft argues that, under the holding of *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015), the claim term "license monitor and control mechanism" (and the related claim terms "license control utility" (Term 10), "license control mechanism" (Term 11), "license functions mechanism" (Term 12), and "adaptive fingerprint security mechanism" (Term 14)) should be construed as a means-plus-function terms.

After *Williamson*, there remains a presumption that claim terms such as these which do not use the word "means" are not means-plus-function terms.  792 F.3d at 1349.[40]  The party seeking to construe the term as a means-plus-function term "must prove by a preponderance of

---

[39]  ViaTech's expert does not identify any structure in the claims for license monitoring and control.  However, he does identify corresponding structure in the specification, which has some overlap with the structure identified by Microsoft.

[40]  In *Williamson*, the en banc court considered only the issue of whether this presumption should be characterized as "strong."  *See id.* at 1348–49.

the evidence that the limitations, as a whole, do not connote sufficiently definite structure to one of ordinary skill in the art." *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1375 (Fed. Cir. 2003). "The correct inquiry, when 'means' is absent from a limitation, is whether the limitation, read in light of the remaining claim language, specification, prosecution history, and relevant extrinsic evidence, has sufficiently definite structure to a person of ordinary skill in the art." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296, 1298 (Fed. Cir. 2014); *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356–57 (Fed. Cir. 2011).

Microsoft argues that "license monitor and control mechanism" (and the related claim terms) must be construed as means-plus-function terms because they are "recited with corresponding functions in the claims,"[41] and, under *Williamson*, the court cannot consider the specification in order to determine whether they connote structure.[42]  This argument is wrong because "it is proper to consult the intrinsic record, including the written description, when determining if a challenger has rebutted the presumption that a claim lacking the term 'means' recites sufficiently definite structure."  *Inventio*, 649 F.3d at 1356–57; *Apple*, 757 F.3d at 1296, 1298; *see also Williamson*, 792 F.3d at 1351.

Neither Microsoft, nor its expert Dr. Wicker, addresses the intrinsic and extrinsic evidence presented by ViaTech showing that the disputed claim terms connote structure. *Compare* Opening Br. at Terms 7–8, 10–12, 14 (citing, e.g., Goldberg Decl. ¶¶ 2, 5, 7–11

---

[41]  *See supra* p. 42 ("Regarding claims 1 and 28, ViaTech concedes that the 'license monitor and control mechanism' is recited with corresponding functions in the claims.  ViaTech also asserts that the specification describes the structure of the license monitor and control mechanism. Clearly, the extensive structure in the specification is not also recited in the claims. §112, ¶ 6 therefore applies. . . . Like claims 1 and 28, claim 31 is claimed in functional terms.").

[42]  *See supra* p. 42 n.38 ("The *E2E Processing* Court misapplied *Williamson* by looking to the *specification* for structure instead of the claim, as *Williamson* requires.  If the Court must resort to the specification for structure, then—by definition—§112, ¶6 applies because the claim lacks the required structure.").

(A244–49) and '152 application at VIATECH0001945–1954), *with* Response Br. at Terms 7–8, 10–12, 14, *and* Wicker Decl. ¶¶ 39–46 (A374–78).   Microsoft concedes there is "extensive structure in the specification."  *See supra* p. 42.  In addition, Microsoft does not dispute that, in claim 31, the terms are recited without a function, and it does not provide any support for the proposition that the court can read a function into the claim based on the modifiers preceding the software-component terms.[43]  And Microsoft's own patent describing the features of the accused Office software states that the "functionality, modules, features, [and] elements" described in the specification are "structural components" of the invention.  Ex. 1 (U.S. Patent No. 8,832,851), col. 5:8–21, 6:20–36, 36:29–35 (A642, A657).

In *M2M Solutions LLC v. Sierra Wireless America, Inc.*, this court ruled that conclusory arguments that the terms "processing module" and "programmable interface" were means-plus-function terms failed to rebut the presumption that they were structural under the holding of *Williamson*.[44]  Microsoft has failed to prove that "license monitor and control mechanism," or the other file access control mechanism component claim terms, should be construed as means-plus-function terms.  *See id.*; *TecSec, Inc. v. International Business Machines Corp.*, 731 F.3d 1336, 1347–48 (Fed. Cir. 2013) ("claims [that] do not recite a function" are not means-plus-function); *Toyota Motor Corp. v. Cellport Sys., Inc.*, No. IPR2015-00633, 2015 WL 4934778, at *3–6 (P.T.A.B. Aug. 14, 2015) (same); *E2E Processing, Inc. v. Cabela's Inc.*, No. 2:14–CV–36–

---

[43] For example, Microsoft claims that the modifier "license monitor and control" in "license monitor and control mechanism" is a basis for reading into the claims the additional functions of "(1) control[ling] access to the digital content file and (2) monitor[ing] use of the digital content by a user."  *See supra* p. 43.

[44] Nos. 12-30, 12-32, 12-33-RGA, 2015 WL 5826816, at *2–5 (D. Del. Oct. 2, 2015) ("Defendants' cursory argument that the admittedly well-understood term 'programmable' does not give the claim element sufficient structure, does little—if anything—to meet its burden under *Williamson* of 'demonstrat[ing] that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function.'").

JRG–RSP, 2015 WL 4051423, at *3–8 (E.D. Tex. July 2, 2015) (disputed "component" terms are "particular software structures").[45]

If the court construes "license monitor and control mechanism" as a means-plus-function term, the functions of these terms should be defined as (1) communicating with a dynamic license database and (2) monitoring use of the digital content by a user to determine whether a use of the digital content by a user complies with the license defined in the dynamic license database, as stated in claims 1 and 28. *See* col. 41:6–11, 47:51–56. The additional functions Microsoft identifies in its proposed construction are not described in the claims, or otherwise linked to this claim element.[46] *See Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) ("The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations."); *Creo Products, Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002); *Industrial Engineering & Development, Inc. v. Static Control Components, Inc.*, No. 8:12–cv–691–T–24–MAP, 2013 WL 2406267, at *6 (M.D. Fla. June 3, 2013).

The structure described in the patent for implementing these functions is the algorithm of using embedded software components to perform the steps of intercepting an attempt by a user to access the digital content, communicating with the dynamic license database through secure communication methods and procedure calls to obtain and decode license information defining

---

[45] *See also Smartflash LLC v. Apple Inc.*, 77 F. Supp. 3d 535, 540–42, 2014 WL 6873161, at *2–4 (E.D. Tex. 2014), *reconsideration denied* No. 6:13cv447, -448, 2015 WL 4208754, at *2–4 (E.D. Tex. Jul. 7, 2015); *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001); *Greenberg v. Ethicon Endo–Surgery, Inc.*, 91 F.3d 1580, 1581–84 (Fed. Cir. 1996). Microsoft argues that ViaTech's cases either "predate *Williamson*, and apply the standard rejected in that case," or "are distinguishable" (*see supra* pp. 41–42), but that is wrong.

[46] Claims 1, 28, and 31 do not recite the function of (1) controlling access to the digital content file, and claim 31 does not recite the function of (2) monitoring use of the digital content by a user, as proposed by Microsoft. *See supra* pp. 39–40. In any case, the same corresponding structure identified below would support these additional functions.

allowed uses of the digital content, comparing information regarding the attempted use of the digital content and the allowed uses defined by the license information in the dynamic license database, determining whether the use complies with the license, and permitting the user to access the digital content as requested if it does. *Compare* col. 4:53–62, 13:59–14:2, 14:7–13, 14:44–15:54, 23:8–24, *and* Goldberg Reply Decl. ¶ 7 (A541), *with Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch. LLC*, 748 F.3d 1134, 1141–42 (Fed. Cir. 2014), *and Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384–86 (Fed. Cir. 2011).

Although Microsoft identifies additional parts of the specification as disclosing the algorithm (*see supra* p. 40 (citing col. 16:10–25, 17:18–23, 17:46–61, 18:61–19:5, 19:40–20:3)), this is another attempt to improperly narrow the scope of the claims. These parts describe an exemplary embodiment of the invention using dynamic code libraries (.DLLs) that are "functionally embedded" at run time, which Microsoft states does not fall within the scope of the claims. *See supra* p. 5 (citing, e.g., col. 16:16–30). In addition, the .DLL code libraries and encryption techniques described in these parts of the specification cited by Microsoft are merely exemplary. *See also* Goldberg Reply Decl. ¶ 6 (A540–41).

<u>Defendant Microsoft's Sur-Reply Position</u>

The license monitor and control mechanism is described functionally and without the recital in the claims of structure to carry out the functions, and is thus subject to 35 U.S.C. § 112, ¶ 6. ViaTech's Reply states that Microsoft "ignored" ViaTech's alleged "intrinsic and extrinsic evidence" that the term "connote[s] structure." Because the '567 Patent states that the "license monitor and control mechanism" is novel and not a prior art structure, there can be no "extrinsic evidence" showing how that term would have been understood as an existing structural component as of the filing date of the patent application. Nor does ViaTech identify any. As for intrinsic evidence, ViaTech identifies alleged corresponding structure disclosed in the

specification.  None of those structural details are found in the claims, which is where the structure must be presented to avoid 35 U.S.C. § 112, ¶ 6.  Notably, ViaTech does not argue that the phrase "license monitor and control" is structural.  On the contrary, the phrase plainly describes function (monitoring and control).

ViaTech ignores *Media Rights Technologies, Inc. v. Capital One Financial Corp.*, 2015 WL 5166358 (Fed. Cir. 2015), which is directly on point, and instead cites to *M2M Solutions LLC v. Sierra Wireless America, Inc.*, 2015 WL 5826816 (D. Del. Oct. 2, 2015).  *M2M Solutions* does not help ViaTech.  There, the term "programmable interface" was found to be a well-understood structure in the art and the term "processing module" had structure recited in the claim itself.  ViaTech makes neither argument here.  Moreover, the defendant in M2M submitted no expert testimony concerning how one of ordinary skill in the art would understand the terms.  Here, Dr. Wicker explains that the terms in the claim do not identify well-understood structures, thus requiring resort to the specification to identify the corresponding structure.

In its Reply, ViaTech points to the original Goldberg declaration (at paragraphs 2, 5, and 7-11) as allegedly identifying the structure in the claim for the "license monitor and control mechanism."  However, the term is first introduced in paragraph 6.  In paragraph 7, Dr. Goldberg points to the specification as showing the corresponding structure, not the claims.  The term is not mentioned in paragraphs 8-10.  In paragraph 11, Dr. Goldberg states that the "specification" (not the claims) describe algorithms for the term.  In sum, Dr. Goldberg's declaration establishes that the structure is found in the specification and not the claims.  Therefore, § 112, ¶ 6 applies.

Finally, ViaTech argues that certain structures should not be considered "corresponding structure" because they are "merely exemplary." (*See supra* p. 47)  ViaTech is wrong on the facts because the structures Microsoft identifies are the only disclosed structures for controlling

48

access to the digital content.  ViaTech is wrong on the law because claim construction under §
112, ¶ 6, requires identifying all structures, including alternative structures and all disclosed
embodiments, that perform the claimed function.  *Micro Chem., Inc. v. Great Plains Chem. Co.*,
194 F.3d 1250, 1258-59 (Fed. Cir. 1999); *Serrano v. Telular Corp.*, 111 F.3d 1578, 1582-83
(Fed. Cir. 1997).

   **9. "monitoring use" (claims 1, 28)**

| Term | ViaTech Construction | Microsoft Construction |
|------|----------------------|------------------------|
| "monitoring use" | plain and ordinary meaning (i.e., "detecting use") | "maintain regular surveillance over user activity via tracking of file input/output calls" |

Plaintiff ViaTech's Opening Position

   Claims 1 and 28 describe the function of the license monitor and control mechanism
LMCM 18 as "monitoring use of the digital content by a user."  The ordinary meaning of
"monitoring use" is "detecting use" (Ex. 2 at 752 (A277)), which is consistent with the patent's
description of the file access control mechanism FACM 16 components being invoked upon "an
attempt by a user system to access the digital content."  *See, e.g.,* col. 4:53–62, 5:4–20, 8:1–6,
22:50–55.  The court should reject Microsoft's proposed construction because it improperly
requires the file access control mechanism FACM 16 components to "maintain regular
surveillance over user activity via tracking of file input/output calls."  There is no support for
reading this limitation into the claims.  *Southco*, 611 Fed. Appx. at 689; *Info-Hold*, 783 F.3d at
1266–68.[47]

---

[47] The portions of the specification Microsoft cites either describe prior-art systems (*see* col.
1:34–37, 3:11–15), or "an alternate embodiment" of the invention" in which "an application such
as a viewer, player or editor, may be customized to use one or more types of eLicensed DCF 10
content" (col. 19:55–64) not described in the asserted claims.

Defendant Microsoft's Answering Position

The central dispute regarding this term is whether monitoring requires mere detection of use (which could be a discrete event), or whether the term requires regular surveillance via tracking of input/output calls.

The specification clearly supports Microsoft's construction, and demonstrates that "monitoring" is used in its ordinary sense of evaluating activity at different points in time.  For example, in one embodiment, "the file access control mechanism includes a monitor to intercept attempts to open digital content files of the at least one designated type by the application … ." (8:1-4; emphasis added.)  The patent provides further details: "The application will be invoked and run for the selected type of eLicense DCF 10 content, whereupon the LicMech 16 will intercept the application file I/O to a chosen DCF 10 of that type of content by means of a **monitor utility** included in the FACM 12." (19:60-64; emphasis added.)

The meaning of "monitoring" is also informed by how the specification describes this function in prior art systems: "[In the prior art] a licensed program is bundled with a file manager program that interacts with the target system operating system to **monitor** file calls to the licensed program." (1:34-37; emphasis added.)    Notwithstanding ViaTech's protests, descriptions of the prior art may be used to understand the meaning of a claim term.  *See, e.g., Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000) (when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning.").

The ordinary meaning of "monitor," according to the dictionary definition referenced in ViaTech's brief, confirms Microsoft's construction: "to watch, keep track of, or check usu. for a

special purpose." *See supra* p. 49 (citing Merriam Webster's Collegiate Dictionary, 10th ed. (A277)).

While ViaTech complains that Microsoft is relying on an "alternative embodiment" that it alleges is not covered by the claims, it cites no authority for the remarkable proposition that a Court must ignore how a claim term is used in the specification, if that usage is in the context of an embodiment not covered by the claim in which that term is used.  Such a rule would run squarely counter to the general rule of claim construction that terms are generally to be given a uniform construction across different claims.  *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

Turning to ViaTech's construction, its position that "monitor" means "detect" has no support in either the intrinsic record, or the Merriam Webster dictionary that ViaTech relies on for other terms.  For example, a heart rate "monitor" will continuously monitor a heart rate.  The monitor may "detect" an arrhythmia, but that is a result of the "monitoring."  Absent monitoring, the arrhythmia will go undetected.

<u>Plaintiff ViaTech's Reply Position</u>

Microsoft argues that the specification supports its construction of "monitoring use" as "maintain[ing] regular surveillance over user activity via tracking of file input/output calls" because it uses the term "monitoring" to mean "evaluating activity at different points in time." *See supra* p. 50.  In fact, however, the patent consistently states that the file access control mechanism FACM 12 components monitor use merely by "intercepting an attempt to access the digital content" and then either allowing or not allowing the user to proceed, without describing any continued monitoring.  *See, e.g.,* col. 6:54–58, 7:45–47, 8:1–6, 19:34–40.

Microsoft does not dispute that the passages it relies on to support monitoring via "file input/output calls" describe either an embodiment that "is not covered by the [asserted] claims,"

or different "prior art systems." *See supra* pp. 50–51. When discussing the "preferred embodiment," the specification states that "communications with and between," e.g., the license monitor and control mechanism LMCM 18, are not implemented "through conventional file input/output processes," because they are subject to "interruption" or "tampering." *See* col. 23:8–47. Microsoft's narrower construction would improperly read this preferred embodiment out of the claims. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).[48]

<u>Defendant Microsoft's Sur-Reply Position</u>

ViaTech's Reply raises two points, neither of which rebut Microsoft's proposed construction. First, ViaTech appears to equate monitoring with "intercepting." However, the term "monitoring" is different from "intercepting." The embodiments are able to "intercept" file input/output calls because of the "monitoring" function, as that term is construed by Microsoft. Second, the interprocess communications referenced by ViaTech are not inconsistent with Microsoft's construction. Those communications take place between the various FACM components and are unrelated to the file input/output calls made by a user.

### 10. "license control utility" terms (claims 1, 28, 31)

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| "license control utility" terms[49] | "software component that provides communications to | means-plus-function / indefinite[50] |

---

[48] Although Microsoft states that ViaTech's dictionary definition supports its construction (*see supra* pp. 50–51), that definition ("to watch, keep track of, or check") provides no support for reading the additional limitations of "maintain[ing] regular surveillance . . . via tracking of file input/output calls" into the claims.

[49] The "license control utility" terms are "license control utility providing communications between a user system and an external system to communicate license definition information between [the / a] user system and [the / an] external system, including a graphical user interface associated with the license control utility to provide communication between a user and user accessible functions of the license functions mechanism" (claims 1 and 28), and "license control utility, including a graphical user interface" (claim 31).

[50] Microsoft argues that the functions performed are "controlling licensing by (1)

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| | and from a user system" | |

Plaintiff ViaTech's Opening Position

The asserted claims describe the license functions mechanism LicMech 16 as a "license control utility" with an associated "graphical user interface." *See* col. 41:4–5, 41:11–19, 47:50, 47:60–67, 49:31–34. The specification states that the license control utility LCU/eLCU 20 and graphical user interface GUI 22 provide the "mechanisms by which [file access control mechanism] FACM 12 communicates with External Systems 10C," e.g., through a dynamic eLicense management mechanism DeLMM 40. *See, e.g.,* col. 10:67–11:12, 17:63–18:3, 22:47–62, 24:1–33, 29:16–22, 30:15–48, 30:59–62, 31:10–16, 31:28–47, 32:55–60, 33:35–43, 34:8–27, 34:52–59, 36:50–67, 37:18–36, 38:7–17, 38:57–67. Term 10 ("license control utility") should accordingly be construed, consistent with the specification, as a "software component that provides communications to and from a user system."

Microsoft improperly argues that Term 10 should be construed as means-plus-function terminology. Such a construction is inconsistent with the language of claim 31, which describes "a license control utility, including a graphical user interface" without any associated functions performed by these components. *Compare* col. 49:33–34, *with TecSec*, 731 F.3d at 1347–48, *Toyota Motor Corp.*, 2015 WL 4934778, at *3–6, *and Beneficial Innovations*, 2010 WL 1441779, at *14–15. The specification states that the license control utility LCU/eLCU 20, graphical user interface GUI 22, and dynamic eLicense management mechanism DeLMM 40

---

communicating between a user system and an external system to communicate license definition information between a user system and an external system, and (2) providing a graphical user interface associated with the license control utility to provide communication between a user and user accessible functions of the license functions mechanism" (claims 1 and 28), and "controlling licensing" (claim 31), and that there is no corresponding structure described in the specification.

provide the user interface and communicate license definition information to an external system. *See* Goldberg Decl. 2, 7–11 (A244–49); *see also, e.g.,* col. 24:1–33 ("In the instance of user systems employing Microsoft Windows 95, 98 or NT, for example, the FACM 12 eLCU 20 GUI is implemented as an extension of the Microsoft Windows Explorer and an eLicense Control Structure is added to the Explorer view."); col. 20:31–24:33 ("Certain of the data record fields in a Dldb 14 are public, that is, are accessible to the user through the FACM 12 GUI FIG. 3B to allow the information therein to be viewed and queried."); col. 11:62–12:3, 17:32–40, 30:15–48, 30:59–62 ("Remote eLicense acquisition is typically via standard HTTP communication methods for the Internet or for intranets . . . ."). The court should accordingly reject Microsoft's proposed construction. *See also* discussion of Term 7 ("file access control mechanism"), *supra*.[51]

Defendant Microsoft's Answering Position

| ViaTech Construction | Microsoft Construction |
| --- | --- |
| "software component that provides communications to and from a user system" | Means plus function<br>Functions: (claims 1 and 28) "controlling licensing by (1) communicating between a user system and an external system to communicate license definition information between a user system and an external system, and (2) providing a graphical user interface associated with the license control utility to provide communication between a user and user accessible functions of the license functions mechanism."<br>(Claim 31): "controlling licensing"<br>Corresponding Structure: None and therefore the term is indefinite |

The central disputes here are whether this term must be construed in accordance with §112, ¶6, and if so, whether there is sufficient corresponding disclosure in the specification for performing the claimed function. Microsoft submits that the answer to the first question is yes, and the answer to the second question is no.

---

[51] The structure implementing the functions of license control utility LCU/eLCU 20 is described at, e.g., col. 3:55–4:52, 8:37–9:43, 10:1–38, 10:67–11:20, 11:55–12:34, 12:61–13:15, 13:32–58, 13:66–14:30, 15:15–54, 16:5–15, 17:25–18:60, 20:4–24:33, 26:6–27:62, 29:1–34:59, 35:44–40:63, and illustrated in Figs. 1A, 1D, 2, 3A–B, and 4.

The asserted claims require the "license control utility" to handle communication of licensing information between the user system and an external system and to include a graphical user interface for communications with the user.  Because the graphical user interface does not perform the function of communicating with an external system, the claim lacks sufficient structure to perform the recited functions. (Wicker Decl. at ¶43). (A376)  Accordingly, the term is subject to 112/6. *See Williamson*, 792 F.3d at 1348.

Because the term is subject to §112, ¶6, the patentee must identify the corresponding structure for performing the claimed functions.  If there is no corresponding structure, then the claim is indefinite.  "Where there are multiple claimed functions … the patentee must disclose adequate corresponding structure to perform all of the claimed functions."  *Media Rights Tech.*, 2015 WL 5166358 at *6 (citing *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318–19 (Fed. Cir. 2012))

With regard to claims 1 and 28, there is no corresponding structure for the function of controlling licensing by communicating between a user system and an external system to communicate license definition information between a user system and an external system. Instead, the patent specification merely states that this function is performed, without explaining how, let alone disclosing an algorithm to do so.  In fact, the specification does not even describe in which direction the claimed "license definition information" is flowing, or how it is communicated.  For example, the specification states that the "graphical user interface *provides mechanisms* by which the FACM 12 communicates with External Systems 10C." (11:3-5) "Mechanism" is a generic nonce word, and no details of the mechanisms are disclosed. Although the patent also states that license acquisition is "typically via standard HTTP communication methods for the Internet or for intranets" (11:61-62), disclosure of a protocol is

not disclosure of the algorithm that uses the protocol to implement the claimed "utility."

With regard to claim 31, the function of the "license control utility" is provided before the nonce word "utility"—namely, "controlling licensing."  The claim specifically states that the process involves an external system (the "product configuration and order database") "providing the license information … to the user system."  Thus, as with claims 1 and 28, claim 31 requires the license control utility to control licensing by communicating with an external entity to retrieve the license information from the product configuration and order database.  Also as with claims 1 and 28, there is no disclosure of the structure to accomplish this communication.

Here too ViaTech argues that the term "license control utility" does not recite any function.  However, as with the "license monitor and control mechanism," the function precedes the nonce word "utility."  The term "license control" is not structural and does not connote structure.  It is functional. (Wicker Decl. at ¶43.) (A376)

Moreover, the license control utility must both communicate with a user via a graphical user interface, and communicate with an external system.  ViaTech does not identify a single structure in the specification that performs both these functions, let alone an algorithm for doing so.

Although ViaTech relies on its expert for this point, Dr. Goldberg likewise fails to identify any corresponding disclosure in the specification for performing the claimed functions.  In paragraph 7 of his Declaration, Dr. Goldberg states that the FACM includes the LMCM and the license control utility.  He then states that the "functions of these components are described in the '567 patent" and also states that the "interfaces" are shown in Figure 1A and further states that the specification discloses the "information" communicated between the various components. (Goldberg Declaration at ¶7 (A246–47)).   Nowhere does he state where the

structure of the license control utility is described, or what algorithm implements it.

In paragraph 10, Dr. Goldberg identifies "Microsoft Windows Mailslots" and "Microsoft Windows Messaging," but these components are part of the Windows environment, and thus outside the "digital content file," and so cannot be part of the license control utility since that utility is in the digital content file. Moreover, these are cited by Dr. Goldberg as examples of communications within the FACM itself, and not between the license control utility and external systems as claimed. Dr. Goldberg also mentions HTTP, but as discussed above, this is a generic communication protocol, and not in and of itself a structure or algorithm for performing the functions of the claimed license control utility.

Because there is no structure or algorithm disclosed in the specification for performing the claimed functions, the term is indefinite, and the claims that include it invalid. *Aristocrat Technologies Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337-38 (Fed. Cir. 2008).

<u>Plaintiff ViaTech's Reply Position</u>

Microsoft's arguments for construing Term 10 ("license control utility") as a means-plus-function term are the same arguments it presents for Term 8 ("license monitor and control mechanism").[52] Because Microsoft relies on the functions recited in independent claims 1 and 28 (which are not also recited in independent claim 31), and it ignores the intrinsic and extrinsic evidence of structure cited by ViaTech, the court should reject these arguments.

---

[52] Microsoft's own patents confirm that a control utility, such as the license control utility claimed in the '567 patent, is software, and that the term refers to structure. *See* Ex. 2, Abstract (A662); Ex. 3, col. 6:42–48 (A689); Ex. 4, col. 3:37–46 (A706); *see also* Exs. 5–7 (A711, A726, A735); Goldberg Decl. ¶¶ 2, 5, 7–11 (A244–49).

Microsoft asserts that claims 1 and 28 describe the "license control utility" as performing the function of "handl[ing] communication of licensing information between the user system and an external system," and that in claim 31 "the function of the 'license control utility' is provided before the nonce word 'utility'—namely, 'controlling licensing,'" even though the claim does not otherwise describe any function for this component. *See supra* pp. 54–56.

If "license control utility" were construed as a means-plus-function term, the functions of this term should be defined as (1) providing communications between a user system and an external system to communicate license definition information between the user system and the external system, as stated in claims 1 and 28, and not the additional functions identified in Microsoft's construction.[53]   *Compare* col. 41:11–14, 47:60–63, *with Cardiac Pacemakers*, 296 F.3d at 1113; *Creo Products*, 305 F.3d at 1344.  The "graphical user interface" component that is "associated with" the "license control utility" (*see* col. 41:16–29, 47:64–67), and the function that it performs, should not be considered part of the means-plus-function term because "graphical user interface" connotes structure, as Microsoft acknowledges.   *Compare supra* pp. 54–55, *and* Wicker Decl. ¶ 43 (A376), *with IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1432–33 (Fed. Cir. 2000) ("§ 112, ¶6 applies only to interpretation of the means or step that performs a recited function when a claim recites insufficient structure or acts for performing the function."); *Prism Techs. LLC v Verisign Inc*., 512 F. Supp. 2d 174, 193 (D. Del. 2007).

Microsoft argues that "license control utility" is indefinite because there is no corresponding structure for the claimed function of controlling licensing by communicating license definition information between a user system and an external system.  *See supra* pp. 55–57.  However, the specification does describe structure that performs the functions of the Electronic License Control Utility "eLCU 20" by stating that this component "provides

---

[53] Claims 1, 28, and 31 do not recite the function of (1) controlling licensing, and claims 1 and 28 do not recite the function of (2) providing a graphical user interface associated with the license control utility to provide communication between a user and user accessible functions of the license functions mechanism, as Microsoft proposes.  *See supra* p. 54.  In addition, claim 31 does not describe the "license control utility" as (3) communicating with an external entity to retrieve the license information from the product configuration and order database, as Microsoft argues for the first time in its response brief, even though this function is not part of its proposed construction.  *See supra* pp. 54–56.  The corresponding structure identified below, however, along with the structure disclosed for a graphical user interface at col. 24:1–33 & Figs. 3A–B, would adequately support these additional functions.

mechanisms [such as the Dynamic eLicense Management Mechanism DeLMM 40] by which the [file access control mechanism] FACM 12 communicates with External Systems 10C," such as an Order/License Server "OLS 36" containing a Product Configuration/Order/License Database "POLDb 34" and a License Generator "LicGen 76," in order to "perform functions and operations related to the ordering and purchasing of DCFs 10, [and] the generation, electronic distribution and tracking of eLicenses." *See* col. 10:67–11:12, 12:35–60, 13:7–14, 26:13–22. Specifically, the system generates a License Request "LicReq 86" including specific data fields, communicates it through the DeLMM 40 to the LicGen 76 "through an Intranet or Internet communication and a standard, secured HTTP [Hypertext Transfer Protocol]" connection using "standard HTTP communication methods," and the LicGen 76 returns an Encoded License Data Package "ELDP 82," which is an "encrypted ACSII string which contains the requisite license data," to the eLCU 20. *See* col. 10:67–11:12, 11:62–12:3, 12:63–13:1, 13:7–14, 13:44–50, 17:63–18:3, 22:47–62, 24:1–10, 24:16–33, 30:15–25, 30:27–46, 30:54–62, 31:10–13, 31:36–46, 32:55–60, 37:26–36, 38:7–17, 38:57–60; Goldberg Reply Decl. ¶ 7 (A541).

Microsoft argues that "disclosure of a protocol is not disclosure of the algorithm that uses the protocol,"[54] but that is wrong. The HTTP and HTTPs communication protocols implement algorithms that divide a message into data packets and send the packets over a network to a destination, and receive data packets and reassemble them into a message, that were standard and well known at the time the patent application was filed. *See* Goldberg Reply Decl. ¶ 8 (A541–42) (citing Exs. 5 and 6 to same (A588–89, A595–98)). These known algorithms, explicitly referred to in the specification, provide corresponding structure for the function of

---

[54] *See supra* pp. 55–57 ("Dr. Goldberg also mentions HTTP, but as discussed above, this is a generic communication protocol, and not in and of itself a structure or algorithm for performing the functions of the claimed license control utility.").

communicating license information with an external system, and this claim term is not indefinite. *See, e.g., HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1278–80 (Fed. Cir. 2012) ("Whether a specification adequately sets forth structure corresponding to a claimed function is viewed from the perspective of one skilled in the art."); *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1365–67 (Fed. Cir. 2003) (finding "the WBF# signal protocol disclosed in the specification [to be] the structures corresponding to the functions recited").

Defendant Microsoft's Sur-Reply Position

Because the "utility" is claimed in functional terms without the recital of definite structure, § 112, ¶ 6 applies.  ViaTech failed to identify any corresponding structure for the utility.  ViaTech now points to the "DeLMM 40."  Yet the DeLMM 40 is a black box described functionally, and moreover, the DeLMM 40 is outside the user system and therefore cannot be part of the claimed utility (*See* item 40 in Fig. 2).  ViaTech points to the HTTP protocols, but the "utility" is more than off-the-shelf software implementing the HTTP protocol.

**11. "license control mechanism" (claims 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 28, 29, 30)**

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| "license control mechanism" | "software component that monitors and controls access to a digital content file" | means-plus-function[55] |

Plaintiff ViaTech's Opening Position

The preambles of claims 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 28, 29, and 30 describe the digital content file DCF 10 as "including a license control mechanism."  The specification describes the "license control mechanism" as "monitoring and controlling access to a [digital content file]

---

[55] Microsoft identifies the claimed function as "to control license enforcement," and the corresponding structure as being found at col. 13:59–65, 16:10–25, 17:18–23, 17:46–61, 18:61–19:5, 19:40–20:3.

DCF 10." *See* col. 22:50–23:6.

The claim preambles should not be construed as limiting (*see* discussion of Term 16 ("preambles") *infra*, but if construed, "license control mechanism" should be defined as a "software component that monitors and controls access to a digital content file." The court should reject Microsoft's argument that Term 11 ("license control mechanism") is means-plus-function terminology. File access control mechanism FACM 12, license monitor/control mechanism LMCM 18, license control utility LCU/eLCU 20, and graphical user interface GUI 22 comprise the "eLicense control mechanism" (*see* col. 22:50–62) and are described in the '567 patent specification as structure. *See* the discussion of Terms 7 (file access control mechanism"), 8 ("license monitor and control mechanism"), and 10 ("license control utility) *supra*; *see also TecSec*, 731 F.3d at 1347–48; *Toyota Motor Corp.*, 2015 WL 4934778, at *3–6.[56]

Defendant Microsoft's Answering Position

| ViaTech Construction | Microsoft Construction |
|---|---|
| "software component that monitors and controls access to a digital content file" | Means-plus-function<br>Function: to control license enforcement<br><br>Corresponding structure: 13:59-65; 16:10-25; 17:18-23; 17:46-61; 18:61-19:5; 19:40-20:3 |

The central dispute here is whether this term must be construed in accordance with §112, ¶6. Microsoft submits that it must be so construed because it recites the function of controlling license enforcement without the recitation of definite structure in the claim.

ViaTech argues that the claimed FACM, LMCM, LCU, and GUI provide the structure for this element and thus take this term out of §112, ¶6. However, each of the independent claims recites a different collection of structures, and there is no basis for ViaTech to arbitrarily choose

---

[56] If "license control mechanism" were to be construed as a means-plus-function term, then the associated structure would be the structure identified for these sub-components.

these four structures as providing the claimed function to the exclusion of others.  Claim 1 includes as a constituent component the "licenses functions mechanism."  Claim 28 includes as constituent components the "licenses functions mechanism" and "adaptive fingerprint security mechanism."

To the extent that ViaTech argues that each entire claim provides the structure for the "license control mechanism" then the term would be indefinite because its meaning changes with every claim (because each claim includes overlapping but different structures).  ViaTech's proposed construction fails "to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

Plaintiff ViaTech's Reply Position

Microsoft does not dispute that the "license control mechanism" referred to in the preambles is not referred to or described as performing a separate function in the body of the claims.  *See supra* pp. 61–62.  Thus, as explained with respect to Term 8 ("license monitor and control mechanism"), the court should reject Microsoft's proposed construction as a means-plus-function term.   *See TecSec*, 731 F.3d at 1347–48; *Toyota Motor Corp.*, 2015 WL 4934778, at *3–6.

If "license control mechanism" is construed to be a means-plus-function term, and the function is controlling license enforcement (as Microsoft proposes, *see supra* pp. 61–62), the corresponding structure would be the algorithms associated with the software components that are described as performing these functions in the claims: Term 8 ("license monitor and control mechanism") and Term 10 ("license control utility"), and not the additional and unnecessary implementation details cited by Microsoft in its construction in order to improperly narrow the

62

scope of the claims.  *See* Goldberg Reply Decl. ¶ 8 (A541–42).[57]

<u>Defendant Microsoft's Sur-Reply Position</u>

Microsoft's Answering Brief adequately addresses ViaTech's arguments.

**12. "license functions mechanism" (claims 1, 4, 5, 28, 31)**

| Term | ViaTech Construction | Microsoft Construction |
|------|----------------------|------------------------|
| "license functions mechanism" | "software component that controls access to the contents of the digital content file according to an electronic license" | means-plus-function[58] |

<u>Plaintiff ViaTech's Opening Position</u>

The asserted claims each describe the "file access control mechanism" as embedded in the digital content file and as including a "license functions mechanism."  *See* col. 41:2–5, 47:49–50, 49:28–31.  The specification states that the license functions mechanism LicMech 16 is the "component" of the file access control mechanism FACM 12 that "controls access to the contents of the file according to an electronic license" saved in the dynamic license database Dldb 14.  *See* col. 14:29–59.  Term 12 ("license functions mechanism") should accordingly be construed as a "software component that controls access to the contents of the digital content file according to an electronic license."

The court should reject Microsoft's proposed construction.  Similar to Term 7 ("file access control mechanism"), which Microsoft agrees describes structure, "the claims do not

---

[57] Microsoft's claim that this term would be indefinite because "each of the independent claims recites a different collection of structures" (*see supra* pp. 61–62) is without merit.  All the asserted independent claims (claims 1, 28, and 31) include the "license monitor and control mechanism" and "license control utility" claim terms.  *See* col. 41:6–19, 47:51–56, 47:60–67, 49:32–34.

[58] Microsoft identifies the claimed function as "controlling license functions" and the corresponding structure as being found at col. 14:34-59 and 14:60–20:29.

recite a function" for Term 12.  *See, e.g., TecSec*, 731 F.3d at 1347-48; *Toyota Motor Corp.*, 2015 WL 4934778, at *3–6.  In addition, the specification describes in detail "the structure and elements" and "implementations" of license functions mechanism LicMech 16.  *See* Goldberg Decl. ¶¶ 2, 7–11 (A244–49); *see also, e.g.,* col. 9:45–46, 10:24, 10:32–38, 10:54–61, 10:65–67, 12:20, 14:31–27:62 & Figs. 1A–D, 2, 3A–B ("As illustrated in FIG. 1B, the LicMech 16 functions of the present invention are embedded in an executable DCF 10 by reconstructing the original DCF 10 Executable Code (ExCode) 44 into a Reconstructed ExCode 44R wherein Links 46 to a Wrapper Dll (Wdll) 48 inserted into the DCF 10 ExCode 44.").  *See also* discussion of Term 7 ("file access control mechanism") *supra*.[59]

Defendant Microsoft's Answering Position

| ViaTech Construction | Microsoft Construction |
|---|---|
| "software component that controls access to the contents of the digital content file according to an electronic license" | Means-plus-function<br>Function: Controlling license functions<br>Corresponding Structure: 14:34 to 20:29 |

The central dispute here is whether this term must be construed in accordance with §112, ¶6.  Microsoft submits that it must be so construed.  Similar to the previous terms, the "license functions mechanism" is expressed in functional terms—a mechanism for controlling license functions, without the recital of definite structure for providing the function.  This term corresponds to LicMech 16 component in the specification.  Therefore, the description of the LicMech component is the corresponding structure.

ViaTech concedes that the license functions mechanism corresponds to the LicMech

---

[59] The structure performing the functions of the license functions mechanism LicMech 16 is the structure of the components of that mechanism, namely, the license monitor and control mechanism LMCM 18, the license control utility CLCU/eCLU 20, the license control utility CLCU/eLCU 20, and the graphical user interface GUI 22.  *See* col. 10:24–49 and Fig. 1A.

component in the specification: "[T]he specification describes in detail 'the structure and elements' and 'implementations' of license functions mechanism LicMech 16." However, ViaTech's proposed construction is wholly functional, and also fails to include any of the disclosed structure for performing the functions of this claim tern, and so should be rejected.

Plaintiff ViaTech's Reply Position

Once again, Microsoft's only argument for construing "license functions mechanism" as a means-plus-function term is based on the purportedly functional modifier "license functions."[60] The court should reject these arguments for the reasons stated above with respect to Term 8 ("license monitor and control mechanism") because "the claims do not recite a function" for this term, which, as shown by the intrinsic and extrinsic evidence cited by ViaTech, refers to structure. *See, e.g., TecSec*, 731 F.3d at 1347-48; *Toyota Motor Corp.*, 2015 WL 4934778, at *3–6. If this term is construed as a means-plus-function term, the specification describes the structure for controlling license enforcement in the algorithms associated with the software components that implement this function in the claims: Term 8 ("license monitor and control mechanism") and Term 10 ("license control utility"). *See* Goldberg Reply Decl. ¶ 8 (A541–42).

Defendant Microsoft's Sur-Reply Position

Microsoft's Answering Brief adequately addresses ViaTech's arguments.

**13. "adaptive fingerprint" (claims 5, 28, 31)**

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| "adaptive fingerprint" | "a fingerprint that identifies a system that has changed or been modified from an originally licensed | "a fingerprint that can be adjusted or changed to reflect changes to a user system" |

---

[60] *See supra* pp. 64–65 ("Similar to the previous terms, the 'license functions mechanism' is expressed in functional terms—a mechanism for controlling license functions, without the recital of definite structure for providing the function.").

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| | configuration" | |

Plaintiff ViaTech's Opening Position

Claims 5, 28, and 31 describe an "adaptive fingerprint security mechanism" as an additional component of the license functions mechanism LicMech 16.  *See* col. 10:24–49 and Fig. 1A; col. 41:58–64, 47:50, 47:57–59.   The specification describes adaptive fingerprint security mechanism AFSM 72 as "unique in operating adaptably in identifying a system that has changed or been modified from an originally licensed configuration and in providing selective levels of adaptability to modifications and changes" in the user system.  *See* col. 25:28–42 & Fig. 1A.   Term 13 ("adaptive fingerprint") should accordingly be construed as "a fingerprint that identifies a system that has changed or been modified from an originally licensed configuration."

Microsoft argues that an "adaptive fingerprint" must "be adjusted or changed to reflect changes to a user system," i.e., the fingerprint itself must "adapt" whenever the hardware "adapts."   Its proposed construction should be rejected because it is inconsistent with the '567 patent specification, which states that license monitor and control mechanism LMCM 18 is the software component that performs this function (*see* col. 25:47–60), and the patent claims.   The function of license monitor and control mechanism LMCM 18 is described only in claim 6.  *See* col. 42:8–20.   It is not described as the function of license monitor and control mechanism LMCM 18 in claim 5, claim 28, or claim 31.

Defendant Microsoft's Answering Position

The dispute regarding this term is whether the "fingerprint" identifies system changes (ViaTech), or whether it is a value that can be changed when the system changes (Microsoft).   The claim language itself supports Microsoft's construction.   An "adaptive fingerprint," must "adapt."   In the patent, if the system changes over time, the fingerprint is updated to reflect the

changes and the new fingerprint replaces the old fingerprint:

> For normal, incremental changes in a system, therefore, such as replacing a network card, upgrading a disk drive or processor, or upgrading or updating programs on the system, the license checking process will not fail and the license data is recreated dynamically to accommodate allowable changes in the SID 66 to accommodate allowable changes in the system (25:65 to 26:4)

Accordingly, the term should be construed to mean "a fingerprint that can be adjusted or changed to reflect changes to a user system."

ViaTech argues that Microsoft's construction is "inconsistent" with the specification because it is the LMCM that writes the new fingerprint to the license database. However, the particular component that writes the fingerprint to the database is immaterial. The issue is what it means for a fingerprint to be adaptive. Indeed, this portion of the specification shows why ViaTech's proposal ("fingerprint that identifies a system that has changed") is unsupportable; the fingerprint does not identify changes to the system. It is updated to reflect changes to the system.

<u>Plaintiff ViaTech's Reply Position</u>

Microsoft argues that "[t]he claim language itself supports Microsoft's construction" of "adaptive fingerprint" as "a fingerprint that can be adjusted or changed to reflect changes to a user system." *See supra* pp. 66–67 ("An 'adaptive fingerprint,' must 'adapt.'"). The claims, however, use the term "adaptive fingerprint" only as part of the larger term "adaptive fingerprint security mechanism," and this software component (as opposed to the separate "license monitor and control mechanism" component) is not described as modifying or updating the fingerprint in response to system changes, as proposed in Microsoft's construction. *See* col. 41:58–64, 49:33.

Consistent with the claim language, the specification describes the adaptive fingerprint security mechanism AFSM 72 software component as "operating adaptably" because it allows hardware and software on the user system, and not necessarily the fingerprint saved in the

67

dynamic license database Dldb 14, to "adapt."[61]  Although the specification also states that "the license data is recreated dynamically to accommodate allowable changes in the [System Identifier] SID 66" (*see supra* p. 67 (quoting col. 25:65–26:4)), the claims do not describe this functionality as "adaptive," or state that it is performed by the "adaptive fingerprint security mechanism."  *Compare* col. 41:58–64, 49:33, *with* col. 42:8–20.

Defendant Microsoft's Sur-Reply Position

ViaTech now argues that the "adaptive fingerprint" "allows the hardware and software to adapt." (*See supra* pp. 67–68)  This is incorrect because hardware and software do not adapt. Rather, the fingerprint adapts to changes in the user system.  The user configurable "adaptability setting" sets the threshold for the adapting of the fingerprint: it "governs how much a system fingerprint is allowed to vary ***and adapt*** to changes in the user system." (22:18-19) (emphasis added)

**14. "adaptive fingerprint security mechanism" terms (claims 5, 28, 31)**

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| "adaptive fingerprint security mechanism" terms[62] | "software component that uses a fingerprint to identify a system that has changed or | means-plus-function[63] |

---

[61]  *See* col. 22:18–20, 25:6–54 ("the AFSM 72 of the present invention is unique in operating adaptably in identifying a system that has changed or been modified"; "[t]he selective adaptability setting of the AFSM 72 of the present invention governs the extent or range of change or modification from an originally licensed host system environment that is allowed").

[62]  The "adaptive fingerprint security mechanism" terms are "adaptive fingerprint security mechanism responsive to an attempted access of the digital contents for obtaining current system fingerprint information from the user system and comparing the current system fingerprint information with the system fingerprint information in the dynamic license database" (claim 5), "adaptive fingerprint security mechanism for accessing a user system and determining fingerprint information identifying the user system" (claim 28), and "adaptive fingerprint security mechanism" (claim 31).

[63]  Microsoft describes the claimed functions as "(1) responding to an attempted access of the digital contents for obtaining current system fingerprint information from the user system and (2) comparing the current system fingerprint information with the system fingerprint information in

| Term | ViaTech Construction | Microsoft Construction |
|------|---------------------|------------------------|
| | been modified from an originally licensed configuration and provides selective levels of adaptability to modifications and changes" | |

Plaintiff ViaTech's Opening Position

Term 14 ("adaptive fingerprint security mechanism") should be construed as a "software component that uses a fingerprint to identify a system that has changed or been modified from an originally licensed configuration and provides selective levels of adaptability to modifications and changes."  *See* the discussion of Term 13 ("adaptive fingerprint") *supra*.

The court should reject Microsoft's proposed construction because Term 14 ("adaptive fingerprint security mechanism") is described in claim 31 without any associated function. *Compare* col. 49:32–33, *with TecSec*, 731 F.3d at 1347–48, *Toyota Motor Corp.*, 2015 WL 4934778, at *3–6, *and Beneficial Innovations*, 2010 WL 1441779, at *14–15.  The specification of the '567 patent describes the structure for generating and comparing fingerprints ("System ID" or "SID 66").  *See* Goldberg Decl. ¶¶ 2, 7–11 (A244–49); *see also, e.g.,* col. 11:21–54, 17:11–24, 20:30–65, 21:10–19, 22:4, 22:18–20, 22:45–46, 24:34–26:4 ("Upon each subsequent accessing of the licensed DCF 10, and as part of the license validation process performed by the LMCM 18, the FACM 12 directs AFSM 72 to acquire or determine a current SID 66 for the current host environment, reads and decrypts the eLicense data from the Dldb 14, including the recorded SID 66, and compares the recorded SID 66 from the Dldb 14 with the current SID 66.").  That structure is also described in the asserted claims.  Microsoft's proposed construction

the dynamic license, (3) in order to provide adaptive fingerprint security (claim 5), "determining fingerprint information identifying the user system in order to provide adaptive fingerprint security" (claim 28), and "providing adaptive fingerprint security" (claim 31), and the corresponding structure as that described at col. 5:4–31, 14:13–23, 25:21–26:4.

imports into the claims the function of "providing adaptive fingerprint security," which the specification and claims describe as functionality of the license monitor and control mechanism LMCM 18, not the adaptive fingerprint security mechanism ASFM 72. *See* col. 41:66–42:7, 42:11–20; *see also* col. 25:47–60, 14:16–19, and Figs. 1–2.[64]

Defendant Microsoft's Answering Position

| ViaTech Construction | Microsoft Construction |
|---|---|
| "software component that uses a fingerprint to identify a system that has changed or been modified from an originally licensed configuration and provides selective levels of adaptability to modifications and changes" | Means-plus-function<br>(claim 1): (1) responding to an attempted access of the digital contents for obtaining current system fingerprint information from the user system and (2) comparing the current system fingerprint information with the system fingerprint information in the dynamic license, (3) in order to provide adaptive fingerprint security.<br>(claim 28): determining fingerprint information identifying the user system in order to provide adaptive fingerprint security.<br>(claim 31): providing adaptive fingerprint security.<br><br>Corresponding structure: 5:4-31, 14:13-23, 25:21-26:4 |

The central dispute here is whether this term must be construed in accordance with §112, ¶6. Microsoft submits that it must be so construed. The "adaptive fingerprint security mechanism" is described by its function, which varies from claim to claim, without the recitation of definite structure in the claim for performing the function. Accordingly it is subject to §112, ¶6.

The specification describes a single structure that performs all the claimed functions, namely the structure described under the heading "adaptive fingerprint security mechanism" in the specification starting at column 24, line 34.

ViaTech argues that the function of providing "adaptive fingerprint security" is provided

---

[64] The structure performing the claimed function is described at, e.g., col. 4:15–52, 8:37–9:34, 9:41-43, 10:10–11:54, 12:21–34, 13:44–58, 14:7–30, 15:15–54, 16:5–15, 17:11–24, 18:22–47, 19:16–26:4, 26:6–28:67, 29:57–30:14, 30:47–31:27, 36:13–49, 37:1–17, and illustrated in Figs. 1A–D, and 2.

by the LMCM.   ViaTech ignores that there is a lengthy discussion of the structure for the "adaptive fingerprint mechanism" in the specification that is clearly linked to the claimed function.   Moreover, ViaTech's argument concerns the identification of corresponding structure, and not whether §112, ¶6 applies.   The first step in the §112, ¶6 analysis is to determine whether there is sufficient structure in the claim.   If there is not, then §112, ¶6 applies, and then the court proceeds with the step of determining the corresponding structure. *See Williamson*, 792 F.3d at 1348.

<u>Plaintiff ViaTech's Reply Position</u>

Microsoft's arguments in support of construing "adaptive fingerprint security mechanism" as a means plus-function-term are the same arguments it presented with respect to Term 8 ("license monitor and control mechanism"), Term 10 ("license control utility"), Term 11 ("license control mechanism"), and Term 12 ("license functions mechanism").[65]   Once again, Microsoft does not address the evidence of structure cited by ViaTech, and its conclusory arguments based on the claim language alone should be rejected.

If "adaptive fingerprint security mechanism" is construed as a means-plus-function term, however, the functions of these terms should be defined as (1) responding to an attempted access of the digital contents for obtaining current system fingerprint information from the user system, as stated in claim 5,[66] (2) comparing the current system fingerprint information with the system fingerprint information in the dynamic license database, as stated in claim 5, and (3) accessing a user system and determining fingerprint information identifying the user system, as stated in

---

[65]  *See supra* p. 70 ("The 'adaptive fingerprint security mechanism' is described by its function, which varies from claim to claim, without the recitation of definite structure in the claim for performing the function. Accordingly it is subject to §112, ¶6.").

[66]  Microsoft's response incorrectly identifies the functions recited in dependent claim 5 as recited in independent claim 1.  Claim 1 does not include an "adaptive fingerprint security mechanism" as a limitation.  *See also* D.I. 40 (Joint Claim Construction Chart) at 17.

claim 28.  *Compare* col. 41:59–64, 47:57–59, *with Cardiac Pacemakers*, 296 F.3d at 1113.[67]

The structure described in the patent for implementing these functions is the algorithm for intercepting an attempt to access the digital content file, obtaining the current system fingerprint, obtaining the system fingerprint saved in the dynamic license database, comparing the fingerprints, determining whether they are an exact match, and if they are not an exact match, performing an adaptive comparison by providing selective levels of adaptability to modifications and changes, and determining whether the modifications and changes fall within the predetermined range of tolerance.  *Compare* col. 5:4–13, 24:52–25:5, 25:12–46, *and* Goldberg Reply Decl. ¶ 10 (A542), *with Chicago Bd. Options Exch.*, 748 F.3d at 1141–42, *and Typhoon Touch Techs.,* 659 F.3d at 1384–86.

The court should reject the portion of Microsoft's construction which contends that the corresponding algorithm should include the additional steps of, when the modifications and changes fall within the predetermined range of tolerance, both allowing access to the digital content and writing the current system fingerprint into the dynamic license database in replacement of the prior system fingerprint.  *See supra* p. 70 (citing col. 5:13–31, 14:13–23, 25:47–26:6).  These steps do not correspond to the claimed functions of the "adaptive fingerprint security mechanism," and they are described in the claims and specification, as performed by the "license monitor and control mechanism."[68]  *See* Goldberg Reply Decl. ¶ 10 (A542).

---

[67]  The additional function identified by Microsoft—providing adaptive fingerprint security—is not recited in claims 1, 28, and 31, as Microsoft contends.  If the claims were construed to include this function, it would be supported by the same structure as the other functions.

[68]  *See, e.g.,* col. 5:13–31, 13:59–14:6 ("The license is validated with each runtime access of the DCF 10 by the license checking functions of the FACM 12 embedded in the DCF 10, that is, the LMCM 18 . . . ."); col. 14:16–20 ("upon access to the DCF 10, the LMCM 18 writes information to the resident Dldb 14, for example, . . . adjusting the adaptive fingerprint system ID"); col. 25:47–60; 41:66–42:7, 42:11–20, 47:51–56.

<u>Defendant Microsoft's Sur-Reply Position</u>

Here too, ViaTech fails to offer any rebuttal to the arguments made and evidence cited by Microsoft, including citation to a lengthy section in the specification entitled "adaptive fingerprint security mechanism."  Nor does ViaTech provide any basis for disregarding the final and crucial step in the adaptability algorithm—namely, writing the new adaptive fingerprint to the database. (25:54-65)

### 15. "purchase information" (claim 14)

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| "purchase information" | plain and ordinary meaning<br><br>(i.e., information related to a purchase) | "information defining the terms of purchase of at least one license available to a user" |

<u>Plaintiff ViaTech's Opening Position</u>

Claim 14 describes the dynamic license database Dldb 14 as including "license purchase information."  The ordinary meaning of "purchase information" is simply "information related to a purchase."  *E.g.,* col. 35:6–15, 39:1–40:52.  Microsoft proposes that Term 15 ("purchase information") should be construed as "information defining the terms of purchase of at least one license available to a user."   Claim 14 already defines "purchase information" in this way (*see* col. 43:12–13), and accordingly no construction of Term 15 is required.

<u>Defendant Microsoft's Answering Position</u>

Microsoft agrees that no construction is necessary for this term.

### 16. preambles (claims 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 28, 29, 30, 31)

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| preambles | only limiting for claim 31 | limiting |

<u>Plaintiff ViaTech's Opening Position</u>

Microsoft argues that Term 16 ("preambles"), and specifically the term "a license control mechanism for controlling the licensed use of digital content of the digital content file" appearing in the preambles of claims 1–7, 13–15, and 28–29 should be construed as limiting. *See* discussion of Term 11 ("license control mechanism") *supra*.  But unlike the "mechanisms" described in the preamble of claim 31, this preamble language is not a limitation appearing in the body of any asserted claim, nor does the specification describe the "license control mechanism" as an essential or critical component of the claimed inventions.  The claim preambles are not limiting and Microsoft's proposed construction should be rejected.  *See, e.g., TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1322–24 (Fed. Cir. 2015).

<u>Defendant Microsoft's Answering Position</u>

The dispute on this term is whether the preambles of claims 1 and 28 are limiting.  The parties agree that the preamble of claim 31 is limiting.

A preamble is generally construed to be limiting if it "recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305 (Fed.Cir.2005) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed.Cir.2002)).  For example, the preamble may be construed as limiting when it recites particular structure or steps that are highlighted as important by the specification.  *Catalina Mktg.*, 289 F.3d at 808.  Additionally, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *NTP, Inc.*, 418 F.3d at 1306 (quoting *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003)).

The preambles of claims 1 and 28 meet this test.  Claim 1 recites a preamble that includes a "digital content file including a license control mechanism for controlling the licensed use of

digital content."  Similarly, claim 28 recites a preamble that includes a "method for distributing a digital content file including a license control mechanism for controlling the licensed use of digital content of the digital content file."  Each of these preambles provides antecedence for "the digital content file" in the body of the claim.  In addition, each of these preambles recites the central functionality of "controlling" digital content based on "licensed use" which are referenced in the body of the claims.  For example, "control" of the file is provided by the file access and control mechanism, the license control utility and the license monitor and control mechanism.  "Licensed" use is evaluated using the license control utility, the license functions mechanism, and the dynamic license database.

<u>Plaintiff ViaTech's Reply Position</u>

Microsoft does not dispute that a "license control mechanism" is not recited in the body of the claims, and it admits that the "functionality of 'controlling' digital content based on 'licensed use'" is performed by other software components that are.  *See supra* pp. 50, 74–75. Because the language "a license control mechanism for controlling the licensed use of digital content" merely describes "a purpose or intended use" of the claimed invention, and the invention is otherwise "structurally complete," these elements of the preambles are not limiting.[69]  *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1322–24 (Fed. Cir. 2015).

<u>Defendant Microsoft's Sur-Reply Position</u>

ViaTech argues that the preambles merely provide the "environment" for the alleged inventions.  This is plainly incorrect, given that each preamble in question recites a "digital content file" (recited in the body of the claims) and a "license control mechanism."

---

[69]  ViaTech does not dispute that the claims require a "digital content file," and that this claim term would also be limiting in the preamble.  *Compare supra* p. 74, *with supra* pp. 74–75.

**17. "license information controlling licensed use of the digital content" (claims 1, 28, 31)**

**18. "information controlling operations of the file access control mechanism" (claims 1, 28, 31)**

Plaintiff ViaTech's Opening Position

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| "license information controlling licensed use of the digital content" | "data defining the terms and conditions of a license controlling licensed use of the digital content" | Indefinite |

Each of the asserted claims describes the dynamic license database as storing "license information controlling licensed use of the digital content."  *See* col. 41:20–24, 48:1–6, 49:34–39.  The specification explains that "license information" is the data residing in the dynamic license database Dldb 14 representing the "terms and conditions" of a license (col. 35:65–36:12), such as, e.g., the "License Type" ("Trial license, fully Licensed, or Unlicensed") and "the maximum number of executions or accesses allowed in the license."  *See* col. 20:31–22:46; *see also* Goldberg Decl. ¶ 13 (A249).  Term 17 ("license information controlling licensed use of the digital content") should accordingly be construed as "data defining the terms and conditions of a license controlling licensed use of the digital content."  Microsoft's argument that this term is indefinite should be rejected.  *Compare id.*, *with Hand Held Products, Inc. v. Amazon.com*, No. 12–768–RGA–MPT, 2014 WL 5779416, at *4 (D. Del. Nov. 5, 2014).

| Term | ViaTech Construction | Microsoft Construction |
|---|---|---|
| "information controlling operations of the file access control mechanism" | "license checking, validation, and usage data controlling operations of the file access control mechanism" | Indefinite |

The asserted claims also describe the dynamic license database as storing "information controlling operations of the file access control mechanism."  *See* col. 41:20–24, 48:1–6, 49:34–

39.  The '567 patent specification distinguishes this information from the "license information controlling licensed use of the digital content" by explaining that, while some data in the dynamic license database Dldb 14 is "informational," other data, including exemplary fields such as, e.g., "a grace period setting field determining a period in which the user is permitted to use the DCF 10 after the license expires," are "used for license checking, validation, and usage control" by the components of file access control mechanism FACM 12.  *See* col. 26:66–28:67. Term 18 ("information controlling operations of the file access control mechanism") is described and defined in the specification and not indefinite.  It should be construed as "license checking, validation, and usage data controlling operations of the file access control mechanism"  *See Hand Held Products*, 2014 WL 5779416, at *4.

<u>Defendant Microsoft's Answering Position</u>

| ViaTech Construction | Microsoft Construction |
|---|---|
| "data defining the terms and conditions of a license controlling licensed use of the digital content" | Indefinite |
| "license checking, validation, and usage data controlling operations of the file access control mechanism" | Indefinite |

These final two terms will be addressed together, and the dispute with regard to them is whether they are indefinite.  The asserted claims each require the dynamic license database to store "license information controlling licensed use of the digital content" and "information controlling operations of the file access control mechanism."  These are two different phrases that must have different meanings.  *Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008).

The claims expressly recite that the dynamic license database stores both types of information, but the specification provides no guidance to determine what types of information

fall within the first category, and what types fall within the second.  Neither phrase is defined in the specification.  Nor does the specification provide any examples of these different types of information, from which the meaning of each term could be gleaned. (Wicker Decl. at ¶47) (A378–79)  The terms are indefinite because the scope of the claims cannot be determined with reasonable certainty.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

ViaTech's attempt to define and distinguish these types of information from one another only underscores their indefiniteness.  ViaTech argues that the first term, "controlling licensed use," corresponds to the "terms and conditions" of a license. In this regard, the patent states that "if the terms and conditions of the license are satisfied, the Wdll 48 LicMech 16 functions decrypts and loads" encrypted content. (17:18-21)

In other words, satisfaction of the "terms and conditions" is both a necessary and a sufficient condition for accessing the content.  Thus, if the "terms and conditions" maps to the "data defining the terms and conditions of a license controlling licensed use of the digital content" term, there is no other information that maps onto the "license checking, validation, and usage control." (Wicker Decl. at ¶47) (A378–79)

Viatech attempts to fill this gap by saying that the patent distinguishes information "controlling operations" from data that is merely "informational."  However, both of these claim terms require control.  The first term requires "controlling licensed use," and the second requires "controlling operations of the file access control mechanism."

ViaTech attempts to address this by pointing, as an ostensible example of information "controlling operations" of the file access control mechanism, to the disclosure of "a grace period setting field determining a period in which the user is permitted to use the DCF 10 after the license expires or fails for any reason." (27:31-33)  However, the grace period is plainly part

of the "terms and conditions" of a license, along with things like expiration control fields, duration fields, and auto-renewal fields. (27:7-63)   The question that therefore remains unanswered is, if the "terms and conditions" of the license are examples of the first type of information "controlling licensed use," where does the specification describe a second type of information "controlling operations of the file access control mechanism"?   The answer is, nowhere. (Wicker Decl. at ¶47) (A378–79)

ViaTech chose to separately recite two different types of information that are to be stored in the database.  While ViaTech's reasons are known only to it, the fundamental point is that the patent specification fails to provide any guidance to determine what types of information fall within the first type, and what types fall into the second type. (Wicker Decl. at ¶47) (A378–79) These terms are therefore indefinite, and the claims that recite them invalid. *Nautilus*, 134 S. Ct. at 2124 (2014).

Plaintiff ViaTech's Reply Position

Microsoft's argues that the terms "license information controlling licensed use of the digital content" and "information controlling operations of the file access control mechanism" are indefinite because "both of these claim terms require control," and "the specification provides no guidance to determine what types of information fall within the first category, and what types fall within the second."  *See supra* pp. 77–79.  In fact, however, the specification does distinguish between "license information," including "terms and conditions" which can be merely "informational," and information "used for license checking, validation, and usage control" by the components of file access control mechanism FACM 12 which is not, and it provides examples falling into both of these categories.  *See* col. 20:31–22:46, 35:65–36:12 (license information); col. 26:66–28:67 (information controlling operations); *see also* Goldberg Decl. ¶ 13 (A249).  Those examples include data fields stored in the dynamic license database

79

Dldb 14 which describe a license and its terms, but are not used as control parameters for the file access control mechanism FACM 12 components.[70]  And, in addition, they include "control parameters" pertaining to "the user's system on which the DCF 10 resides, and the runtime environment in which the DCF 10 is accessed," which would not be license terms.  *See* col. 20:34–41; *see also* Goldberg Reply Decl. ¶ 11 (A542–43).[71]

Although some information may fall into both categories, whether a field is "license information" and/or "information controlling operations of the file access control mechanism" is not indefinite.  *Hand Held Products, Inc. v. Amazon.com*, No. 12–768–RGA–MPT, 2014 WL 5779416, at *4 (D. Del. Nov. 5, 2014); *Kroy IP Holdings, LLC v. Safeway, Inc.*, No. 2:12–cv–800–WCB, 2014 WL 3735222, at *1–2 (E.D. Tex. July 28, 2014); *Veracode, Inc. v. Appthority, Inc.*, No. 12-10487-DPW, 2015 WL 5749435, at *19–21 (D. Mass. Sept. 30, 2015).

Defendant Microsoft's Sur-Reply Position

If anything, ViaTech's Reply confirms the indefiniteness of these terms.  ViaTech struggles without success to provide a cogent distinction between these types of information.  First, ViaTech again points to "informational" content, such as a publisher name and contact information.  Such information is not an example of either category of information because, as ViaTech concedes, it is not used for "controlling" anything.  ViaTech next points to eLicense "control parameters" pertaining to the "user's system" and "runtime environment" at 20:34-41.

---

[70] These informational fields, which can be queried and viewed by the user as shown in, e.g., Figures 3A–B, include, for example, a description of the type of product that is licensed (e.g., software program or music file); the product name and version; the name, contact information, and web address of the software publisher; the name of the reseller from which software was purchased; and a receipt for purchase.  *See* col. 21:33–45, 21:50–51, 22:1–3, 26:66–27:2.

[71] Microsoft claims that a "grace period" is "plainly part of the 'terms and conditions' of a license" in addition to being information that controls operation of the FACM 12 components (*see supra* pp. 78–79), but this is wrong because the patent states that the grace period applies "after the license expires or fails."  *See* col. 27:31–33.

These eLicense "parameters" are not described in detail, but, as "control" parameters, would appear to fall equally under both types of information.  ViaTech fails to identify examples of information that would fall within each category, but not the other.[72]   Because the patent specification fails to provide any guidance for construing and distinguishing these terms, they are indefinite.  *Nautilus*, 134 S. Ct. at 2124 (2014).

---

[72] Although not referenced in ViaTech's brief, Dr. Goldberg also identifies parameters concerning communication methods used by the FACM, but the patent does not suggest that such parameters are stored in the dynamic license database. Those parameters are thus not relevant to the two claim terms in question.

**COUNTERCLAIM-PLAINTIFF MICROSOFT'S U.S. PATENT NO. 6,243,468**

## A.   AGREED CONSTRUCTIONS

The parties agree to the following claim constructions:

| Term | Agreed Construction |
|---|---|
| "hashes" / "hashing a concatenation"[73] | Plain and ordinary meaning<br><br>(i.e., "transforms (transforming) a string of characters into a value that represents the original string")<br><br>Agreed construction, with the understanding that "represents" does not mean uniquely represents. |
| "registration unit"[74] | "software component that that registers a software product" |
| "computer is upgraded" / "upgraded computer" "computer that has been upgraded" / "upgrade"[75] | "a computer in which at least one of the hardware components has been changed" / "change at at least one of the hardware components in a computer" |

## B.   DISPUTED CONSTRUCTIONS

### 1.   Term 1[76]:  "product ID" (Claims 18, 23)

| Microsoft  Construction | ViaTech  Construction |
|---|---|
| "information that represents a software product" | "a code identifying a unique installation of a software product" |

Counterclaim-Plaintiff's Opening Position

The terms at issue are found in claims 18, 23, and 38 of United States Patent No. 6,243,468.  Microsoft only addresses limitations from claims 18, 23, and 38 of the '468 Patent because those are the only claims that are asserted.

---

[73] Term 6 in Joint Claim Construction Chart. *See* D.I. 73 (Joint Claim Construction Chart) at 7.

[74] Term 8 in Joint Claim Construction Chart. *See id.* at 9.

[75] Term 15 in Joint Claim Construction Chart. *See id.* at 16.

[76] The Term number refers to the numbering in the Joint Claim Construction Chart.

Turning to the first term in dispute, a "product ID" is simply a piece of information, such as a number, that represents a software product.  The specification is clear that it is nothing more exotic than that.  The '468 Patent provides a "software anti-piracy system that adapts to hardware upgrades." ('468 Patent, Title).  In the '468 Patent, an anti-piracy system is added to a software product so that the software product will only run on a designated computer. ('468 Patent, Abstract)  The anti-piracy system accomplishes this goal by registering a software product for use on a particular computer.  When the software executes, the computer on which it is being run is examined to determine if it is the computer on which the software product was registered,[77] and if not, execution is not permitted.  ('468 Patent, 2:35-43)

In claims 18 and 23, the system employs a "product ID" and "hardware ID."  The product ID represents the product being protected and the hardware ID represents the computer on which the software product is registered.  The '468 Patent states that a hardware ID may change if an "unscrupulous customer attempts to install the product on another computer" ('468 Patent, 7:31-32) or if a legitimate customer modified the computer by upgrading a component.  For example, a "different hardware ID suggests that the underlying hardware components have been altered in some manner.  For instance, reconfiguring the floppy disk drive or replacing the hard disk drive might change the hardware ID."  ('468 Patent, 7:24-30)

In claims 18 and 23, the product ID is used in conjunction with the hardware ID to compute a registration ID.  For example, Microsoft might assign a product ID to Microsoft Word software and a different product ID to its Media Player software.  Even if the hardware ID is the

---

[77] The system attempts to distinguish between an upgraded computer (which is considered the original computer even though hardware changes have been made) and a different computer. ('468 Patent, 1:7-11)

same (because both programs are registered on the same computer) the computed registration ID for each product will generally be different (because the product IDs are generally, although not necessarily, different).   Where the registration IDs are different, the registration ID for Media Player will not enable the use of Microsoft Word and likewise the registration ID for Microsoft Word will not enable the use of Media Player.[78]   To achieve this, the "product ID" merely needs to be "information that represents a software product."   The '468 Patent has examples of possible product ID's but they are just that—exemplary.   ('468 Patent, 2:48-51, 5:29-31, 5:52-56)

ViaTech's construction is incorrect, and unduly narrow, for at least two reasons.   First, a "product ID" does not identify a "unique installation."   Second, a "product ID" does not need to be a "code," a word that is if anything far less clear than "product ID."

With regard to the first issue, a product ID in the '468 patent does not identify a "unique installation."   Rather, as explained above, the product ID and the hardware ID together are used to register a particular software title to a particular computer.   Indeed, the term "unique installation" does not even appear in the '468 patent, and it is unclear what that even means. Nothing in the patent even requires the product ID to be a unique value—it simply needs to represent a software product.[79]

The basis for ViaTech's construction appears to be a single sentence discussing one example of a product ID—an example that is by no means definitional.   That passage states that "the customer is prompted to enter a portion of the product ID of the software product.   The product ID (PID) *in this case* is the CD key printed on label 23 of the shrink-wrap package."

---

[78] Or, for example, different software vendors may have different product IDs but each vendor may use a single product ID to identify that vendor's products.

[79] While true that a software company might want to assign a different product ID to different products, that is not a requirement of an anti-piracy system.

('468 Patent, 5:29-33) (emphasis added)  The phrase "in this case" demonstrates that this is an exemplary product ID and not the only possible product ID.  The passage further states that this product ID is combined with "other information" to generate a new product ID "that is unique to the specific installation."  ('468 Patent, 5:34-39)  First, it would be improper to read the "uniqueness" of the second product ID into the claim at all.  Second, it is clear from this passage that the first product ID is not unique, and therefore it would be improper to adopt a construction for the claim term "product ID" that requires uniqueness, since that would exclude the first product ID.  *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) ("[A] claim construction that excludes a preferred embodiment ... is rarely, if ever correct and would require highly persuasive evidentiary support.") (quoting *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed.Cir.2003)).

Moreover, these passages merely discuss exemplary product IDs, and because the patentee did not express an intent to be its own lexicographer, the broad ordinary meaning of "product ID" controls.[80]  *Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) ("A patentee can act as his own lexicographer, but, to do so, 'a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning' and must 'clearly express an intent to redefine the term.'").

ViaTech's construction also includes the word "code."  Although the '468 patent does provide an example of a "product ID" as being a "registered product code," the term "product ID" is not limited to registered product codes.  ('468 Patent, 2:5-6)  Rather, a "product ID" is

---

[80] To the extent that ViaTech attempts to argue that the "ordinary meaning" of product ID is limited to "unique installations," Microsoft notes that ViaTech's own '567 Patent states that a "product ID" is "a code identifying the product."  ('567 Patent, 22:10)

broadly "information" that represents a software product.  The Court should reject the use of the word "code" because it is merely one example in the '468 Patent and, without more, could be vague and unclear.[81]  A jury will understand the word "information."  To the extent that a "code" is something more specific than "information," the word "code" would itself require further construction and should thus be avoided.  "'Claim construction' is for the purpose of explaining and defining terms in the claims," *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008), and ViaTech has not yet explained why it seeks the word "code" instead of the more understandable term "information."  *See also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) (claims are construed as an aid to the decision-maker, by restating the claims in non-technical terms).

Counterclaim-Defendant's Answering Position

Microsoft's '468 patent describes and claims a "Software Anti-Piracy System That Adapts To Hardware Upgrades." The specification of the patent states that the claimed system reduces piracy by requiring each software product to be "registered for a single computer that consists of a specific hardware composition." *See generally* col. 2:35–3:47.

The parties submitted their Joint Claim Construction Chart to the court December 22, 2015. That Chart identifies twenty-four claim terms appearing in claims 1 through 36, 38 and 39 of the '468 patent for construction, D.I. 73, although Microsoft's Opening Claim Construction Brief proposes constructions for only eight of those terms appearing in claims 18, 23, and 38. *See supra* at 82. All of the terms proposed for construction in the Joint Chart are, however,

---

[81]  For example, the term "code" is being used in this context as a number or some similar identifier.  It certainly isn't software code, which might be where ViaTech is trying to get.

addressed in this brief, and ViaTech's proposed constructions should be adopted by the court as explained below.[82]

The parties dispute whether the term "product ID" appearing in claims 1, 4–5, 10, 13, 18, 21–24, 27–29, 32, and 36 can be any information that merely "represents a software product" (Microsoft), or whether it must be "a code identifying a unique installation of a  software product" (ViaTech). Microsoft first argues that the use of the word "code" in ViaTech's construction as "vague and unclear." *See supra* at 85–86. Microsoft's argument is wrong, and the court should adopt ViaTech's proposed construction of this term because the specification specifically states that the "product ID" consists of a sequence of bits, or "code," identifying the software product installed on a particular computer, including, e.g., a serial number such as a product key that is unique to the specific software installation.[83] *See, e.g., Noah Systems Inc. v. Intuit Inc.*, No. 06–cv–00933, 2010 WL 9096712, at *36–37 (W.D. Pa. May 7, 2010) (construing

---

[82] Microsoft has not modified its infringement contentions, and has specifically asserted that it is reserving the right to assert infringement of the remaining claims of the '468 patent.

[83] *See* Abstract, col. 2:36–43 ("This invention concerns an anti-piracy system and method that reduces the opportunity for piracy and illicit use of software products by requiring each software product to be registered for a single computer that consists of a specific hardware composition."); col. 2:48–51 ("The software product has an associated product ID consisting of, for example, a manufacturer ID, a registered product code, a serialized number, and a checksum value."); col. 5:30–39, 5:46–56 ("At step 150, the software product 100 obtains its product ID 102.  As an example, the product ID consists of a 5-bit RPC (registered product code) value for the software product, a 3-bit site value indicating a place of manufacture, and a 7-bit serialized number that is incremented with each product."); col. 1:66–2:10, 5:20–39 ("The manufacturer generates and assigns a serialized key that uniquely identifies that product. For instance, the key might consist of a manufacturer ID, a serialized incrementing number, a registered product code, and a checksum value. The key is printed on a label 24 and affixed somewhere on the product, such as the CD-ROM case. . . . During installation, the customer is prompted to enter a portion of the product ID of the software product.  The product ID (PID) in this case is the CD key printed on label 24 of the shrink-wrap package. The customer enters the product ID 102, which is associated with the program 100. Additionally, another portion of the product ID is already included in the software program 100 and the software product combines the two portions, along with other information, into a product ID that is unique to the specific installation.").

"standardized itemization codes" as "a code or identifier for a product or service . . ."), *adopted in relevant part* 2010 WL 3191844, at *2 (W.D. Pa. Aug. 11, 2010); *Carnes Co. Inc. v. Penn Ventilation, Inc.*, No. 99–C–0650–C, 2000 WL 34235985, at *2–4 (W.D. Wisc. July 27, 2000) (construing "product identification code" as a "unique identifier for a particular product . . ."); *Single Touch Interactive Inc. v. Zoove Corp.*, No. 12–cv–831 YGR, 2013 WL 3802805, at *2,*12–15 (N.D. Cal. July 17, 2013) (construing "advertiser identifier" and "product identifier" as "an alphanumeric code to select a particular advertiser/product . . .").

Microsoft also argues that the term "unique installation" in ViaTech's construction is unclear. *See supra* at 84 ("[T]he term 'unique installation' does not even appear in the '468 patent, and it is unclear what that even means. Nothing in the patent even requires the product ID to be a unique value—it simply needs to represent a software product."). The court should reject this argument, and Microsoft's proposed construction, because they are not supported by the specification or consistent with the purpose of the invention. Microsoft admits that the anti-piracy system of the '468 patent ensures that each purchased copy of a software product can be installed, registered, and used only "on a particular computer."[84]  To achieve this purpose, every example of a "product ID" described in the patent includes a serial number (e.g., a "CD key printed on label 24 of the shrink-wrap package") that is "unique to the specific installation."  *See supra* note 83.  If the "product ID" were not unique to the copy of the software

---

[84] *See supra* at 82–83 ("In the '468 Patent, an anti-piracy system is added to a software product so that the software product will only run on a designated computer. The anti-piracy system accomplishes this goal by registering a software product for use on a particular computer." (record citation omitted)).

purchased, installed, and registered by a user, then the user could, e.g., use the same CD-ROM to install and register an unlimited number of pirated copies of the software, and the system would not be able to distinguish these pirated installations from other legitimate installations because they would all have the same generic "product ID" (e.g., "Microsoft Word" or "Media Player").

Unlike Microsoft's construction, ViaTech's construction ("a code identifying a unique installation of a software product") is consistent with the purpose of the invention, and it should be adopted by the court. *See, e.g., Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1368–71 (Fed. Cir. 2014) ("The specification demonstrates that the entire purpose of the invention was to enable the application to be stored within the memory on the chip of the integrated circuit card."); *InterDigital Communications, Inc. v. ZTE Corp.,* Nos. 1:13–cv–00009–RGA, –00010–RGA, 2014 WL 1620733, at *5–6 (D. Del. Apr. 22, 2014) ("The Court finds that the inventor's description of the '244 Patent, as solving the problem of manual selection, limits the scope of the patent.").

Counterclaim-Plaintiff's Reply Position

As a preliminary matter, Microsoft only addresses limitations from claims 18, 23, and 38 of the '468 Patent because those are the only claims that are asserted.[85]

In its proposed constructions for nearly all of the disputed terms in Microsoft's patent, ViaTech seeks to read numerous minute details from the specification into the claims, all based

---

[85] Microsoft notes that ViaTech's arguments for the non-asserted claims are essentially the same as for the asserted claims and are likewise incorrect for the same reasons expressed in Microsoft's briefing.  Because the claims are not asserted, any dispute regarding those claims is moot.

on a theory of lexicography.  However, ViaTech does not and cannot meet the strict showing required to depart from the ordinary and customary meaning of a claim term on this ground, which requires showing that the patentee "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning' and must 'clearly express an intent to redefine the term." *Cadence Pharm. Inc. v. Exela PharmSci Inc.,* 780 F.3d 1364, 1369 (Fed. Cir. 2015).

The proper starting point for the inquiry is therefore the ordinary meaning of the term, and in that regard, ViaTech does not dispute that the ordinary meaning of a "product ID" in the context of anti-piracy software is "information that represents a software product."  Thus, there is no dispute that nothing in the ordinary meaning of the term requires a "code" let alone "a code identifying a unique installation of a software product," as ViaTech proposes.  Nothing in the intrinsic record warrants reading either limitation into the term.

As to the aspect of ViaTech's proposed construction that requires the "product ID" to be a "code," ViaTech asserts that the specification "specifically states that the 'product ID' consists of a sequence of bits, or 'code'."  (*Supra* at 87)  This is factually incorrect.  In fact, the specification states that a "code" is merely one possible example of a product ID: "The software product has an associated product ID consisting of, *for example,* a manufacturer ID, a registered code, a serialized number, and a checksum value."  ('468 Patent, 2:48-51)  The term is plainly not limited to the example, which includes a number of components including a manufacturer ID and a serialized number which are not referred to as "codes."  Nothing in the specification suggests that the "registered code" is necessary to the invention or part of every Product ID.  *See, e.g., Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*) (a specification often makes a distinction between "setting out specific examples of the invention," which are not limiting, as opposed to presenting "the claims and the embodiments in the specification to be

coextensive."); *Prolitec, Inc. v. Scentair Techs., Inc.*, 807 F.3d 1353, 1358 (Fed. Cir. 2015) (rejecting construction that would exclude disclosed embodiments, noting that the specification's "use of 'may' signifies that the inventors did not intend to limit" the term); *Inline Plastics Corp. v. EasyPak, LLC*, 799 F.3d 1364, 1368 (Fed. Cir. 2015) (error to construe "frangible section" narrowly so as to exclude disclosed embodiment).

Turning to the aspect of ViaTech's construction requiring the "product ID" to be a code "identifying a unique installation of a software product," ViaTech points to nothing in the intrinsic record that "clearly set[s] forth" a definition of "product ID" that requires "identifying a unique installation." Indeed, and very much to the contrary, the specification expressly discloses that a given "product ID" can be associated with multiple "hardware IDs" representing different installations.

To put this issue into context, the background of the patent discusses prior art systems where a single key can be used to install a given piece of software on multiple machines: "The product tracks the number of installations. Once the purchaser enters the same key more times than a defined limit, the product is disabled." ('468 Patent, 2:15-17)

The problem with such a system was not that a single key could be associated with multiple installations, but rather that an upgraded computer is a different "installation" that counts against the overall allotment:

> While such mechanisms help reduce illicit copying, they often cause other problems in the form of consumer inconvenience. For instance, the premise that more installations than a requisite number means illegal use may be wrong in some cases. A user who has upgraded his/her computer, for example, should be able to legitimately reinstall the software product on the upgraded machine. However, if the requisite number of installations has already been reached, the product will not install, forcing the user (who is now disgruntled) to call the manufacturer for assistance.

('468 Patent, 2:20-28)

The '468 addresses this issue by adding logic that attempts to distinguish an upgraded computer from a new computer, even though they are both new installations. In an exemplary embodiment, an authorized computer is distinguished from an unauthorized computer based on an evaluation of the "hardware ID."  When a software product is first installed, a "hardware ID" is generated and registered in association with the product ID. ('468 Patent, 2:52-3:4)  When the software product is subsequently launched, the hardware ID is checked.  If the hardware ID at the time of launch is the same as the hardware ID at the time of registration, the software is permitted to run.  Otherwise, if the hardware IDs are different, then the "software product determines whether a new set of hardware components in the computer is substantially different from the original set of hardware components."  ('468 Patent, 3:26-28)

For example, if only a few components have changed, the computer is determined to be an "upgraded" computer.  However, if substantial changes are made, then the computer is determined to be a new (and thus unauthorized) computer ('468 Patent, 3:30-36), and "the software product is prevented from operating on this new computer without an additional license from the registration authority."  (*Id.* at 3:36-38)  The patent explains that the customer may "contact the registration authority to obtain a new registration ID, and if appropriate, pay an additional licensing fee for ***an additional installation***." ('468 Patent, 7:34-36)  Thus, in this scenario, the same product ID is associated with both the original hardware ID for the original installation, and the new hardware ID for the new installation.

Moreover, the specification further explains that when the current hardware ID does not match the originally registered hardware ID, the software product can send both the product ID and the new hardware ID to the registration authority.  ('468 Patent, 8:50-56)  The registration authority then evaluates the extent of the change in the hardware ID and, if the differences are

not substantial, issues a new registration ID.  ('468 Patent, 8:58-65)  In this scenario, there can be "multiple entries in the database for a single product ID."  ('468 Patent, 8:65-66)  In short, the specification plainly contemplates multiple scenarios where a single product ID can be associated with multiple "hardware IDs" representing different installations.

While ViaTech correctly notes the specification elsewhere discloses "a product ID that is unique to the specific installation" ('468 Patent, 5:37-38), that single disclosure does not trump the other extensive disclosure of product IDs that are <u>not</u> unique to a specific installation.[86]  The specification, taken as a whole, makes clear that there simply is no "uniqueness" requirement for the claim term "product ID."

ViaTech also misreads the patent when it asserts that "[e]very example of a 'product ID' described in the patent includes a serial number (e.g., a 'CD key printed on label 23 of the shrink-wrap package') that is 'unique to the specific installation."  (*Supra* at 88)  As the above discussion shows, even a product ID with a serialized number can be associated with multiple installations.  In fact, the "serialized number" in the example of a "CD key" represents a CD containing software which is intended to be installed multiple times.  ('468 Patent, 2:15-19)  A product ID, however, need not have a serialized number and need not be a "CD key."  Indeed, the patent is not limited to software distributed via CD.  "In other implementations, the software product may be delivered electronically over a network."  ('468 Patent, 5:25-27)  If there is no CD, there would be no "CD key."

---

[86] As Microsoft pointed out in its Opening Brief, this passage states that the CD key product ID may be combined "with other information, into a product ID that is unique to the specific installation."  ('468 Patent, 5:29-39)  Thus, the CD key product ID could be non-unique, with the "other information" making the exemplary product ID "unique to the specific installation."

Finally, ViaTech suggests that the "purpose of the invention" requires a product ID that is unique to a specific installation.  As noted above, this too does not withstand scrutiny.  The background of the invention contemplates a single product ID associated with multiple installations, as does the discussion of the preferred embodiments.

The two cases that ViaTech cites are therefore distinguishable.  In each case, the patentee sought a broad construction that would include technology specifically excluded from the invention.  *See, e.g., Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1368–71 (Fed. Cir. 2014) (patentee's construction permitted external storage where "the patented invention was designed to eliminate the need for such external storage"); *InterDigital Communications, Inc. v. ZTE Corp.*, Nos. 1:13–cv–00009–RGA, –00010–RGA, 2014 WL 1620733, at *5–6 (D. Del. Apr. 22, 2014) (invention distinguished from prior art manual connection techniques and is thus limited to "automatic" connections).  There has been no such exclusion or limitation from the claimed scope of the '468 patent with regard to the "product ID."  It was not an objective of the '468 Patent to eliminate non-unique product IDs, no prior art was distinguished on that basis, and embodiments of the invention specifically contemplate use of product IDs that are not unique to an installation.

Given the absence of anything in the intrinsic record that "clearly set[s] forth a definition of the disputed claim term other than its plain and ordinary meaning," the Court should adopt as the construction for this term its undisputed ordinary meaning:  "information that represents a software product."

<u>Counterclaim-Defendant's Sur-Reply Position</u>

Microsoft states, incorrectly, that "ViaTech does not dispute that the ordinary meaning of a 'product *ID*' in the context of anti-piracy software is 'information that represents a software

product,'" and that "nothing in the ordinary meaning of the term requires a 'code' let alone 'a code identifying a unique installation of a software product,' as ViaTech proposes." *Supra* at 90. In fact, it is Microsoft's construction that differs from the ordinary meaning of the term "product ID" (or "identification"), which numerous courts have found to mean a "code," "identifier," or some other sequence of letters, numbers, or symbols that "identifies" a particular product, as proposed by ViaTech.[87]   The specification of the '468 patent is consistent with this ordinary meaning because it states that the "product ID" and "hardware ID" are sequences of bits on a computer that "identify" or "uniquely identify" each software product or set of hardware components.[88]   Whereas ViaTech's construction of "product ID" as "a code identifying" the product is consistent with the ordinary meaning and the specification, Microsoft's construction of any "information" that merely "represents" the product in some unspecified and non-unique way is broader than both, and would improperly read the "ID" portion of "product ID" out of the claims.[89]   *See Apple Inc. v. Motorola, Inc*., 757 F.3d 1286, 1304–05 (Fed. Cir. 2014).

---

[87] *Compare*, *e.g*., Ex. 1 at 5 (A756) (defining "code" as, e.g.: "Any representation of one set of data for another. For example, a parts code is an abbreviated name of a product, product type or category."), *with Noah Systems Inc. v. Intuit Inc.,* No. 06–cv–00933, 2010 WL 9096712, at *36–37 (W.D. Pa. May 7, 2010), *adopted in relevant part* 2010 WL 3191844, at *2 (W.D. Pa. Aug. 11, 2010), *Carnes Co. Inc. v. Penn Ventilation, Inc.,* No. 99–C–0650–C, 2000 WL 34235985, at *2–4 (W.D. Wis. July 27, 2000), *and Single Touch Interactive Inc. v. Zoove Corp.,* No. 12–cv–831 YGR, 2013 WL 3802805, at *2,*12–15 (N.D. Cal. July 17, 2013).

[88] *See* col. 1:66–2:4, 5:51–56 ("The manufacturer generates and assigns a serialized key that uniquely identifies that product. . . . As an example, the product ID consists of . . . a 7-bit serialized number that is incremented with each product."); col. 2:52–57, 5:57–59 ("During installation, the software product generates a hardware ID that identifies the set of hardware components.") & claims 1, 3, 8–10, 12, 16–18, 20, 22, 24, 26, 28–29, 31, 33–37.

[89] For example, a product category ("word processor"), a description of the product's functionality ("a word processor that allows the user to edit text, save documents, and perform

Likewise, Microsoft is wrong that "the ordinary meaning of a 'product ID' in the context of anti-piracy software" does not require "'identifying a unique installation of a software product'" on a computer, and that there is "nothing in the intrinsic record" that supports this construction. *See supra* at 82–86. Instead, the '468 patent states that both "[a]n anti-piracy system" in general and "[t]his invention" in particular "reduc[e] the opportunity for piracy and illicit use of software products by requiring each software product to be registered *for a single computer*." *See* Abstract, col. 2:36–43 ("If a user attempts to install the software product on another computer, the software product will recognize a different hardware composition and disable itself.").[90]   Although Microsoft claims that the patent describes "multiple scenarios where a single product ID can be associated with multiple 'hardware IDs' representing different installations" on different computers (*see supra* at 92–93), the passages from the specification it cites actually support ViaTech's proposed construction. When the system detects a "new computer," the user must obtain "an additional license" by paying "an additional licensing fee for *an additional installation*" (*see supra* at 92 (citing col. 3:26–38, 7:34–36)), which requires obtaining and entering a new, unique "product ID."[91]   Conversely, when the system merely

_____

supporting functions such as spell checking"), or even the source code for the entire product might be "information that represents" a software product, but they would not be a "product ID."

[90] *See also* col. 1:6–11; col. 3:53–55 ("an anti-piracy system that facilitates registration of a software product for installation and use on a particular computer"); col. 3:66–4:1 (same); col. 7:14–22, 39–52 ("The anti-piracy system is effective at stopping repeated installation of the same software product on multiple different machines.").

[91] *See, e.g.*, col. 5:20–45 ("With reference again to FIG. 2, the customer purchases a software product . . . . During installation, the customer is prompted to enter a portion of the product ID of the software product. . . . [T]he software product combines the two portions, along with other information, into a product ID that is unique to the specific installation.").

detects an upgraded version of the same computer, it permits the software to run without obtaining a new license (and a new "product ID"), because the software has only been installed on a single computer. *See supra* at 92–93 (citing col. 8:50–66).

### 2. Term 2: "hardware ID" (Claims 18, 23)

| Microsoft  Construction | ViaTech  Construction |
| --- | --- |
| "information that represents a set of hardware components within a computer" | "a code identifying a set of hardware components within a computer" |

Counterclaim-Plaintiff's Opening Position

There are two disputes with regard to the construction of this term.[92]

First, whereas Microsoft contends that a hardware ID need only be "information," ViaTech seeks to limit the term to a "code."  For the reasons discussed above with respect to the "product ID" limitation, this term need only provide some way of representing the hardware components, because that is all that is needed in order to register a particular software program to a particular computer.  To the extent that ViaTech believes the word "code" implies something more restrictive than "information," ViaTech has not explained what that distinction is or why it is appropriate.  Moreover, the specification does not use the term "code" in connection with the hardware ID.

Second, the hardware ID need only "represent" a set of hardware components, and does not need to "identify" those components, as ViaTech proposes.  For example, in the '468 Patent, the hardware ID is used to distinguish one set of hardware components from another set, and to detect whether a computer has been legitimately modified or whether the software has been loaded on a new computer.  (*See, e.g.*, '468 Patent, 7:24-30; 7:39-52).

---

[92] Microsoft has added "within a computer" to its construction to eliminate a potential dispute.

There is simply nothing in the patent to support ViaTech's proposal that the hardware ID must identify the specific hardware components.  For instance, there is nothing that requires the hardware ID to identify, *e.g.,* that the computer is using an Intel Pentium processor, and the particular models of hard drive, floppy disk, network interface card, etc.  A hardware ID is created to represent a particular set of hardware so the hardware ID may be compared to a subsequently generated hardware ID.  ('468 Patent, 5:57-59)  Indeed, the hardware ID may not necessarily change even if the hardware changes, further underscoring that it need not "identify" anything.  ('468 Patent, 7:23-29)  If ViaTech's construction excludes such a hardware ID, as the word "identify" suggests, then it is incorrect.  *See Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) ("[A] claim construction that excludes a preferred embodiment ... is rarely, if ever correct and would require highly persuasive evidentiary support.") (quoting *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed.Cir.2003)).

<u>Counterclaim-Defendant's Answering Position</u>

The parties' dispute is whether these terms can be any information that merely "represents a set of hardware components" (Microsoft), or whether they refer to "a code identifying a set of hardware components within a computer" (ViaTech). The court should adopt ViaTech's proposed construction because the specification explicitly states that the "hardware ID" consists of a sequence of bits that is derived from and identifies a set of hardware components on the computer.[93]

---

[93] *See* col. 2:44–48, 2:52–60 ("According to one aspect of the invention, the system includes a software product that is loaded onto a specific computer having a set of hardware components (e.g., RAM, hard disk drive, floppy disk drive, BIOS, network card, video card, etc.). . . . During installation, the software product generates a hardware ID that identifies the set of hardware components. As an example, the software product generates a five-digit hardware ID that

Microsoft proposes a broader construction of "hardware ID" which would encompass any information that represents a set of hardware components. *See supra* at 97 ("[T]he hardware ID need only 'represent' a set of hardware components, and does not need to 'identify' those components, as ViaTech proposes."). The court should reject this argument because it is not consistent with the use of the term in the specification (*see supra* note 93), and it would read the explicit limitations of a "hardware ID" that "identifies" a set of hardware components within the computer out of the asserted claims.[94]  *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention."); *Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1304–05 (Fed. Cir. 2014) (rejecting construction that "contradicts the claim language because it reads 'analyzer server' out of the claim"); *CallWave Communications, LLC v. AT & T Mobility, LLC,* Nos. 12–1701–RGA, –1702–RGA, –1703–RGA, –1704–RGA,  –1788–RGA, 2014 WL 7205657, at *2 (D. Del. Dec. 17, 2014).

---

includes a bit representing each of five system components: BIOS, a video BIOS in the video card, RAM, a hard disk drive, and a floppy disk drive."); col. 3:39–47; col. 5:57–6:22 ("The software product 100 generates a hardware ID (H/W ID) that identifies a set of hardware components that make up the customer's computer 32 (step 152).").

[94] ViaTech's construction would not require the "hardware ID" to individually identify each of "the specific hardware components" as Microsoft argues. *See supra* at 97-98. Instead, ViaTech's proposed construction requires that the "hardware ID" identify a set of hardware components as a whole, as required by the explicit language of the claims.

Counterclaim-Plaintiff's Reply Position

Contrary to ViaTech's assertion, the '468 Patent does not provide any special definition for "hardware ID."[95]

As to ViaTech's assertion that the hardware ID must be a "code," the hardware ID is never identified as a "code," even on an exemplary basis, in the specification of the '468 Patent.[96]   Rather than identify any disclosure of a "code," ViaTech instead points to a passage stating that a hardware ID can be "a sequence of bits." (*Supra* at 87)  However, ViaTech fails to note that this is merely exemplary:  "***As an example***, the software product generates a five-digit hardware ID . . ." ('468 Patent, 2:54-56)

With regard to ViaTech's proposed inclusion of the term "identifying" in its construction, this word creates a significant risk of confusion, in suggesting that one be able to determine what the constituent hardware components are from the hardware ID.  As noted above, the role of the hardware ID is to distinguish two different installations, which can be accomplished without actually "identifying" the specific hardware components that constitute each installation.  For example, because the hardware ID is derived from multiple components on a computer, two computers with different components should, typically, generate two different hardware IDs. However, it is possible that two computers with different components may generate the same hardware ID.  ('468 Patent, 7:23-29)  This is because the disclosed hardware ID algorithm does

---

[95] It is worth noting that ViaTech proposes the same construction for "hardware ID" as for the term "multi-bit hardware ID."  Clearly, the term "multi-bit hardware ID" is narrower than the term "hardware ID," and ViaTech's proposed constructions ignore the differences between the terms.

[96] In its opening brief, Microsoft invited ViaTech to explain the scope of the word "code" in its proposed constructions.  ViaTech declined to do so.

not guarantee that different hardware components will necessarily generate different hardware IDs.[97]   Thus, any given hardware ID cannot be used to identify the constituent hardware components that were used to generate the hardware ID.

Here too, given that ViaTech has failed to identify any evidence warranting departure from the ordinary meaning of hardware ID, the Court should adopt that meaning as the construction of the term:  "information that represents a set of hardware components within a computer."

<u>Counterclaim-Defendant's Sur-Reply Position</u>

Similar to Term 1 ("product ID"), Microsoft argues, incorrectly, that ViaTech's construction of Term 2 "depart[s] from the ordinary meaning of hardware ID."  *See supra* at 100-01. ViaTech's construction of this term as a "code identifying" the set of hardware components is consistent with the ordinary meaning of the term "hardware *ID*" (or "identifier"), as stated above with respect to Term 1.   In contrast, Microsoft's construction of "hardware ID" as "information that represents" (but does not "identify") the hardware components is inconsistent with the patent,[98] and would read the term "ID" out of the claims.

Microsoft argues, also incorrectly, that the term "'identifying' . . . creates a significant risk of confusion" because it would require "'identifying' the specific hardware components that constitute each installation."  *Supra* at 100.  ViaTech's construction only requires "identifying *a*

---

[97]For example, the hardware ID may be derived from a subset of components that are common to two machines, or the components may be sufficiently similar (e.g., have similar serial numbers) that, although different, they generate the same derived value for use in the hardware ID.

[98] Microsoft acknowledges that "the role of the hardware ID is to distinguish two different installations" of software on two different computers. *See supra* at 100. Information that merely "represents" the hardware components of a computer in some unspecified, non-unique way would not distinguish between those components and the components of a different computer.

*set of hardware components within a computer*" (in order to distinguish that set from the set in a different computer), not identifying each component individually.

### 3. Term 3: "registration ID" (Claims 18, 23)

| Microsoft  Construction | ViaTech  Construction |
|---|---|
| "information used in the process of determining whether a software product is permitted to operate" | "a code identifying a combination of a product ID and a hardware ID computed when a software product is registered" |

Counterclaim-Plaintiff's Opening Position

With regard to the aspect of ViaTech's proposed construction requiring "a combination of a product ID and a hardware ID computed when a software product is registered," that should be rejected both as redundant, and as an improper attempt to recharacterize other express claim language found in some, but not all, claims of the patent.

In particular, in both asserted claims that use this term (claims 18 and 23), the registration ID is "computed from the product ID and hardware ID."  However, other claims do not require the "registration ID" to be computed from the product ID and hardware ID.  For example, claim 10 recites a "registration ID that represents the software product being registered to run on a specific computer having a set of hardware components."  It would be plainly improper to adopt a construction of "registration ID" that requires it to be computed from the product ID and hardware ID when that detail is expressly recited in some claims and not others.

Turning to Microsoft's construction, the '468 Patent describes (and expressly recites in claims 18 and 23) a system in which a registration ID is received from a registration authority for the purpose of permitting software to run on a particular computer.  "The registration process forces the customer to register the software product for installation and use on a specific computer." ('468 Patent, 5:43-45; *see also* Abstract) In the preferred embodiment, the registration ID is provided in the process of registering a software product ('468 Patent, 6:48-58),

but of course this is an example and so "computed when a software product is registered," appearing in ViaTech's construction, is inappropriate.  The registration ID provides a license to operate software on a given computer: "the registration unit returns a message denying a new registration ID and explaining that a new license is required before the product can be reinstalled and run on the new computer."  ('468 Patent, 9:7-10)  Accordingly, the term "registration ID" should be construed as "information used in the process of determining whether a software product is permitted to operate."

Counterclaim-Defendant's Answering Position

The parties dispute whether the term "registration ID" is "information used in the process of determining whether a software product is permitted to operate" (Microsoft), or whether it is "a code identifying a combination of a product ID and a hardware ID computed when a software product is registered" (ViaTech). The court should adopt ViaTech's construction because the '468 patent states that a registration unit computes the "registration ID" from the product ID and hardware ID, for example using a hashing algorithm, when the software product is registered with a registration authority.[99]

_____

[99] *See, e.g.*, col. 2:61–3:4 ("The software product concatenates the product ID and hardware ID and sends it to a registration authority, such as the product manufacturer or an authorized third party.  The registration authority has a registration unit that computes a registration ID from the product ID and the hardware ID.  One preferred approach is to hash the concatenation of the product ID and hardware ID to produce the registration ID.  The registration authority stores the registration ID, product ID, and hardware ID in a database.  The registration authority sends the registration ID back to the software product, where the registration ID is stored locally on the computer."); col. 5:40–6:58 ("The registration server 34 has a registration unit 110 to assign a registration ID (Reg ID) to the software product on the customer's computer.  The registration unit 110 computes the registration ID from the product ID and the hardware ID (step 156 in FIG. 4).  In the illustrated implementation, the registration unit 110 employs a hashing algorithm 112 to compute a hash value of the concatenated product ID and hardware ID."); *see also* Claims 10, 24, 29 (describing "the software product having a corresponding original registration ID that

Microsoft argues, incorrectly, that "[i]t would be plainly improper to adopt a construction of 'registration ID' that requires it to be computed from the product ID and hardware ID when that detail is expressly recited in some claims and not others." *See supra* at 102.   The specification specifically states that "[t]he registration unit 110 computes the registration ID from the product ID and the hardware ID (step 156 in FIG. 4)" (*see supra* note 99), and this feature is necessary to achieve the purpose of the invention, which is to ensure that a single copy of the software product (represented by the product ID) can be registered only for a single computer (represented by the hardware ID), in order to prevent software piracy.[100]

In contrast, the construction for "registration ID" that Microsoft proposes ("information used in the process of determining whether a software product is permitted to operate") is not supported by the intrinsic evidence. As explained above, the method for registering the software product described in the patent involves sending information to a registration server of a registration authority, using a registration unit to calculate a registration ID, and receiving the registration ID from the registration server. *See supra* note 99.  It does not include "determining whether a software product is permitted to operate," as Microsoft proposes. This is a separate process described (e.g., in Figures 5 and 6 and the accompanying text in the specification), which

---

represents the software product being registered to run on a specific computer"); Claim 18 ("A method for registering a software product for use on a computer, comprising the following steps: . . . and storing the registration ID."); Claim 37 ("registering a software product for use on a computer having an original set of hardware components, comprising the following steps: . . . and storing the original registration ID").

[100] *See, e.g.*, Abstract, col. 2:36–43 ("This invention concerns an anti-piracy system and method that reduces the opportunity for piracy and illicit use of software products by requiring each software product to be registered for a single computer that consists of a specific hardware composition.").

consists of, e.g., calculating a test ID from the current product ID and hardware ID, and comparing the test ID to the registration ID in order to determine whether to permit the software product to run on the computer.[101]   The patent does not describe this separate process as registering the software product by obtaining a "registration ID," and there is no support for Microsoft's proposed construction.

Counterclaim-Plaintiff's Reply Position

Here too, ViaTech seeks to inject the word "code" into its construction, even though neither the asserted claims nor the specification refers to the "registration ID" as a "code."

ViaTech also seeks to limit the registration ID to one that is both "computed" and that "identif[ies] a combination of a product ID and a hardware ID."   While the asserted claims do state that the "registration ID" is "computed from the product ID and hardware ID," other claims reciting a "registration ID" do not include this requirement, demonstrating that it would be improper to read this limitation into the term itself.[102]

---

[101] Abstract; col. 3:5–47, 6:59–7:13 ("FIG. 5 shows steps in a method for running the software product 100 on the computer 32. . . . On each launch after installation, the software product obtains the product ID 102 (step 172) and generates the hardware ID from the set of hardware components within the computer (step 174).   At step 176, the software product 100 computes its own test ID from the product ID and hardware ID using the hashing algorithm 112. . . . The software product 100 retrieves the original registration ID 118 from memory 42 (step 178 in FIG. 5) and compares the test ID to the registration ID 118 (step 180 in FIG. 5). If the two match (i.e., the 'yes' branch from step 182), the software product is enabled to operate on the computer (step 184).   On the other hand, if no match occurs (i.e., the 'no' branch from step 182), the software product is locked and prevented from operating on the computer (step 186 in FIG. 5)."); col. 7:61–8:39; *compare also, e.g.,* Claim 18 (describing a "method for registering a software product for use on a computer" by obtaining and storing a "registration ID"), *with* Claim 24 (describing a "method for running a software product on a computer" by comparing the "registration ID" to a test ID).

[102] Microsoft argued in its opening brief that "[i]t would be plainly improper to adopt a construction of 'registration ID' that requires it to be computed from the product ID and

Moreover, neither the specification nor the claims require that the "registration ID" "identify[] a combination of a product ID and hardware ID" as ViaTech urges.  ViaTech also seeks to impose an improper temporal limit—i.e, that the registration ID be computed "when a software product is registered."  Nothing in the specification requires that the computation be performed "when a software product is registered," and ViaTech does not explain the basis for this further restriction.

By contrast, Microsoft's construction accurately reflects the role of the registration ID as described in the specification of the '468 Patent.  The registration ID is computed from the product ID and hardware ID in order to register a software product on a particular computer (based on the hardware ID).  ('468 Patent, 3:16-20)  By associating the registration ID with a hardware ID, the invention can permit the software product to run on the same or a substantially similar computer, but not on a computer that is not substantially similar.  In one embodiment, if the registration unit determines that a user is attempting to run the software on a computer that has a hardware ID that is deemed not associated with the registration ID, "the registration unit returns a message denying a new registration ID and explaining that a new license is required before the product can be reinstalled and run on the new computer."  ('468 Patent, 9:7-10)  Thus, the "registration ID" is, as Microsoft proposes, "information used in the process of determining whether a software product is permitted to operate."

ViaTech also argues that the act of registering the software product is a "separate process" from "determining whether a software product is permitted to operate."  (*Supra* at 104)

---

hardware ID when that detail is expressly recited in some claims and not others."  (*Supra*. at 102) ViaTech responds that Microsoft is "incorrect[]" but provides no case law supporting its position.  (*Supra* at 104)

Although this observation is not entirely accurate, it is in any event beside the point, since the act of registering generates the "information used in the process of determining whether a software product is permitted to operate," as Microsoft proposes in its construction.  Indeed, it is not accurate to call this a "separate process."  The act of registering is part of the overall process by which a software product is permitted to operate.  In the preferred embodiment, a software product is registered on a computer by storing a registration ID that is derived from, among other things, the hardware ID of a computer.  Once created, the registration ID is then used to determine whether the software product is permitted to run.  Microsoft's construction accurately captures the role of the registration ID in the specification, whereas ViaTech's construction is not based on the teachings of the specification.

> Counterclaim-Defendant's Sur-Reply Position

Term 3 ("registration *ID*"), like Term 1 ("product ID") and Term 2 ("hardware ID"), should be construed as a "code identifying" certain information.

Microsoft argues that the remainder of ViaTech's construction should be rejected because it "seeks to limit the registration ID to one that is both 'computed' and that 'identif[ies] a combination of a product ID and a hardware ID.'" *Supra* at 105. A code consisting of bits on a computer must be "computed" from the information it identifies, however, and Microsoft admits "the specification of the '468 Patent" states that the "registration ID is computed from the product ID and hardware ID in order to register a software product on a particular computer (based on the hardware ID)." *Supra* at 106 (citing col. 3:16–10); *see also supra* at 103 & n.99.

Microsoft argues that its construction of "registration ID" as "information used in the process of determining whether a software product is permitted to operate" "accurately reflects the role of the registration ID as described in the specification of the '468 Patent," because

"[o]nce created, the registration ID is then used to determine whether the software product is permitted to run." *Supra* at 107 ("The act of registering is part of the overall process by which a software product is permitted to operate."). According to Microsoft's logic, any information used by the anti-piracy system of the '468 patent—including the "product ID," "hardware ID," "test ID," and "registration ID"—would be "information used in the process of determining whether a software product is permitted to operate," and these terms would be interchangeable and improperly read out of the claims. *See Apple*, 757 F.3d at 1304–05.

### 4. Term 7: "registration authority remote from the computer" / "registration authority" (Claims 18, 23)

| Microsoft  Construction | ViaTech  Construction |
|---|---|
| Plain and ordinary meaning. Alternatively, "registration" means "the process of determining whether a software product is permitted to operate." | "a remotely located product manufacturer or authorized third party that registers a software product" |

<u>Counterclaim-Plaintiff's Opening Position</u>

The term "registration authority" recited in claims 18 and 23 does not require construction and should be given its plain and ordinary meaning.  Alternatively, should the Court determine that a construction would be helpful, then "registration" should be construed as "the process of determining whether a software product is permitted to operate."  The remaining portions of these phrases are readily understood and do not require construction.

Claims 18 and 23 both recite "submitting the product ID and hardware ID to a *registration authority*" and "receiving a registration ID from the *registration authority*."  The claims do not require anything more of the "registration authority."  The claims therefore provide the context to understand what the "registration authority" is and no further explication is necessary.  In the context of claims 18 and 23, it is an entity that receives a product ID and hardware ID from a piece of software and returns a registration ID to the software.  To the extent

the Court determines that the term "registration" requires construction, the analysis for registration is the same as that discussed by Microsoft in connection with Terms 3 and 6.

ViaTech's construction is incorrect because it seeks to limit the "registration authority" to a "product manufacturer or authorized third-party."  Nothing in the patent defines a "registration authority" as being limited to these two entities.  On the contrary, the '468 Patent twice states that these are simply examples of registration authorities: a registration authority "might be, *for example*, the product manufacturer or an authorized third party," ('468 Patent, 5:41-43) and a "registration authority, *such as* the product manufacturer or an authorized third party."  ('468 Patent, 2:61-63)  In addition, the term "remote" should not be read into the construction of "registration authority."  The "registration authority" should not be defined based on proximity to other entities.  Moreover, whereas claim 1 expressly recites a "registration authority remote from the computer," claims 18 and 23 do not.  If a "registration authority" were—by definition— "remote" from the computer, there would have been no need to expressly recite this additional limitation in claim 1.  The fact that claim 1 includes the term "remote" and claims 18 and 23 do not means that it would be error to read it into the latter claims.  *See Phillips v. AWH Corp.*, 415 F.3d 1303 at 1324 (Fed. Cir. 2005) (holding that "baffles" did not require a deflecting characteristic that was explicitly recited in other unrelated claims).

    Counterclaim-Defendant's Answering Position

The parties' dispute as to the term "registration authority" is whether the "registration authority" determines if "a software product is permitted to operate" (Microsoft), or whether it refers to "a remotely located product manufacturer or authorized third party that registers a software product" (ViaTech). ViaTech's construction should be adopted because it is consistent with the specification, which states both that a software product is registered with a registration

authority when the computer containing the software connects through a computer network or

other means to a remote registration server, and that the registration authority can be the software

manufacturer or another third party authorized to register the software:[103]



*Fig. 2*

Microsoft argues that ViaTech's construction is incorrect because the descriptions in the

specification of a "remote" registration authority that is a "product manufacturer or authorized

---

[103] *See* col. 3:66–4:10 & Figs. 2, 4 ("FIG. 2 shows an anti-piracy system 30 that facilitates registration of a software product with a registration authority for installation and use on a particular computer. The system 30 includes a customer computer 32 and a registration server 34, which resides at the registration authority remote from the customer. The customer computer 32 and registration server 34 are interconnected by a network 36 to provide data communication. In the absence of a customer computer's access to a network, the manufacturer or trusted third party may provide proxy access to the registration server by other means, such as electronic mail, fax machine, postal mail, or telephone."); col. 4:21–26 ("Within the described context, the network 36 is representative of an Internet or Intranet, or a local or wide area network. However, the network 36 may be implemented in many different forms, including both wire-based networks (e.g., cable, telephone, fiber optic, etc.) and wireless networks (e.g., RF, satellite, microwave, etc.).") col. 5:40–45 ("As part of the installation process, the customer registers the software product with the registration authority. This authority might be, for example, the product manufacturer or an authorized third party."); *see also* col. 2:61–67, 5:46–51, 6:23–50.

third-party" are merely exemplary.  *See supra* at 109 ("Nothing in the patent defines a 'registration authority' as being limited to these two entities. . . .").  Any other implementation (e.g., a local "registration authority" without a centralized registration server to ensure that pirated copies of the same software are not also installed on other computers, or a registration authority that is not authorized to register the software product) is not supported by the specification.  *See, e.g., Gemalto*, 754 F.3d at 1369 (rejecting patentee's proposed broad construction of the claims because "[t]he specification demonstrates that external  memory storage was a defining feature of prior art Java technology, and that the patented invention was designed to eliminate the need for such external storage," and "the claims cannot be of broader scope than the invention that is set forth in the specification" (quoting *On Demand Mach. Corp. v. Ingram Indus., Inc.,* 442 F.3d 1331, 1340 (Fed. Cir. 2006))).

Microsoft also argues that a "registration authority" can be any "entity" that receives a product ID and hardware ID and returns a registration ID, as stated in the patent claims.  *See supra* at 108 ("Claims 18 and 23 both recite 'submitting the product ID and hardware ID to a *registration authority*' and 'receiving a registration ID from the *registration authority*.' The claims do not require anything more of the 'registration authority.' The claims therefore provide the context to understand what the 'registration authority' is and no further explication is necessary. In the context of claims 18 and 23, it is an entity that receives a product ID and hardware ID from a piece of software and returns a registration ID to the software."). However, construing "registration authority" as any "entity" that merely performs the other claimed method steps would improperly read the requirement of a "registration authority" out of the claims. *See, e.g., CallWave Communications*, 2014 WL 7205657, at *2 (rejecting construction that "reads out the word 'remote'").

Finally, Microsoft's alternative proposed construction of a "registration" authority as an authority performing "the process of determining whether a software product is permitted to operate," which is based on its proposed construction of Term 3 ("registration ID") (*see supra* at 108) also should be rejected for the same reasons.

<u>Counterclaim-Plaintiff's Reply Position</u>

Here too, ViaTech improperly seeks to incorporate details from the specification into the term "registration authority," even though the specification is express that those details are merely exemplary, not definitional. The patent states that a registration authority "***might be***, for example, the product manufacturer or an authorized third party," ('468 Patent, 5:41-43) and refers to a "registration authority, ***such as*** the product manufacturer or an authorized third party." ('468 Patent, 2:61-63) ViaTech does not dispute that the "product manufacturer" or "authorized third party" are merely exemplary, but instead argues that "[a]ny other implementation . . . is not supported by the specification." (*Supra* at 111) ViaTech misunderstands the law of written description support. There is no requirement that the specification include a written description of every single species within the scope of a generic term such as this one. The Federal Circuit has "repeatedly cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346-1347 (Fed. Cir. 2015). The disclosure of two examples (1) satisfies the written description requirement and (2) does not limit the claim term to just these two examples. As explained in the specification and as recited in the claims, the registration authority is simply the source of the registration ID. There is no reason, technical or otherwise, why the registration ID cannot be received from an entity other than the "product manufacturer" or "an authorized third party."

ViaTech's reliance on *Gemalto*, 754 F.3d at 1369, is again misplaced.  In *Gemalto*, the patentee sought to extend the claims to cover a situation specifically excluded in the patent specification.  Specifically, the patentee argued for a construction that would cover external memory, even though the patent distinguished prior art systems with external memory, and the very purpose of the invention was to eliminate external memory.  *Id.*  Nothing in *Gemalto* suggests that a patent is limited to the specific examples recited in the specification, and in fact the opposite is true.  It is axiomatic, that absent lexicography, patent claims are not limited to the specific examples in a patent.  *See, e.g., Prolitec*, 807 F.3d at 1358 (Fed. Cir. 2015) (rejecting construction that would exclude disclosed embodiments, noting that the specification's "use of 'may' signifies that the inventors did not intend to limit" the term).

ViaTech also argues that Microsoft's construction "reads out" the term registration authority from the claims.  (*See supra* at 111)  That is incorrect.  Microsoft's alternative construction reflects the usage of "registration" in the '468 Patent, as a term that concerns the process of determining whether a software product is permitted to operate.  One might expect a lay juror to instead think that "registration" is the process of informing the manufacturer of a purchase, for warranty purposes and the like, for example by submitting a registration card.  Microsoft's alternative construction appropriately eliminates that potential risk of confusion.

Finally, ViaTech seeks to read in the term "remote" from the specification into asserted claims.  The location of the registration authority is not specified in the asserted claims, and should not be read into the claims.  Rather, only claim 1 recites the remote limitation.

<u>Counterclaim-Defendant's Sur-Reply Position</u>

Microsoft states that "ViaTech improperly seeks to incorporate details from the specification into the term 'registration authority' . . . [that] are merely exemplary, not

definitional." *Supra* at 112–13. In fact, ViaTech's construction ("a remotely located product manufacturer or authorized third party that registers a software product") comes directly from the claim language itself, as confirmed by the specification.  In order to be a "registration authority," an entity must either be the "product manufacturer" itself or a "third party" that has been "authorized" to register the product, as stated in ViaTech's construction. In addition, both of these entities are "remotely located" from the user's computer, and Microsoft is wrong that the "registration authority" need not be "remote." *See supra* at 113. The specification defines the "invention" as "an anti-piracy system and method that reduces the opportunity for piracy and illicit use of software products by requiring each software product to be registered *for a single computer* . . . ." *See* col. 2:36–43 (emphasis added). If every computer had its own, local "registration authority," there would be no way to determine whether other copies of the software product were simultaneously registered on different computers, and the system would not be effective in reducing software piracy.[104]

### 5.  Term 11: "substantially similar" (Claim 38)

| Microsoft  Construction | ViaTech  Construction |
|---|---|
| Not indefinite. Plain and ordinary meaning | Indefinite |

Counterclaim-Plaintiff's Opening Position

The sole issue for this term is whether ViaTech can prove, by clear and convincing evidence, that the phrase "substantially similar" is indefinite.  *Enzo Biochem, Inc. v. Applera*

---

[104] Microsoft's "alternative construction" for this term, which is based on its proposed definition of the word "registration" in "registration ID" (*see supra* Term 3), should be rejected both for the reasons stated above for Term 3, and because it enhances, not "eliminates" the "risk of confusion." *See supra* at 113. Under this construction, the claim term "registration authority" would be replaced with the nonsensical term "the process of determining whether a software product is permitted to operate authority."

*Corp.*, 599 F.3d 1325, 1331 (Fed. Cir. 2010).  Extensive Federal Circuit precedent establishes that the term "substantially" does not render a claim invalid as indefinite (nor does the term "similar" render a claim indefinite).

The Federal Circuit "has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) (holding that "substantially planar" is not indefinite).  Rather, "[t]he word 'substantially,' when used in a claim, can [permissibly] denote either language of approximation or language of magnitude." *Enzo Biochem*, 599 F.3d at 1333 (Fed. Cir. 2010).  *E.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 1002 (Fed. Cir. 2015) (holding that "substantially centered" is not indefinite); *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) ("[t]he term 'substantial' is a meaningful modifier implying 'approximate,' rather than 'perfect.'").  *See also, e.g.*, *CallWave Commc'ns, LLC v. AT & T Mobility, LLC*, No. CV 12-1701-RGA, 2015 WL 3508991, at *8 (D. Del. 2015) (Andrews, J.) (holding that no construction is necessary of "substantially real time" because it "is made of ordinary words that a juror would have no trouble understanding."); *SourceProse Corp. v. AT & T Mobility*, LLC, No. A-11-CV-117-LY, 2014 WL 2879694, at *13 (W.D. Tex. June 24, 2014) (holding that "geographically substantially similar" is not indefinite); *Ruckus Wireless, Inc. v. Netgear, Inc.*, No. C-08-2310, 2013 WL 6627737 at *3-7 (N.D. Cal. 2013) ("[T]he court construes the term 'substantially omnidirectional' as 'radiating power approximately equally in all directions.'  This construction reflects the use of the term 'substantially' as a term of approximation (rather than as a term of magnitude). . . . "); *Transcenic, Inc. v. Google Inc.*, 7 F. Supp. 3d 405, 419 (D. Del. 2013) ("substantially" is not indefinite); *Cree, Inc. v. SemiLEDs Corp.*, No. CIV.A. 10-866-RGA, 2012

WL 975697, at *21 (D. Del. 2012) (Andrews, J.) (construing "substantially congruent" as "having substantially the same size and shape."); *Fractus, S.A. v. Samsung Elecs. Co.*, No. 6:09CV00203, 2010 WL 5287531, at *14 (E.D. Tex. 2010) ("As such, the Court construes 'substantially similar' and 'basically the same' according to their plain and ordinary meaning.").

Here, similar to *Enzo Biochem*, the limitation "denotes language of magnitude because it purports to describe *how much*" hardware variation is allowed before the software product becomes disabled. *Enzo Biochem*, 599 F.3d at 1333. In this regard, the specification discloses that "the system flexibly accommodates a situation in which the user upgrades one or a few components in the computer without creating a new machine." ('468 Patent, Abstract; *See also* 2:24-26) The specification provides examples of permissible and impermissible hardware changes. For example, in one embodiment, a change of "not more than two out of five components" is permissible whereas a change of "more than two out of five components" is not:

> In this situation, the software product determines whether a new set of hardware components in the computer is **substantially** different from the original set of hardware components. If only one or a few components are different (e.g., not more than two out of five components), the upgraded computer is more like the original computer and the software product is permitted to operate. Conversely, if many or all components are different (e.g., more than two out of five components), the "upgraded" computer more closely resembles a new computer and the software product is prevented from operating on this new computer without an additional license from the registration authority.

('468 Patent, 3:26-38) (emphasis added). (*See also, e.g.,* '468 Patent, 7:46-49; 8:17-26).

The "two out of five" criteria is exemplary only and is not itself a limitation of the asserted claims, and it does not provide a definition of "substantially similar." Nor should the claim be construed as limited to a specific numerical range. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1373 (Fed. Cir. 2001) (holding that a word of degree was definite, even without a numerical claim construction). This Court has noted that "[w]hen a claim term is expressed in general descriptive words, it is generally improper to limit the term to a numerical

range." *ADCO Products, Inc. v. Carlisle Syntec Inc.*, 110 F. Supp. 2d 276, 286 (D. Del. 2000) (holding that "'substantially equal amounts' is sufficiently clear that no additional construction is necessary.").

<u>Counterclaim-Defendant's Answering Position</u>

The parties dispute whether the term "substantially similar" appearing in claims 38–39 is indefinite under 35 U.S.C. § 112 ¶ 2. That term is indefinite, as ViaTech proposes, because both "substantially" and "similar" are terms of degree, and the '468 patent does not define either (1) a standard for measuring "substantially similar," or (2) an objective boundary delineating how similar the computers must be in order to fall within the scope of the claims.[105]

The specification does not define the "similar" or "substantially similar" terminology (or even use these terms).[106]  As a result, the claim is indefinite. *See, e.g., Delaware Display Group LLC v. Lenovo Group Ltd*., Nos. 13-2108, -2109, -2112-RGA, 2015 WL 6870031, at *6–7 (D. Del. Nov. 6, 2015) (finding term "relatively low angles" to be indefinite when "what makes

---

[105] Patent claims are invalid as indefinite if the claims, viewed in light of the specification and prosecution history fail to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct.  2120, 2129–30 (2014). When the claims use a subjective term of degree, the patent must both identify a "'standard for measuring'" that term and "provide objective boundaries for those of skill in the art" as to the scope of the claims. *Interval Licensing LLC v. AOL, Inc*., 766 F.3d 1364, 1370–71 (Fed. Cir. 2014) (quoting *Datamize, LLC v. Plumtree Software, Inc*., 417 F.3d 1342, 1351 (Fed. Cir. 2005) and *Nautilus*, 134 S. Ct. at 2128–29) (emphasis removed).

[106] The specification (and other asserted claims) describe a single computer with a new set of hardware components that is "substantially *the same*" as a previous set (*see infra*), but this is a different standard than determining whether two separate computers with different hardware components are "substantially *similar*." Although Microsoft argues that "[t]he specification provides examples of permissible and impermissible hardware changes" (*see supra* at 116), those examples refer to the different standards recited in other claims.

those angles of light 'low,' or 'relatively low,' is indiscernible" from the specification); *Netgear, Inc. v. Ruckus Wireless, Inc.*, 5 F. Supp. 3d 592, 609–10 (D. Del. 2013) (finding term "optimal conditions" to be indefinite when "[t]he specification does not teach a person of ordinary skill whether the identified parameters are those used to determine 'optimal conditions' or what the limits of the identified parameters are for 'optimal conditions'"); *KLA-Tencor Corp. v. Xitronix Corp.*, No. A–08–CA–723–SS, 2011 WL 318123, at *3–5 (W.D. Tex. Jan. 31, 2011) (finding term "substantially" to be indefinite because it "appears nowhere . . . other than in Claims 7 and 9," and thus "there is no standard for determining what is substantially maximizing in the patent itself"); *Fairfield Industries, Inc. v. Wireless Seismic, Inc.*, No. 4:14–CV–2972, 2015 WL 1034275, at *14–15 (S.D. Tex. Mar. 10, 2015) ("substantial").[107]

---

[107] The cases Microsoft cites are distinguishable. In the *Apple* and *SourceProse* cases cited by Microsoft, the specification provided sufficient objective guidance for a person of skill in the art to understand the scope of the term of degree. *See Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 1002–03 (Fed. Cir. 2015) ("Apple thus presented evidence to show that skilled artisans would interpret 'substantially centered' in the '163 patent to mean essentially centered except for a marginal spacing to accommodate ancillary graphical user interface elements."); *SourceProse Corp. v. AT & T Mobility, LLC*, No. A-11-CV- 117-LY, 2014 WL 2879694, at *13 (W.D. Tex June 24, 2014) ("The court finds that this description provides substantial guidance for a person skilled in the art to understand the bounds of the term 'geographically substantially similar.'"). Microsoft's other indefiniteness cases were decided under the more lenient, pre-*Nautilus* standard, which no longer applies. *See Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349 (Fed. Cir. 2012); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010); *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901 (Fed. Cir. 2005); *Ruckus Wireless, Inc. v. Netgear, Inc.*, No. C-08-2310, 2013 WL 6627737 (N.D. Cal. Dec. 16, 2013); *Transcenic, Inc. v. Google Inc.*, 7 F. Supp. 3d 405 (D. Del. 2013); *Cree, Inc. v. SemiLEDs Corp.*, No. CIV.A. 10-866-RGA, 2012 WL 975697 (D. Del. 2012); *Fractus, S.A. v. Samsung Elecs. Co.*, No. 6:09CV00203, 2010 WL 5287531 (E.D. Tex. Dec. 17, 2010). In *CallWave Communications, LLC v. AT & T Mobility, LLC*, the court did not consider whether the claim term "substantially real time" (or any other term) was indefinite. *See* Nos. 12–1701–RGA, –1702–RGA, –1704–RGA, No. 13–711–RGA, 2015 WL 3508991, at *8 (D. Del. June 3, 2015).

<u>Counterclaim-Plaintiff's Reply Position</u>

The parties agree that the sole issue is whether ViaTech can prove by clear and convincing evidence that the term "substantially similar" is indefinite or whether, contrary to ViaTech's argument, the meaning of the term may be discerned with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129–30 (2014).

There is also no dispute regarding the legal framework to be applied.  As provided in *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1331-1332 (Fed. Cir. 2010), "[t]he word 'substantially,' when used in a claim, can [permissibly] denote either language of approximation or language of magnitude" and "the court must determine whether the patent provides 'some standard for measuring that degree.'"  The Federal Circuit confirmed this standard after the Supreme Court's *Nautilus* decision, stating: "We do not understand the Supreme Court to have implied in *Nautilus*, and we do not hold today, that terms of degree are inherently indefinite. Claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014).

In *Interval Licensing*, the Federal Circuit was confronted with the term "unobtrusive manner," which the Court held to be a "purely subjective term" that was not adequately explained in the specification.  In fact, the patent was sufficiently confusing that it was unclear to which embodiments the term applied, or how it should be applied.  *Id.*

In contrast, while the term in question here—"substantially similar"—is a term of degree, it is not a "purely subjective term."[108]  It is a term that, in substance, distinguishes an upgraded

---

[108] Purely subjective terms like "unobtrusive" or "aesthetically pleasing" are in a special category of "terms of degree" because they are not only matters of degree, but that degree is "completely

computer from a new computer.  The relevant claim language from claim 38 recites: "discerning whether the second computer is substantially similar to the first computer in which only a subset of the hardware components are different."  In the context of claim 38, the "first computer" is the computer as it existed at the time the software product was registered.  The "second computer" is the computer at the time of a subsequent installation.  The invention of claim 38 determines whether the "second" computer is a modified (e.g., upgraded) version of the "first" computer (the first computer with some hardware components changed), or a different computer.

The specification provides objective guidance for discerning between an upgraded computer (a substantially similar computer) and a new computer (one that is not substantially similar).  In the background, the patent explains that a system with no tolerance to changes in hardware as a result of upgrades and other modifications can lead to "disgruntled" users.  ('468 Patent, 2:28)  To address this, the specification discloses that "the system flexibly accommodates a situation in which the user upgrades one or a few components in the computer without creating a new machine."  ('468 Patent, Abstract; *see also id.* at 2:24-26)  The specification explains that a hardware ID can be created that represents a set of hardware components.  If the hardware ID at the time of registration and the hardware ID at the time of subsequent installation do not match, then the invention determines how similar or different the two computers are.  In the exemplary embodiment, five hardware components are evaluated.  A change of "not more than two out of five components" is permissible whereas a change of "more than two out of five components" is not.  ('468 Patent, 3:26-38; 7:39-49; 8:17-26)  Thus, the significance of the

---

dependent on a person's subjective opinion."  *See Datamize, LLC. v. Plumtree Software, Inc.*, 417 F.3d 1342, 1349 *(*holding that "aesthetically pleasing" is indefinite because the "meaning of the claim language would depend on the unpredictable vagaries of any one person's opinion of the aesthetics of interface screens.").

hardware component changes is used to determine whether the two computers are "substantially similar" (thereby permitting the software to run) or different (and thereby not permitting the software to run). The specification provides ample guidance to set the degree of tolerated change to a point that demarcates between upgraded computers and new computers.

ViaTech ignores the clear teaching in the specification concerning distinguishing upgraded computers from new computers, and instead argues that the term is indefinite because "the specification does not define the term 'similar' or 'substantially similar.'" (*Supra* at 117) However, there is no requirement that the specification "define" these terms. It is sufficient that one of skill in the art could determine what is meant with "reasonable certainty" after reviewing the intrinsic record. *Nautilus, Inc*. 134 S. Ct. at 2129–30.

Moreover, the exacting standards that ViaTech applies to Microsoft's patent are a far cry from the arguments ViaTech made when defending its own '567 Patent against Microsoft's indefiniteness challenge. With regard to ViaTech's '567 Patent, Microsoft argued that the claims are indefinite because they recite a database that must store two types of information, where the specification fails to provide any guidance as to how to identify and distinguish these two types of information. ViaTech in response did not identify any "definitions" for the challenged terms in its patent specification. On the contrary, ViaTech argued that the specification provided examples that sufficiently shed light on the meaning of the terms. In fact, the examples from the ViaTech patent fail to distinguish the two types of information and provide no guidance for understanding the alleged distinction recited in the claims, and therefore ViaTech's patent claims are indefinite. Here, in contrast, the '468 Patent specification provides actual guidance for distinguishing a "substantially similar" (upgraded) computer from a different computer, as well as a concrete example to illustrate how the line may be drawn.

ViaTech also argues that because various cases cited by Microsoft where terms including the word "substantially" were found to be definite were decided before *Nautilus,* they "no longer apply." (*Supra* at n.107)   However, many of those decisions did not rely on the "insolubly ambiguous" standard rejected in *Nautilus,*[109] and moreover, post-*Nautilus* cases have ratified the permissibility of using "substantially" as a term of degree in claims.  *See, e.g., Interval Licensing LLC,* 766 F.3d at 1371.  ViaTech thus has no basis to suggest that those cases would have been resolved differently under the *Nautilus* standard.

The cases on which ViaTech relies are plainly distinguishable.  ViaTech first cites *Delaware Display Group LLC v. Lenovo Group Ltd.*, Nos. 13-2108, -2109, -2112-RGA, 2015 WL 6870031, at *6–7 (D. Del. Nov. 6, 2015).  That case actually supports Microsoft.  There, the defendant argued that several terms were indefinite.  The first was "positioned near."  The Court held the term was definite and reiterated that terms of degree do not require absolute precision to be definite:

> Terms of degree are not by themselves impermissible.  The patent must, however, provide enough certainty within the context of the invention.  The properties and purpose of the invention, together with the examples provided by the specification, would apprise an ordinary skilled artisan of the scope of the invention. Therefore, I need not impose more restrictive boundaries on this term.  That the patent does not state how close is close enough does not render the claim indefinite.

*Id.* at *6 (internal quotations and citation omitted).

---

[109] For example, none of *Enzo Biochem, Inc. v. Applera Corp.,* 599 F.3d 1325 (Fed. Cir. 2010), *Playtex Products, Inc. v. Procter & Gamble Co*., 400 F.3d 901 (Fed. Cir. 2005), *Ruckus Wireless, Inc. v. Netgear, Inc.,* No. C-08-2310, 2013 WL 6627737 (N.D. Cal. Dec. 16, 2013); or *Fractus, S.A. v. Samsung Elecs*. Co., No. 6:09CV00203, 2010 WL 5287531 (E.D. Tex. Dec. 17, 2010), relied on the "insolubly ambiguous" standard rejected in *Nautilus* to find the "substantially" term at issue in those cases definite.

Although the Court did hold that the term "relatively low angle" was indefinite, the reasoning was specific to the patent in question, which did "not provide any elucidation," *id.* at *7, as to the reference point for the "relatively low" angles, or provide any "objective guidance" as to what "relatively low angles" are, *id.* at *6.

Viatech next cites *Netgear, Inc. v. Ruckus Wireless, Inc.*, 5 F. Supp. 3d 592, 609–10 (D. Del. 2013).  That case is distinguishable because the Netgear patent referred to the determination of "optimal conditions," but failed teach one of ordinary skill in the art how the determination should be made.

Here, in contrast, the '468 Patent explains that its purpose is to distinguish upgraded from new computers, and provides guidance as to how the distinction is to be made, such as detecting a set of hardware components (five in the preferred embodiment) and determining that the computer is an upgraded computer only if a certain number of those components changed (two of five components in the preferred embodiment).  ('468 Patent, 3:26-38; 8:16-34; 8:56-9:14)

*KLA-Tencor Corp. v. Xitronix Corp.*, No. A–08–CA–723–SS, 2011 WL 318123, at *3–5 (W.D. Tex. Jan. 31, 2011) and *Fairfield Industries, Inc. v. Wireless Seismic, Inc.,* No. 4:14–CV–2972, 2015 WL 1034275, at *14–15 (S.D. Tex. Mar. 10, 2015), also cited by ViaTech, are likewise distinguishable because in each, the term "substantially" was first introduced in the claims, and the specification provided no criteria for determining the scope of "substantially."  In contrast, the '468 Patent uses the term "substantially" in the specification and provides sufficient context to understand what is meant by this term.  ('468 Patent, 3:26-38)

Because one of skill in the art would understand what is meant by determining whether two computers are "substantially similar" to a reasonable degree of certainty, the term is not indefinite.

<u>Counterclaim-Defendant's Sur-Reply Position</u>

Microsoft admits that the Federal Circuit has held that "a 'purely subjective term' that was not adequately explained in the specification" is indefinite (*see supra* at 119 (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014)), and, contrary to its arguments, that holding applies to the term "substantially similar."

First, although Microsoft argues that "substantially similar" is "not a 'purely subjective term'" (*see id.*), it is well established that both "substantially" and "similar" are, on their face, subjective terms of degree.[110]   Second, although Microsoft states that the specification of the '468 patent "provides objective guidance for discerning" when computers are "substantially similar" (*id.* at 120–21), this argument mischaracterizes the claim terms.   Microsoft states that claim 38 describes a method for comparing an original and "upgraded" computer,[111] but there is no support for this argument in either the claim language or the intrinsic evidence.   In contrast to other claims describing a single "computer that has been upgraded," claim 38 explicitly describes "different computers"—i.e., a "first computer" and "second computer"—without stating that

---

[110] *See, e.g., Fairfield Industries, Inc. v. Wireless Seismic, Inc.,* No. 4:14–CV–2972, 2015 WL 1034275, at *14–15 (S.D. Tex. Mar. 10, 2015) ("substantial"); *KLA-Tencor Corp. v. Xitronix Corp.*, No. A–08–CA–723–SS, 2011 WL 318123, at *3–5 (W.D. Tex. Jan. 31, 2011) ("substantially"); *ACQIS LLC v. Alcatel-Lucent USA Inc.*, Nos. 6:13–CV–638, –638, 2015 WL 1737853, at *8–10 (E.D. Tex. Apr. 13, 2015) ("similar").

[111] *See id.* ("The invention of claim 38 determines whether the 'second' computer is a modified (e.g., upgraded) version of the 'first' computer (the first computer with some hardware components changed), or a different computer. The specification provides objective guidance for discerning between an upgraded computer (a substantially similar computer) and a new computer (one that is not substantially similar).").

either one is an "upgraded" version of the other.[112]   The patent deliberately uses different language for the comparison of two computers in claim 38 ("substantially similar") than it does for the comparison of different versions of the same computer in the other patent claims.  *See infra* Terms 9–10, 12–14, 20.   Moreover, during prosecution, Microsoft itself confirmed that claim 38 requires "two different computers."[113]   And Microsoft even states elsewhere in its reply brief that "[c]laim 38 recites a method for preventing multiple installations of a software product on different computers." *Infra* at 132.

Because the only example in the specification concerns determining whether an "upgraded computer is more like the original computer" (*see* col. 3:26–38, 7:39–8:39), and there is no example or any other guidance for determining whether two separate computers are "substantially similar" (which is a different standard), this subjective term of degree is indefinite. *See*, *e.g., Delaware Display Group LLC v. Lenovo Group Ltd.*, Nos. 13-2108, -2109, -2112-RGA, 2015 WL 6870031, at *6–7 (D. Del. Nov. 6, 2015) ("relatively low angles" was "indiscernible" from the specification); *Netgear, Inc. v. Ruckus Wireless, Inc.,* 5 F. Supp. 3d 592, 609–10 (D. Del. 2013) ("optimal conditions"); *KLA-Tencor Corp.*, 2011 WL 318123, at *3–5 ("substantially"); *Fairfield Industries*, 2015 WL 1034275, at *14–15 ("substantial").

---

[112] *Compare*, *e.g.*, claims 29–35 ("A method for running a software product on a computer that has been upgraded . . . ."), *with* claim 38 ("A method for preventing multiple installations of a software product on different computers . . . .").

[113] After claim 38 was rejected as indefinite (*compare* D.E. 73-2 at 40 of 139 (original claim 38), *with id*. at 53, 56 of 139 (Feb. 17, 2000 Office Action)), Microsoft argued that "[c]laim 38 refers to installation of the same software product on two different computers" *(see id.* at 64, 73–74 of 139 (May 16, 2000 Response)), and the rejection was withdrawn. *See id*. at 82, 85–86 of 139 (Aug. 17, 2000 Office Action).

Finally, even if the single example did refer to the comparison of two different computers as in claim 38, the term "substantially similar" still would be indefinite. Claims are definite under 35 U.S.C. § 112 ¶ 2 "only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 n.6 (2014) (quoting *United Carbon Co. v. Binney & Smith Co*., 317 U.S. 228, 236 (1942)). The "substantially similar" term fails both tests. Microsoft argued during prosecution that determining whether two computers are "substantially similar" was the basis for the patentability of claim 38 without defining what degree of similarity is required,[114] and the single example in the specification does not suggest what other potential hardware changes would (and would not) fall within the scope of the claims.[115]

### 6.  Term 22:  "registering the software product for use with a first computer having a first set of hardware components" (Claim 38)

---

[114] After the claims were twice rejected as unpatentable, *see* D.E. 73-2 at 53–54, 57–58 of 139 (Feb. 17, 2000 Office Action); *id*. at 82–83, 86–89 of 139 (Aug. 17, 2000 Office Action), Microsoft amended claim 38 to include the limitations "discerning whether the second computer is substantially similar [to] the first computer . . . and allowing the software product to operate on the second computer in the event that the second computer is substantially similar," and argued, successfully, that this comparison distinguished the claims from the cited prior art. *Compare id.* at 94, 101, 116–17 of 139 (Nov. 17, 2000 Amendment), *with id.* at 119–22 of 139 (Dec. 20, 2000 Notice of Allowability).

[115] *See United Carbon Co.*, 317 U.S. at 231–37 ("An invention must be capable of accurate definition, and it must be accurately defined, to be patentable."); *Halliburton Energy Services, Inc. v. M-I, LLC*, 514 F.3d 1244, 1251, 1253–56 (Fed. Cir. 2008) (when "Halliburton differentiated its invention from the prior art because it was a 'fragile gel,'" finding "fragile gel" indefinite); *Prolifiq Software Inc. v. Veeva Systems Inc*., No. C 13–03644 SI, 2014 U.S. Dist. LEXIS 108630, at *27 (N.D. Cal. Aug. 6, 2014) ("[T]hese examples [from the specification] are insufficient to show with reasonable certainty the scope of the claims because they provide no information as to what falls outside the boundaries of the claims."); *Skyhook Wireless, Inc. v. Google, Inc*., No. 10–11571–RWZ, 2014 WL 898595, at *5–6 (D. Mass. Mar. 6, 2014) ("[B]y substituting examples for the required 'standard,' the specification leaves the definition of 'far' so open-ended as to leave a person skilled in the art to guess at the scope of the invention.").

| Microsoft Construction | ViaTech Construction |
|---|---|
| "Registering" means "the process of determining whether a software product is permitted to operate." No further construction necessary. | "obtaining a registration ID from a registration authority for use with a first computer having a first set of hardware components" |

Counterclaim-Plaintiff's Opening Position

Claim 38 recites a method to prevent multiple installations of software on different computers. The first step of the method is "registering the software product for use with a first computer having a first set of hardware components." ViaTech has identified the entire first step as in need of construction. However, the phrase contains many terms that are readily understood and that do not require construction. The only term that arguably needs construction in the first method step of claim 38 is the term "registering."

As noted above, the term "registering" should be construed as "the process of determining whether a software product is permitted to operate." Starting with the claim language itself, claim 38 provides a method with four steps. The first step "registers" the software product "for use" with a first computer. The subsequent steps determine if the computer is "substantially similar" to the first computer. If the computer is not "substantially similar," then the method concludes that the computer is a different—and therefore—unauthorized computer. The step of registering is therefore the step by which a computer is authorized. In other words, the step of registering on the first computer determines that the software product is permitted to operate on the first computer.

The specification broadly discloses that "[t]he registration process forces the customer to register the software product for installation and use on a specific computer." ('468 Patent, 5:43-45) (*See also* '468 Patent, 2:37-39; 3:26-38). A successful registration, therefore, means that a determination has been made that the software product may operate at least on that specific computer. (*See* '468 Patent, 3:26-38). Although the specification also discloses a preferred

127

embodiment that includes a "registration authority" using a "registration unit" to compute a "registration ID" from a "product ID" and a "hardware ID," such limiting terms are absent from claim 38. Rather, claim 38 contains four steps which do not mention a registration authority, registration unit, registration ID, or hardware ID. These terms should not be read into claims where they are absent. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). *See also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."), *quoted in GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

ViaTech's construction should be rejected because it seeks to read limitations expressly found in other claims into claim 38. The Federal Circuit has explained that "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." *See id.* at 1314. Here, although claim 38 does not refer to a "registration ID" or a "registration authority," other claims do. For example, claim 1 expressly refers to a "registration authority" that "returns a registration ID." ('468 Patent, 9:33-34) Claims 18 and 23 both recite "receiving a registration ID from a registration authority." ('468 Patent, 11:44-46) Such language is not found in claim 38. Likewise, claim 37, which is not asserted, recites "registering a software product for use on a computer" where one of the steps includes "receiving an original registration ID from the registration authority." ('468 Patent, 14:15) Accordingly, whereas claim 37 expressly limits the "registering" step to receiving a "registration ID" from a

"registration authority," claim 38 is more broadly recited and expressly lacks this additional detail.

As in *Phillips*, this additional language in claim 37 "would be unnecessary if persons of skill in the art understood that" it was inherent in the limitation being construed. *Phillips*, 415 F.3d at 1324 (holding that "baffles" did not require a deflecting characteristic that was explicitly recited in other unrelated claims). Viatech has no basis to limit a broad term to include express limitations found in other claims. "[W]hen the inventor wanted to restrict the claims . . . he did so explicitly." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009).

The Federal Circuit's *Ancora Technologies* opinion is also instructive. *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014). There, the Federal Circuit rejected a construction that would have limited "programs" to "application programs." In that case, some claims referred to "programs" generally and others referred to "application programs." The court explained that "the difference in terminology [between the two claims] tends to reinforce, rather than undermine, adoption of the broad ordinary meaning of 'program' by itself." *Id.*

ViaTech's approach would also result in a prolix and confusing definition. Since it proposes to construe the phrase at issue in part by referring to other, construed terms, inserting ViaTechs's actual proposed construction using the definitions it proposes for "registration ID" and "registration authority" would convert the phrase "registering the software product for use with a first computer having a first set of hardware components" into:

> "obtaining a code identifying a combination of a product ID and a hardware ID computed when a software product is registered from a remotely located product manufacturer or authorized third party that registers a software product for use with a first computer having a first set of hardware components."

ViaTech's approach seeks to substitute a readily-understandable phrase having 17 words with a phrase having 49 words and which is encumbered with terms and concepts that have no place in claim 38.

Moreover, ViaTech's construction is circular because it includes the phrase "when a software product is registered"—the very same concept that is ostensibly being construed.  If the meaning of "when a software product is registered" is clear, then the "registering" phrase in claim 38 does not require construction in the first place.  Once ViaTech's improper baggage is removed, ViaTech's construction is reduced to a tautology: "registering the software product" is "when a software product is registered."  ViaTech's construction should be rejected and the Court should adopt Microsoft's construction.

<u>Counterclaim-Defendant's Answering Position</u>

The parties dispute whether "registering a software product for use with a first computer having a first set of hardware components," as stated in claim 38, means "determining whether a software product is permitted to operate" (Microsoft) or "obtaining a registration ID from a registration authority for use with a first computer having a first set of hardware components" (ViaTech). The court should adopt ViaTech's proposed construction because it is supported by the intrinsic evidence. Both the specification and the patent claims state that "registering the software product for use on the computer," means sending a product ID and hardware ID to a registration server belonging to a registration authority, and then receiving a registration ID from the registration authority and storing it on the customer computer.[116]

---

[116] *See* Abstract; col. 3:57–58, 5:40–6:58 & Fig. 4 ("As part of the installation process, the customer registers the software product with the registration authority. . . .  FIG. 4 shows steps in a method for registering the software product 100 for installation and use on the computer 32. . . .

Microsoft argues that this construction would "read limitations expressly found in other claims into claim 38." *Supra* at 128. However, during prosecution Microsoft argued that all of the claims—including claim 38—were distinguishable from the prior art based on the features of obtaining a registration ID and comparing it to a test ID, which "enables the software product to determine if the software product has been installed on a new computer" rather than a computer that has merely been "upgraded."[117]  The examiner agreed and allowed all of the claims to issue

---

At step 150, the software product 100 obtains its product ID 102. . .  The software product 100 generates a hardware ID (H/W ID) that identifies a set of hardware components that make up the customer's computer 32 (step 152). . . . The software product in this example concatenates the 15-bit product ID with the 5-bit hardware ID, and sends the 20-bit value over the network 36 to the registration server 34 (step 154 in FIG. 4). This phase is preferably automated in that the software product automatically initiates connection with the registration server 34 to register itself with the registration authority. . . . The registration server 34 has a registration unit 110 to assign a registration ID (Reg ID) to the software product on the customer's computer. The registration unit 110 computes the registration ID from the product ID and the hardware ID (step 156 in FIG. 4). . . . The registration server 34 returns the registration ID over the network 36 to the customer computer 32 (step 160 in FIG. 4). . . . The registration ID 118 is stored locally in the system memory 42 of the customer computer 32, where it is accessible by the software program 100 (step 162 in FIG. 4)."); *see also* Claims 10, 18, 24, 29.

[117] After the claims were twice rejected as unpatentable over the cited prior art (*see* D.E. 73-2 at 53–54, 57–58 of 139 (Feb. 17, 2000 Office Action); *id*. at 64, 74–78 of 139 (May 16, 200 Response); *id*. at 82–83, 86–89 of 139 (Aug. 17, 2000 Office Action), Microsoft amended, e.g., claim 1 to describe that, when the software product is launched, the system generates a second hardware ID, calculates a test ID from the second hardware ID and the product ID, compares the test ID to the registration ID previously obtained from the registration authority, and allows the software product to execute only if the test ID and the registration ID substantially match.  *See* D.E. 73-2 at 94–95 of 139 (Nov. 17, 2000 Amendment). At the same time, Microsoft amended claim 38 to include the corresponding limitation of "discerning whether the second computer is substantially similar [to] the first computer in which only a subset of the hardware components are different, and allowing the software product to operate on the second computer in the event that the second computer is substantially similar." *See id*. at 101 of 139. Microsoft then argued that all the claims were allowable over the prior art based on the functionality enabled by the comparison of the registration ID and test ID. *See id*. 109–17 ("The amendment to claim 1 enables the software product to determine if the software product has been installed on a new computer. However, when the comparison between the test ID and the registration ID indicates that one or more of the hardware components has been changed (upgraded) since the registration

based on this feature, finding that the prior art did not disclose "when the comparison between the test ID and the registration ID indicates that hardware components have been ungraded since the registration ID was computed, the software product may still execute if the software product determines that the change was [not] substantial." *Id.* at 119–22 of 139 (Dec. 20, 2000 Notice of Allowability). Microsoft defined what it means to register a software product for use with a first computer, and then discern whether a second computer is substantially similar to the first computer (as stated in claim 38), and based on this definition "registering a software product" means "obtaining a registration ID from a registration authority," as stated in ViaTech's construction. *See Gemalto,* 754 F.3d at 1369.

Microsoft proposes an alternative construction of "registering" a software product as "determining whether a software product is permitted to operate" based on its proposed construction of "registration ID" (*see supra* Term 3). *Supra* at 127–28.   For the reasons explained above, however, this definition should be rejected because it is inconsistent with the intrinsic evidence.

Counterclaim-Plaintiff's Reply Position

Claim 38 recites a method for preventing multiple installations of a software product on different computers.  Part of the method involves "registering the software product for use with a first computer having a first set of hardware components."  The phrase is readily understandable and requires no construction.   Microsoft offers, in the alternative, to construe the term "registering," for the reasons given above in connection with the term "registration" (Term 4).

---

ID was computed (i.e., they are not identical), the software product may still execute if the software product determines that the change was not substantial. None of the cited references, taken alone or in combination, teaches or suggests this feature.").

ViaTech provides no rationale for requiring construction of the entire phrase, and does not suggest that the term "the software product" is unclear or that the phrase "for use with a first computer having a first set of hardware components" requires elucidation.  In fact, ViaTech's proposed construction simply repeats the phrase "for use with a first computer having a first set of hardware components" from the claim term, thus belying its assertion that the phrase requires construction.

ViaTech again attempts to read in numerous details from the specification, namely, the use of a "registration ID" which ViaTech further contends requires a product ID and a hardware ID.[118]

ViaTech's sole basis for reading these limitations into claim 38 is the prosecution history. According to ViaTech, the Applicant made broad arguments in a November 17, 2000, submission allegedly distinguishing "all the claims" on the basis of the registration ID.  (*Supra* at 131)  However, even a cursory reading of the prosecution history demonstrates that ViaTech is wrong.  In the November 17, 2000, Amendment, the Applicant distinguished different claims using different arguments.  Dkt. No. 73-2 at 102-117 (Nov. 17, 2000 Amendment).  For example, the Applicant argued that claim 1 required a registration ID and a hardware ID, both of which are expressly recited in the claim.  *Id.* at 108-110.

By contrast, the Applicant did not distinguish claim 38 on this same basis.  The Applicant instead referred to the limitations recited in claim 38, and did not discuss the registration ID, the

---

[118]    Although the terms "product ID" and "hardware ID" are not explicit in ViaTech's construction, ViaTech through its construction of "registration ID" seeks improperly to import the requirements of a "hardware ID" and a "product ID" into claim 38.

hardware ID, or the product ID, and thus it would be impermissible to read any of those terms into any term in claim 38.  The complete argument for claim 38 was as follows:

> **Claim 38** has been amended to recite a method for preventing multiple installations of a software product on different computers, comprising the step of "registering the software product for use with a first computer having a first set of hardware components." In an event that the software product is subsequently installed on a second computer having a second set of hardware components different from the first set, the method contemplates "detecting the different set of hardware components" and "discerning whether the second computer is substantially similar to the first computer in which only a subset of the hardware components are different, and allowing the software product to operate on the second computer in the event that the second computer is substantially similar." If the second computer is not substantially similar to the first computer, the software product is disabled.

*Id.* at 115-16.

ViaTech also confuses statements made by the Applicant with statements made by the Examiner.  However, remarks made by the examiner cannot give rise to disavowal over the clear statements by the Applicant.  *See 3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1332 (Fed. Cir. 2013)  ("[W]e are guided by legal principles dictating that we rest on the statements made by the patentee over conflicting statements of an examiner because it is the patentee's words that define the claim."). *See also Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007) ("[W]hen a **patent applicant** surrendered claim scope during prosecution before the PTO, the ordinary and customary meaning of a claim term may not apply.") (emphasis added).

Counterclaim-Defendant's Sur-Reply Position

Microsoft argues that the "sole basis" for ViaTech's proposed construction "is the prosecution history." *See supra* at 133. In fact, ViaTech's construction is based on the claim language "registering the software product for use with a first computer," and the description in the specification of "registering the software product 100 for installation and use on the computer

32," which states that the software product connects to a "registration server 34 to register itself with the registration authority," which "computes the registration ID" and returns it to the customer computer where it is stored locally and used by the software product.  *See* Abstract; col. 3:57–58, 5:40–6:58 & Fig. 4.  Microsoft admits elsewhere in its reply brief that "a software product is registered on a computer by storing a registration ID."  *Supra* at 107.

In addition, although Microsoft argues that it "did not discuss the registration ID, the hardware ID, or the product ID" when distinguishing claim 38 from the prior art during prosecution, and that it "did not distinguish claim 38 on th[e] same basis" as the other claims (*see supra* at 133–34), in fact the prosecution history supports ViaTech's construction. When it amended, e.g., claim 1 to describe generating a "test ID" from the "hardware ID" and "product ID" and comparing the "test ID" to the "registration ID" previously obtained from a "registration authority," Microsoft argued that these features both distinguish its invention from and solve problems in the prior art by allowing the software product to continue to run when some changes have been made to a computer but "the change was not substantial." *See* D.E. 73-2 at 94–95, 109–11 of 139 (Nov. 17, 2000 Amendment) (citing '468 patent col. 2:24–33); *see also supra* n.117.  At the same time, Microsoft amended claim 38 to include the limitations of "discerning whether the second computer is substantially similar [to] the first computer" and "allowing the software product to operate on the second computer in the event that the second computer  is substantially similar," and argued that these limitations were the basis for patentability. D.E. 73-2 at 101, 116–17 of 139 (Nov. 17, 2000 Amendment).  The prosecution history in fact supports ViaTech's construction.

### 7.  Term 23:  "detecting the different set of hardware components" (Claim 38)

| Microsoft Construction | ViaTech Construction |
|---|---|
| Plain and ordinary meaning. Alternatively, "determining that the hardware components are different." | "obtaining a test ID, comparing the test ID to the registration ID, and determining that test ID and the registration ID do not match" |

Counterclaim-Plaintiff's Opening Position

Here again ViaTech attempts to rewrite a readily-understandable and broad phrase and replace it with an entirely different phrase that includes numerous details recited in other claims, but not in claim 38. The phrase "detecting the different set of hardware components" does not require construction and the jury should use the plain and ordinary meaning of the terms. Alternatively, should the Court determine that a construction would be helpful, then the phrase should be construed as "determining that the hardware components are different."

Claim 38 broadly claims a method that registers a software product on a first computer and then subsequently determines whether the computer on which software is to be run is "substantially similar" to the first computer. To make this determination, the method has a step to detect the differences (if any) between the first computer and the computer in question. The claim broadly recites a detecting step and does not limit claim 38 to any particular manner of detecting.

Likewise, the specification broadly discloses that a software product, after having been registered for use on a specific computer and when subsequently run, "determines whether a new set of hardware components in the computer is substantially different from the original set of hardware components." ('468 Patent, Abstract; 3:26-29; 7:43-46) "If not substantially different, the upgraded computer is more like the original computer and the software product is permitted to operate; otherwise, the computer more resembles a new computer and the software product is prevented from operating." ('468 Patent, Abstract)

136

ViaTech's construction is wrong because it would require the comparison of two identifiers that are not recited—and therefore not required—by claim 38.  Nowhere does claim 38 recite a method requiring a "registration ID" or a "test ID."  It necessarily follows that claim 38, likewise, does not require a comparison of these two identifiers.  Detecting the differences between two computers does not require either a "test ID" or a "registration ID."  On the contrary, the claim expressly recites a "first set of hardware components" and a "second set of hardware components."  The "detecting" step determines whether there is a difference between these two sets of hardware components.  Notably, ViaTech's incorrect construction does not even refer to the "hardware components" expressly recited in the claim.

Moreover, it is clear that ViaTech is attempting to read details from other claims into claim 38, which expressly lacks those details.  For example claims 1, 10, 23, 24, 28, 29, 36, and 37 each recite both a registration ID and a test ID.  The fact that numerous other claims expressly recite such limitations demonstrates that claim 38, which lacks any such recital, does not require a "registration ID" or a "test ID."  *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014) ("[T]he difference in terminology [between the two claims] tends to reinforce, rather than undermine, adoption of the broad ordinary meaning of 'program' by itself.").

In addition, as with a previous term, ViaTech proposes a construction that includes terms that ViaTech contends themselves require further construction.  We provide here ViaTechs's actual proposed construction using the definitions it proposes for "product ID", "hardware ID", "test ID" and "registration ID".  According to ViaTech, the phrase "detecting the different set of hardware components" should be replaced with:

> obtaining a code identifying a combination of a code identifying a unique installation of a software product and a code identifying a set of hardware components within a computer computed when a software product is launched using the same algorithm as the code identifying a combination of a code

identifying a unique installation of a software product and a code identifying a set of hardware components within a computer computed when a software product is registered, comparing the code identifying a combination of a code identifying a unique installation of a software product and a code identifying a set of hardware components within a computer computed when a software product is launched using the same algorithm as the code identifying a combination of a code identifying a unique installation of a software product and a code identifying a set of hardware components within a computer computed when a software product is registered to the code identifying a combination of a code identifying a unique installation of a software product and a code identifying a set of hardware components within a computer computed when a software product is registered, and determining that code identifying a combination of a code identifying a unique installation of a software product and a code identifying a set of hardware components within a computer computed when a software product is launched using the same algorithm as the code identifying a combination of a code identifying a unique installation of a software product and a code identifying a set of hardware components within a computer computed when a software product is registered and the code identifying a combination of a code identifying a unique installation of a software product and a code identifying a set of hardware components within a computer computed when a software product is registered do not match

ViaTech's approach seeks to substitute a readily-understandable phrase having 7 words with a phrase having 304 words and injects numerous terms and concepts that are absent from claim 38 and which are not required by the actual text of claim 38.

Accordingly, ViaTech's construction should be rejected and the phrase requires no construction. Should the Court choose to construe the term "detecting the different set of hardware components," the Court should construe the phrase to mean "determining that the hardware components are different."

Counterclaim-Defendant's Answering Position

The parties dispute whether "detecting the different set of hardware components" in claim 38 should be given its plain and ordinary meaning (Microsoft)[119] or whether it should be construed as "obtaining a test ID, comparing the test ID to the registration ID, and determining that test ID and the registration ID do not match" (ViaTech). The court should adopt ViaTech's construction because the specification states that the anti-piracy system of the '468 patent determines whether hardware components in a computer are different by obtaining the product ID and current hardware ID, computing a test ID from them, and then comparing the test ID to the registration ID that was previously obtained and stored.[120]

Microsoft argues that ViaTech's construction "would require the comparison of two identifiers that are not recited—and therefore not required—by claim 38." *See supra* at 137–38 ("Nowhere does claim 38 recite a method requiring a 'registration ID' or a 'test ID.' It necessarily follows that claim 38, likewise, does not require a comparison of these two identifiers."). But, as described above with respect to Term 22, during prosecution of claim 38

---

[119] Microsoft's alternative construction of "determining that the hardware components are different" is substantially the same as the plain and ordinary meaning of "detecting the different set of hardware components."

[120] *See* Abstract; col. 3:5–20, 6:59–7:30 & Fig. 5 ("On each launch after installation, the software product obtains the product ID 102 (step 172) and generates the hardware ID from the set of hardware components within the computer (step 174). . . . At step 176, the software product 100 computes its own test ID from the product ID and hardware ID using the hashing algorithm 112. . . . The software product 100 retrieves the original registration ID 118 from memory 42 (step 178 in FIG. 5) and compares the test ID to the registration ID 118 (step 180 in FIG. 5). If the two match (i.e., the 'yes' branch from step 182), the software product is enabled to operate on the computer (step 184). On the other hand, if no match occurs (i.e., the 'no' branch from step 182), the software product is locked and prevented from operating on the computer (step 186 in FIG. 5). . . . In the typical case, the test and registration IDs will not match if the hardware ID is different now than it was when the customer first registered the software product with the registration authority. That is, the only thing that has changed in the computation of the test and registration IDs is the hardware ID.").

Microsoft defined what it means to detect a different set of hardware components on a second computer and discern whether the second computer is substantially similar to a first computer in the context of this claim. *See supra* note 117. Because this definition requires comparing a test ID and registration ID, and claim 38 was amended and allowed to issue over the prior art based on this comparison, "detecting the different set of hardware components" described in claim 38 requires "obtaining a test ID, comparing the test ID to the registration ID, and determining that test ID and the registration ID do not match," as ViaTech proposes.

<u>Counterclaim-Plaintiff's Reply Position</u>

As ViaTech acknowledges, the dispute with regard to this term is whether the plain and ordinary meaning should control, or whether the patent redefined the claim phrase to have the very specialized, and far from ordinary, meaning that ViaTech ascribes to the term.

To set the stage, there is no dispute that Microsoft's alternate construction properly captures the ordinary meaning of the claim phrase.  ViaTech concedes "Microsoft's alternative construction of 'determining that the hardware components are different' is substantially the same as the plain and ordinary meaning of 'detecting the different set of hardware components.'" (*Supra* at n. 119)

ViaTech on the other hand attempts to import numerous details from the preferred embodiment into the claim, in contravention of clear legal authority that claims are not limited to the disclosed embodiments and will only deviate from their plain and ordinary meaning when the patentee provides a clear limiting definition, which is absent here.  *See Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) ("A patentee can act as his own lexicographer, but, to do so, 'a patentee must clearly set forth a definition of the disputed claim

term other than its plain and ordinary meaning' and must 'clearly express an intent to redefine the term.'").

As with the previous term, ViaTech cites to the prosecution history, but as explained with regard to the previous term, Term 6, the arguments for claim 38 did not refer to a "registration ID" or a "test ID."  On the contrary, these terms appear, for example, in claim 1, and were argued with respect to claim 1.  Therefore, there is no support for ViaTech's statement that "Microsoft defined what it means to detect a different set of hardware components."  (*Supra* at 140)  There is no such definition either in the patent specification or in the prosecution history, and thus no reason to deviate from the undisputed ordinary meaning of the phrase.

Accordingly, ViaTech's construction should be rejected and the Court should find either that the phrase requires no construction, or alternatively "detecting the different set of hardware components" should be construed to mean "determining that the hardware components are different."

Counterclaim-Defendant's Sur-Reply Position

Microsoft does not dispute that the anti-piracy system of the '468 patent detects different hardware components by computing a test ID from the product ID and current hardware ID and comparing it to the registration ID to see whether there is an exact or  substantial  match.  *Compare supra* at 139–40 & n.120, *with supra* at 140–41. Instead, Microsoft argues that this is merely a "preferred embodiment" described in the specification. *See supra* at 140.  As noted in the above discussion of Term 22, however, Microsoft argued during prosecution that these features are necessary for the system to operate as intended and that they distinguished all the claims, including claim 38, from the prior art, and this term should be construed accordingly.

**8. Term 24:  "discerning whether the second computer is substantially similar to the first computer" (Claim 38)**

| Microsoft Construction | ViaTech Construction |
|---|---|
| Not indefinite. Plain and ordinary meaning. | Indefinite |

Counterclaim-Plaintiff's Opening Position

Microsoft contends that this phrase does not require construction and that the jury may apply the plain and ordinary meaning of the terms in the phrase. Microsoft understands that the sole dispute concerning this phrase is whether the term "substantially similar" is definite or indefinite. Microsoft contends that the term "substantially similar" is definite. Microsoft has already analyzed the term "substantially similar" with regard to Term 5, and the same reasons apply to the use of the term "substantially similar" here. For the same reasons expressed with regard to Term 5, ViaTech cannot show that claim 38 is invalid on the ground of indefiniteness.

Counterclaim-Defendant's Answering Position

The parties dispute whether the term "discerning whether the second computer is substantially similar to the first computer" recited in claim 38 is indefinite. The specification of the '468 patent only discusses determining whether the hardware components in a single computer that has been upgraded are "substantially different."[121] It distinguishes this scenario, which allows the customer to upgrade a computer without obtaining a new license, from the scenario whereby "an unscrupulous customer attempts to install the product on another

---

[121] *See generally* col. 3:26–47, 7:39–9:14 ("Another advantage is that the anti-piracy system is sensitive to the situation in which the customer has upgraded his/her computer, without effectively creating a new machine, and is now attempting to reinstall the software product on the upgraded computer. . . .").

computer," in which case the software program "will self-lock, thereby preventing its operation."[122]

Because the '468 patent does not include any standard for "discerning whether the second computer is substantially similar [to] the first computer" as described in claim 38, or provide an objective boundary defining how "substantially similar" two different computers must be for the software product to be permitted to operate on both of them, this term is indefinite.  *See, e.g., Delaware Display Group*, 2015 WL 6870031, at *6–7 (claims indefinite when the meaning of a term was "indiscernible" from the specification); *Netgear*, 5 F. Supp. 3d at 609–10.

<u>Counterclaim-Plaintiff's Reply Position</u>

The phrase in question is clear on its face, and ViaTech offers no argument other than that it is indefinite on the same grounds as Term 5.

For the same reasons given in response to those arguments, Microsoft submits that this term is definite as well.

<u>Counterclaim-Defendant's Sur-Reply Position</u>

Microsoft states that ViaTech's arguments with respect to this term are the same as its arguments with respect to Term 11 ("substantially similar").  *Supra* at 143.  ViaTech separately proposed this term for construction because, in addition to not defining what constitutes

---

[122] *See* col. 7:26–38 ("Of course, an entirely different computer with a different set of hardware components might also result in a different hardware ID. If an unscrupulous customer attempts to install the product on another computer, the software product will determine that the test and registration IDs do not match and will self-lock, thereby preventing its operation on the different computer. The customer is then forced to contact the registration authority to obtain a new registration ID, and if appropriate, pay an additional licensing fee for an additional installation.").

"substantially similar," the specification also does not describe an anti-piracy system that permits a software product to run on two different computers (a "first computer" and a "second computer"). *See supra* at 142–43 & nn.121–122. For this reason, and for the reasons separately stated for Term 11, this claim term is indefinite.

### 9. Term 4: "test ID"

| Microsoft Construction | ViaTech Construction |
|---|---|
| "information generated after the registration ID and used in the process of determining whether a software product is permitted to operate" | "a code identifying a combination of a product ID and a hardware ID computed when a software product is launched using the same algorithm as the |

Counterclaim-Plaintiff's Position

This term is not found in any of the claims being asserted by Microsoft in this Action, and therefore Microsoft contends that any dispute as to this term is moot and Microsoft has therefore not provided briefing for this term.

Counterclaim-Defendant's Answering Position

Microsoft did not argue that the term "test ID" should be construed in its opening brief. Based on the parties' Joint Claim Construction Chart, however, the parties dispute whether a "test ID" is "information generated after the registration ID and used in the process of determining whether a software product is permitted to operate" (Microsoft) or whether it is "a code identifying a combination of a product ID and a hardware ID computed when a software product is launched using the same algorithm as the registration ID." The court should adopt ViaTech's proposed construction of this term, because the specification states that the anti-piracy system of the '468 patent computes the "test ID" from the product ID and the current hardware

ID when the software product is launched using the same algorithm previously employed by the registration authority to compute the registration ID.[123]

The construction Microsoft previously proposed of "information generated after the registration ID and used in the process of determining whether a software product is permitted to operate" is not supported by the intrinsic evidence.  In order for the anti-piracy system of the '468 patent to operate as intended by ensuring that a software product (represented by the product ID) is registered and executed only on a single computer (represented by the hardware ID) (*see, e.g.*, Abstract, col. 2:36–43), both the "test ID" and registration ID must be calculated from the product ID and hardware IDs using the same algorithm, as required by ViaTech's proposed construction.  If different algorithms or information were used to calculate these values, the comparison would not match or substantially match, and the system would be unable to determine whether the software product is running on the same computer for which it was registered, as required by the '468 patent anti-piracy system.

### 10. Term 5:  "computing … by applying an operation to" / "computing" / "computed" / "apply the operation to"[124]

| Microsoft Construction | ViaTech Construction |
|---|---|
| | |

---

[123] *See* col. 3:5–15  7:1–13 ("Each time the software product is subsequently launched, the software product again obtains the product ID and generates the hardware ID for the computer. The software product then computes its own test ID from the product ID and hardware ID using the same algorithm (e.g., hashing algorithm) employed by the registration unit at the registration authority. The software product compares the test ID to the registration ID. If the two match, the software product is enabled to operate on the computer; otherwise, if no match occurs, the software product is locked and prevented from operating on the computer.").

[124] ViaTech inadvertently omitted the term "computed" from the Joint Claim Construction Chart, but this term is no different than, and should be construed consistently with, the term "computing." *See* D.I. 73 (Joint Claim Construction Chart) at 6.

| No construction required. Alternatively, "performing an action on a computer." | Plain and ordinary Meaning<br><br>(i.e., "deriving (derive) a new code by applying an algorithm to") |
|---|---|

Counterclaim Plaintiff's Position

This term is not found in any of the claims being asserted by Microsoft in this Action, and therefore Microsoft contends that any dispute as to this term is moot and Microsoft has therefore not provided briefing for this term.

Counterclaim-Defendant's Answering Position

Microsoft does not argue this term should be construed in its opening brief, but based on the alternative construction it previously proposed, the parties dispute whether "computing" a registration ID/test ID from a product ID and hardware ID means "performing an action on a computer" (Microsoft") or "deriving a new code by applying an algorithm to" the product ID and hardware ID (ViaTech).   ViaTech's construction should be adopted because the specification explains that the product ID and hardware ID are each comprised of a sequence of bits derived

from the software product and hardware system,[125] and it states that an algorithm (such as hashing algorithm) is applied to these bits in order to "compute" the registration ID and test ID.[126]

In contrast, there is no support for the broad construction Microsoft proposes ("performing an action on a computer"), and Microsoft did not cite any intrinsic or extrinsic evidence as a basis for the construction.  *See* D.I. 73 (Joint Claim Construction Chart) at 6.

**11. Term 9: "substantially matches" / "substantially match"**
**Term 10: "substantially different"**
**Term 12: "substantially the same"**
**Term 13: "substantially changed"**
**Term 14: "more like a new computer" / "more like the specific computer" / "more like the original computer"**
**Term 20: "new computer"**

| Term | Microsoft Construction | ViaTech Construction |
|---|---|---|
| "substantially matches" / "substantially match" | Not indefinite. Plain and ordinary meaning. | Indefinite |
| "substantially different" | Not indefinite. Plain and ordinary meaning. | Indefinite |
| "substantially the same" | Not indefinite. Plain and ordinary meaning. | Indefinite |

---

[125] *See, e.g.*, col. 2:36–51, 5:30–39, 5:46–6:22 ("As an example, the product ID consists of a 5-bit RPC (registered product code) value for the software product, a 3-bit site value indicating a place of manufacture, and a 7-bit serialized number that is incremented with each product. The software product 100 generates a hardware ID (H/W ID) that identifies a set of hardware components that make up the customer's computer 32 (step 152). The hardware ID is a multi-bit value having at least one bit representing each of the corresponding system components. As an example, the software product generates a 5-bit hardware ID that includes a single bit for each of five system components: BIOS 50, VBIOS 86, RAM 48, hard disk drive 52, and floppy disk drive 54.").

[126] *See, e.g.*, col. 6:39–44 ("The registration unit 110 computes the registration ID from the product ID and the hardware ID (step 156 in FIG. 4). In the illustrated implementation, the registration unit 110 employs a hashing algorithm 112 to compute a hash value of the concatenated product ID and hardware ID."); col. 7:1–5 ("At step 176, the software product 100 computes its own test ID from the product ID and hardware ID using the hashing algorithm 112. This is the same hashing algorithm as employed by the registration unit 110 when computing the original registration ID 118.").

| "substantially changed" | Not indefinite. Plain and ordinary meaning. | Indefinite |
|---|---|---|
| "more like a new computer" / "more like the specific computer" / "more like the original computer" | Not indefinite. Plain and ordinary meaning. | Indefinite |
| "new computer" | Not indefinite. "A computer that is substantially different from the original computer." | Indefinite |

Counterclaim Plaintiff's Position

This term is not found in any of the claims being asserted by Microsoft in this Action, and therefore Microsoft contends that any dispute as to this term is moot and Microsoft has therefore not provided briefing for this term.

Microsoft's arguments for Term 5 ("substantially similar") apply to these terms as well.

Counterclaim-Defendant's Answering Position

The parties dispute whether the claim terms describing determining whether the test ID and registration ID "substantially match," whether a new set of hardware components is "substantially different" or "substantially changed," and whether the computer is "substantially the same," "more like a new computer," "more like the specific computer," or "more like the original computer" are indefinite.  Each of these terms is indefinite, as ViaTech proposes, because it is "a term of degree," and neither the specification nor the prosecution history of the '468 patent "provide[s] objective boundaries for those of skill in the art" to identify the scope of the permitted changes and differences that would, and would not, meet these limitations.  *See, e.g., Interval Licensing*, 766 F.3d at 1370–71.  Instead of providing objective boundaries defining the hardware changes permitted by the claimed systems, the specification defines the permitted range of changes and differences using only subjective language, by equating the various terms of degree with each other.  For example, the patent states that a customer has "upgraded his/her computer, without effectively creating a *new machine*," when "only *one or a*

148

*few components* are different," and "the upgraded computer is *more like the original computer*."[127]   Conversely, if "*many or all components* are different," then "a new set of hardware components in the computer is *substantially different* from the original set of hardware components," and "the 'upgraded' computer more closely resembles a *new computer*."[128]   These subjective descriptions in the specification do not provide any objective measure for determining the scope of the claims. *See, e.g., Delaware Display Group*, 2015 WL 6870031, at *6–7 ("relatively low angles"); *Netgear*, 5 F. Supp. 3d at 609–10 ("optimal conditions"); *KLA-Tencor Corp.*, 2011 WL 318123, at *3–5.

Microsoft acknowledges that the patent claims include "'relative terms'" that "'purport[] to describe *how much'* hardware variation is allowed before the software product becomes disabled." *See supra* at 115–16 (quoting *Deere & Co.*, 703 F.3d at 1359, and *Enzo Biochem*, 599 F.3d at 1333).   It argues that such terms are not indefinite because the specification provides an example of "permissible and impermissible hardware changes." *Id*. at 116 ("For example, in one

---

[127] *See* col. 3:26–38, 7:39–52 ("Another advantage is that the anti-piracy system is sensitive to the situation in which the customer has upgraded his/her computer, without effectively creating a new machine, and is now attempting to reinstall the software product on the upgraded computer. In this situation, the software product determines whether a new set of hardware components in the computer is substantially different from the original set of hardware components. If only one or a few components are different, the upgraded computer is more like the original computer and the software product is permitted to operate. Conversely, if many or all components are different, the 'upgraded' computer more closely resembles a new computer and the software product is prevented from operating on this new computer.").

[128] *See id.; see also* col. 3:22–25, 45–47, 7:57–61 ("However, the system is also sensitive to the situation in which the user simply upgrades one or a few components in the computer without effectively creating a new machine."); col. 8:40–42 ("The anti-piracy system is advantageous in that it allows the customer some flexibility to upgrade or modify his/her computer without locking out the program.").

embodiment, a change of 'not more than two out of five components' is permissible whereas a change of 'more than two out of five components' is not . . . ."). The vast majority of the patent claims are not limited to this example, however, and Microsoft states that it is merely "one embodiment" of the invention that "is exemplary only" and "not itself a limitation" or "definition" of the subjective terms of degree.[129]

Microsoft does not explain, and the intrinsic evidence does not suggest, what other potential hardware changes or differences would (and would not) fall within the scope of the claims, even though Microsoft argued during prosecution that this was the patentable feature of the claims. *See supra* note 117. Thus, the 468 patent does not define the scope of the feature Microsoft claims to have invented, and these terms of degree are each indefinite. *See Halliburton Energy Services, Inc. v. M-I, LLC*, 514 F.3d 1244, 1251, 1253–56 (Fed. Cir. 2008) ("In this case, Halliburton differentiated its invention from the prior art because it was a 'fragile gel.' As discussed above, Halliburton's proposed definition of that term is not sufficiently definite because it does not adequately distinguish the fragileness of the invention from disclosed prior art . . . ."); *Prolifiq Software*, 2014 U.S. Dist. LEXIS 108630, at *8 ("[T]hese examples [from the

---

[129] *See id.* ("The 'two out of five' criteria is exemplary only and is not itself a limitation of the asserted claims, and it does not provide a definition of 'substantially similar.' Nor should the claim be construed as limited to a specific numerical range."). The broad claim language should not be construed to be limited to this single example because "[i]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Prolifiq Software Inc. v. Veeva Systems Inc.*, No. C 13–03644 SI, 2014 U.S. Dist. LEXIS 108630, at *13 (N.D. Cal., Aug. 6, 2014) (quoting *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012)); *see also Halliburton Energy Services*, 514 F.3d at 1248, 1250–51 ("[T]he specification states that 'preferably' none of these clays are added; this strongly suggests that absence of clays is simply a preferred embodiment. . . . Thus, a requirement of low or no organophilic clays is not properly part of the construction of 'fragile gel' as contained in the asserted independent claims.").

specification] are insufficient to show with reasonable certainty the scope of the claims because they provide no information as to what falls outside the boundaries of the claims."); *Skyhook Wireless, Inc. v. Google, Inc.*, No. 10–11571–RWZ, 2014 WL 898595, at *5–6 (D. Mass. Mar. 6, 2014) ("By discussing only two available methods for measuring distance, and by substituting examples for the required 'standard,' the specification leaves the definition of 'far' so open-ended as to leave a person skilled in the art to guess at the scope of the invention.").

Finally, although Microsoft proposes a construction for the term "new computer" as "[a] computer that is substantially different from the original computer," that construction suffers from the same defect as the term itself. A "computer that is substantially different" is a term of degree that fails to provide objective boundaries for the claims. *See, e.g., Halliburton Energy Servs.*, 514 F.3d at 1251, 1253–56 (finding claim term indefinite when the patentee's "proposed construction of 'fragile gel' . . . is ambiguous as to the requisite degree of the fragileness"); *Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*, Nos. 6:11–CV–011, –391, 2012 WL 2872121, at *14 (E.D. Tex. July 12, 2012) (rejecting the patentee's construction "of an unbounded term of degree using other terms of degree").

### 12. Term 16: "original registration ID" / "original registration IDs"
#### Term 17: "original set of hardware components"
#### Term 18: "original computer"

| Term | Microsoft Construction | ViaTech Construction |
|---|---|---|
| "original registration ID" / "original registration IDs" | Registration ID is construed separately.  No further construction necessary.  Alternatively, an "original" registration ID is "a first" registration ID. | "a code (codes) identifying a combination of a product ID and a hardware ID computed when a software product is registered for the first time" |
| "original set of hardware components" | Plain and ordinary meaning.  Alternatively, an "original" set of hardware components is "a first" set of hardware components. | "the hardware components within a computer when a software product is registered for the first time" |

151

| "original computer" | Plain and ordinary meaning. Alternatively, an "original" computer means "the computer with the original set of hardware components" | "the computer when a software product is registered for the first time" |
| --- | --- | --- |

### Counterclaim-Plaintiff's Position

This term is not found in any of the claims being asserted by Microsoft in this Action, and therefore Microsoft contends that any dispute as to this term is moot and Microsoft has therefore not provided briefing for this term.

### Counterclaim-Defendant's Answering Position

The parties dispute whether the "original" registration ID, set of hardware components, and computer referred to in the claims means a "first" registration ID, set of hardware components, or computer (Microsoft) or whether they refer to a registration ID, set of hardware components, or computer "when a software product is registered for the first time" (ViaTech). As described above with respect to Term 3, "registration ID" should be construed as "a code identifying a combination of a product ID and a hardware ID computed when a software product is registered." The specification states that, after a software product has been registered by obtaining the registration ID (*see* col. 5:46–6:55), the "original" registration ID is subsequently compared to the test ID to determine whether the software product is permitted to operate on the computer.[130]   Likewise, the specification describes that after the customer has upgraded the

---

[130] *See* col. 7:1–13 ("At step 176, the software product 100 computes its own test ID from the product ID and hardware ID using the hashing algorithm 112. This is the same hashing algorithm as employed by the registration unit 110 when computing the original registration ID 118. The software product 100 retrieves the original registration ID 118 from memory 42 (step 178 in FIG.

computer, a comparison of the test ID and "original registration ID" is used to determine whether the software is or is not permitted to operate. *See* col. 7:39–61.  The court should adopt ViaTech's proposed constructions of "original registration ID," "original set of hardware components," and "original computer," because these terms refer to the registration ID, set of hardware components, and computer that exists "when a software product is registered for the first time," as provided in ViaTech's constructions.

The generic constructions Microsoft previously identified of a "first" registration ID, set of hardware components, or computer should not be adopted by the court, because they do not reflect the disclosure in the specification confirming that an "original" registration ID, set of hardware components, and computer refers to these elements as they existed at the time the software product was first registered.

### 13. Term 19:  "new set of hardware components"

| Microsoft Construction | ViaTech Construction |
|---|---|
| "a set of hardware components in an upgraded computer" | "the hardware components within a computer after the computer is upgraded" |

<u>Counterclaim-Plaintiff's Position</u>

This term is not found in any of the claims being asserted by Microsoft in this Action, and therefore Microsoft contends that any dispute as to this term is moot and Microsoft has therefore not provided briefing for this term.

---

5) and compares the test ID to the registration ID 118 (step 180 in FIG. 5). If the two match (i.e., the 'yes' branch from step 182), the software product is enabled to operate on the computer (step 184). On the other hand, if no match occurs (i.e., the 'no' branch from step 182), the software product is locked and prevented from operating on the computer (step 186 in FIG. 5).").

Counterclaim-Defendant's Answering Position

The parties dispute whether a "new set of hardware components" means "a set of hardware components in an upgraded computer" (Microsoft) or whether it means "the hardware components within a computer after the computer is upgraded" (ViaTech). To the extent that there is a difference between these constructions, the court should adopt ViaTech's proposed construction because it is consistent with the claim language and with the specification. *See, e.g.*, Abstract, col. 3:16–46, 7:39–52, 7:62–8:39.

### 14. Term 21: "code segment" (Claims 10, 11–15)

| Microsoft Construction | ViaTech Construction |
|---|---|
| "software" | "software component" |

Counterclaim-Plaintiff's Position

This term is not found in any of the claims being asserted by Microsoft in this Action, and therefore Microsoft contends that any dispute as to this term is moot and Microsoft has therefore not provided briefing for this term.

Counterclaim-Defendant's Answering Position

Finally, the parties' dispute with respect to the term "code segment" is whether the term refers to "software" (Microsoft) or a "software component" (ViaTech).  Microsoft does not argue in its opening brief that this term should be construed, and the court should adopt ViaTech's proposed construction. The '468 patent describes that the claimed functions are performed by "software code within the software product" (*see* col. 1:15–20, 6:59–63, 7:62–66), and states that "program modules" such as these may be implemented on computer-readable media. *See* col. 4:49–62. Consistent with the constructions ViaTech proposed for the software mechanisms recited in the claims of ViaTech's '567 patent (*see*

Terms 7–8, 10–12, 14 in the '567 patent claim construction briefing), the claim term "code segment" should be construed as a "software component."

Dated: April 13, 2016                           Respectfully submitted,

                                                James D. Taylor, Jr. (#4009)
                                                Allison J. McCowan (#5931)
                                                SAUL EWING LLP
                                                222 Delaware Avenue, Suite 1200
                                                Wilmington, DE 19899
                                                Telephone:  (302) 421-6800
                                                Facsimile:  (302) 421-6813
                                                Email: jtaylor@saul.com
                                                Email: amccowan@saul.com

                                                Michael J. Lennon (Admitted *pro hac vice*)
                                                Sheila Mortazavi (Admitted *pro hac vice*)
                                                KENYON & KENYON LLP
                                                One Broadway
                                                New York, NY 10004-1007
                                                Telephone:  (212) 425-7200
                                                Facsimile:  (212) 425-5288
                                                Email: mlennon@kenyon.com
                                                Email: smortazavi@kenyon.com

                                                By   /s/ James D. Taylor, Jr.

                                                Attorneys for plaintiff and counterclaim-defendant
                                                VIATECH TECHNOLOGIES, INC.

Dated:  April 13, 2016                    FISH & RICHARDSON P.C


By:  /s/ Martina Tyreus Hufnal
    Martina Tyreus Hufnal
    222 Delaware Avenue, 17th floor
    P.O. Box 1114
    Wilmington, DE 19801
    Tel: (302) 652-5070
    hufnal@fr.com

    Frank E. Scherkenbach
    Kurt L. Glitzenstein
    Steven R. Katz
    Chet D. Campbell
    One Marina Park Drive
    Boston, MA 02210
    Tel: (617) 521-7883
    scherkenbach@fr.com
    glitzenstein@fr.com
    katz@fr.com
    cycampbell@fr.com

Attorneys for Defendant *Microsoft Corporation*