IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VIATECH TECHNOLOGIES, INC.,

                   Plaintiff,

    v.

MICROSOFT CORPORATION,

                   Defendant.

Civil Action No. 14-1226-RGA

## MEMORANDUM OPINION

James D. Taylor, Jr., Esq., Allison J. McCowan, Esq., SAUL EWING LLP, Wilmington, DE; Michael J. Lennon, Esq., Sheila Mortazavi, Esq. (argued), KENYON & KENYON LLP, New York, NY, attorneys for Plaintiff.

Martina Tyreus Hufnal, Esq., FISH & RICHARDSON P.C., Wilmington, DE; Frank E. Scherkenbach, Esq., Kurt L. Glitzenstein, Esq. (argued), Steven R. Katz, Esq. (argued), Chet D. Campbell, Esq., FISH & RICHARDSON P.C., Boston, MA, attorneys for Defendant.

June 14, 2016

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is the issue of claim construction of ten terms in U.S. Patent

No. 6,920,567 ("the '567 patent"). The Court has considered the parties' joint claim construction

brief and associated joint appendix (D.I. 92, 93, 94, 95, 98).[1] The Court heard oral argument on

May 6, 2016. (D.I. 123 [hereinafter, "Tr."]).

## I. BACKGROUND

On September 24, 2014, Plaintiff ViaTech Technologies, Inc. filed this action against

Defendant Microsoft Corporation, alleging infringement of the '567 patent. (D.I. 1). The '567

patent is directed to a method and apparatus for "use in creating and distributing files containing

digital content and for enforcing the licensed use of digital content files." ('567 patent, 1:21–23).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or

catechism for conducting claim construction.' Instead, the court is free to attach the appropriate

weight to appropriate sources 'in light of the statutes and policies that inform patent law.'"

*SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*,

415 F.3d at 1324). When construing patent claims, a court considers the literal language of the

claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments,*

*Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these

sources, "the specification is always highly relevant to the claim construction analysis. Usually,

---

[1] Microsoft's motion to supplement the joint appendix (D.I. 95) is granted. (*See* D.I. 123 at 4).

it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks and citations omitted).

> "[T]he words of a claim are generally given their ordinary and customary meaning. . . . [The ordinary and customary meaning is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."

*Id.* at 1312–13 (internal quotation marks and citations omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (internal quotation marks and citations omitted). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would

3

exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation omitted).

## III. PATENT AT ISSUE

ViaTech alleges infringement of claims 1–7, 13–15, and 28–32 of the '567 patent. (D.I. 1). Claims 1, 28, and 31 of the '567 patent are independent claims. ('567 patent, 40:65–41:24, 47:43–48:29, 49:26–50:30).

Claim 1 reads:

1. A digital content file including a license control mechanism for controlling the licensed use of digital content, comprising:

    a digital content, and

    an embedded file access control mechanism embedded in the digital content file, including

        a license functions mechanism embedded in the digital content file and including

            a license monitor and control mechanism communicating with a dynamic license database and monitoring use of the digital content by a user to determine whether a use of the digital content by a user comp[li]es with the license defined in the dynamic license database, and

            a license control utility providing communications between a user system and an external system to communicate license definition information between the user system and the external system, including

                a graphical user interface associated with the license control utility to provide communication between a user and user accessible functions of the license functions mechanism, and

    the dynamic license database wherein the dynamic license database is associated with the digital content file for storing information controlling operations of the file access control mechanism and license information controlling licensed use of the digital content.

(*Id.* at 40:65–41:24).

Claim 28 reads:

28.  A method for distributing a digital content file including a license control mechanism for controlling the licensed use of digital content of the digital content file, comprising the steps of:

preparing a licensable digital content file, containing

a digital content,

an embedded file access control mechanism, including

a license functions mechanism including

a license monitor and control mechanism communicating with a dynamic license database for monitoring use of the digital content by a user to determine whether a use of the digital content by a user complies with the license defined in the dynamic license database,

an adaptive fingerprint security mechanism for accessing a user system and determining fingerprint information identifying the user system, and

a license control utility providing communications between a user system and an external system to communicate license definition information between the user system and the external system, including

a graphical user interface associated with the license control utility to provide communication between a user and user accessible functions of the license functions mechanism, and

the dynamic license database wherein the dynamic license database is associated with the digital content file for storing information controlling operations of the file access control mechanism and license information controlling licensed use of the digital content, wherein

the dynamic license database initially associated with the licensable digital content file contains initial license information defining the requirements for at least one license that may be obtained by a user of a user system,

providing the licensable digital content file to a user system through a distribution mechanism, and

in the user system,

accessing the initial license information in the dynamic license database to determine the requirements for the at least one license that may be obtained by a user of the user system, including

accessing the user system to obtain system fingerprint information identifying the user system in which the digital content is to be used,

executing the requirements defined in the initial license information to obtain license information defining a license allowing use of the digital contents, and

writing the license information and system fingerprint information into the dynamic license database for use by the license monitor end control mechanism in controlling licensed use of the digital Content by the user.

(*Id.* at 47:43–48:29).

Claim 31 reads:

31. A method for providing a license for use of digital content in a digital content file residing in a user system wherein the digital content file includes an embedded file access control mechanism for controlling the licensed use of digital content of the digital content file, the file access control mechanism including a license functions mechanism including a license monitor and control mechanism, an adaptive fingerprint security mechanism, and a license control utility, including a graphical user interface, and a dynamic license database associated with the digital content file for storing information controlling operations of the file access control mechanism and license information controlling licensed use of the digital content, comprising the steps of

in the user system, and by operation of the file access control mechanism

generating a purchase request for a license containing user system information wherein the purchase request includes system fingerprint information and financial information relating to the purchase of a license, and

providing the request an order processing system,

in the order processing system,

generating an order identification and authorization for a license, and

providing the order identification and authorization and the purchase request to a product configuration and order database containing at least one license management database associated with the digital content file and containing license information for controlling use of the digital content file in compliance with a license defined by the license information, and

in the product configuration and order database,

> reading the license management database corresponding to the digital content file and generating license information defining a license for use of the digital content in the user system,

> providing the license information defining a license for use of the digital content in the user system to the user system, and

in the user system, and by operation of the file access control mechanism,

> writing the license information into the dynamic license database to define a license for use of the digital content in the user system.

(*Id.* at 49:26–50:30).

## IV. CONSTRUCTION OF DISPUTED TERMS

1.      "embedded"/"embedded in the digital content file"

     a.      *Plaintiff's proposed construction*: "functionally included"

     b.      *Defendant's proposed construction*: "code that is part of the digital content file, rather than being linked or otherwise 'functionally embedded'"/otherwise, indefinite

     c.      *Court's construction*: code is "embedded in the digital content file" if it is "part of or functionally included in the digital content file"

The asserted claims of the '567 patent all recite a "file access control mechanism" that is "embedded" in a "digital content file." ('567 patent, 40:65–42:24, 42:66–43:55, 47:43–50:39). The '567 patent specification describes that the file access control mechanism "includes a [license functions mechanism] that controls access to the contents of the [digital content in the digital content file] according to an electronic license." (*Id.* at 14:45–47). The specification goes on to explain that "there are several possible implementations of a [license functions mechanism] in the presently preferred embodiment . . . , each of which conforms to the present invention." (*Id.* at 14:60–63). The first implementation that the specification describes is one in which the

object code that is the executable digital content file includes the object code that implements the license functions mechanism. (*Id.* at 15:15–28). The patent describes this implementation as "embedd[ing]" the executable code components of the license functions mechanism in the executable code of the digital content file. (*Id.* at 15:25–26; D.I. 93-3 at 11). The second implementation that the specification describes is one in which the object code that is the executable digital content file does not include the object code that implements the license functions mechanism. ('567 patent, 15:31–44). In the second implementation, the object code that is the executable digital content file includes links that make calls to the object code that implements the license functions mechanism, which resides in a separate file. (*Id.* at 15:34–45; D.I. 93-3 at 12–13). In the second implementation, "the [license functions mechanism is] embedded functionally at runtime into the [digital content file], rather than directly and physically into the [digital content file]." ('567 patent, 15:43–45).

The parties dispute what to make of the distinction drawn in the specification between implementations that embed the license functions mechanism code "directly and physically" into the digital content file from those that "functionally embed[]" the license functions mechanism into the digital content file by combining the two at runtime. (D.I. 92 at 12, 13). ViaTech argues that "embedded" should be interpreted to cover both implementations and thus to mean that the code that implements the file access control mechanism need only be functionally included in the digital content file. (*Id.* at 12). Microsoft argues that because the specification distinguishes "embedded" from "functionally embedded," the file access control mechanism being "embedded" in the digital content file means that the code that implements the file access control mechanism must be a part of the digital content file. (*Id.* at 13). Microsoft contends that its proposed construction is the plain meaning of "embedded." (*Id.*).

8

Code that is "embedded" in the digital content file, pursuant to that term's plain and ordinary meaning in the context of the patent, is code that is part of or functionally included in the digital content file. As Microsoft points out, the patent distinguishes code that is "embedded . . . directly and physically" from code that is "embedded functionally at runtime." ('567 patent, 15:42–44). However, the patent describes the license functions mechanisms as "embedded" in both implementations. (*Id.*). The patent states that the "preferred embodiment[,] . . . which conforms to the present invention[,]" includes implementations in which the file access control mechanism components are not directly and physically part of the digital content file. (*Id.* at 14:60–63; *see also id.* at 9:31–34, 15:56–16:29, 43:56–44:17, 44:43–45:21). Although the Federal Circuit has distinguished "embedded" code from linked code in the context of a web page, *Augme Technologies, Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1333 (Fed. Cir. 2014), that construction does not control here because it would be at odds with the patent's consistent use of the term "embedded" to encompass directly and physically, as well as functionally, included in the digital content file.

"Functionally included" is not indefinite. ViaTech's expert Dr. Goldberg opined that "functionally included" has the same meaning as "functionally embedded." (D.I. 93-5 at 2; *see also* D.I. 93-3 at 14 ("I assume that Dr. Goldberg means 'functionally embedded' when he uses the term 'functionally included.'")). Microsoft acknowledges that the specification describes code from a separate file that is combined in memory with the digital content at the time of execution as "functionally embedded." (D.I. 92 at 13). Further, Microsoft's expert Dr. Wicker asserts that "'functional embedding' in the '567 Patent describes . . . 'embedding functionally at runtime' via the use of dynamic link libraries." (D.I. 93-3 at 14). Thus, I conclude that Microsoft has not proven that embedded, as construed, "fail[s] to inform, with reasonable

9

certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

For the reasons stated above, code is "embedded in the digital content file" if it is "part of or functionally included in the digital content file."

2.    "dynamic license"

    a.    *Plaintiff's proposed construction*: "modifiable file access control and licensed use information"

    b.    *Defendant's proposed construction*: "a license that can be modified by the file access control mechanism, and is not fixed or static"

    c.    *Court's construction*: decline to construe

I decline to construe this term because it appears in the claims only as part of the longer term "dynamic license database," which I construe below.

3.    "dynamic license database"

    a.    *Plaintiff's proposed construction*: "a modifiable record into which file access control and licensed use information can be written"

    b.    *Defendant's proposed construction*: "a database that resides in the digital content file and that is programmed to accept modifiable licenses"[2]

    c.    *Court's construction*: "a database that resides in the digital content file and that is programmed to accept modifiable licenses"

The parties dispute whether the "dynamic license database" must reside in the digital content file. (D.I. 92 at 28). ViaTech argues that "the claims explicitly state which components are (and are not) 'embedded' or 'include[d],' and describe the 'dynamic license database' as being merely 'associated with' the digital content file." (*Id.* (alteration in original)). Microsoft

---

[2] Microsoft originally proposed that the Court construe "dynamic license database" to mean "a database that resides in the digital content file and that contains modifiable licenses." (D.I. 92 at 27). Microsoft amended its proposed construction in response to ViaTech's assertion that the dynamic license database "does not necessarily contain a license." (D.I. 92 at 28, 29 n.16).

argues that the dynamic license database must reside in the digital content file because the claims

recite that the digital content file "comprise[s]" (claim 1), "contain[s]" (claim 28), or "includes"

(claim 31) the dynamic license database. (*Id.* at 28–29). ViaTech does not dispute that the

preamble language "digital content file" in the asserted claims is limiting. (*Id.* at 85 n.69). Thus,

in each asserted independent claim, the structure of the claim makes clear that the dynamic

license database resides in the digital content file. (*See, e.g.*, '567 patent, 40:65–41:24 (claiming

"[a] digital content file . . . comprising . . . the dynamic license database . . . .")). Although, as

ViaTech points out, the specification discloses systems in which the dynamic license database

need not reside in the digital content file (*see* D.I. 92 at 29–30 (citing '567 patent, 23:7–28,

23:36–47, & Fig. 1A)), "the claim construction inquiry . . . begins and ends in all cases with the

actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248

(Fed. Cir. 1998).

     The parties also dispute whether the term "dynamic" modifies "license" or "database."

(D.I. 92 at 23, 28). ViaTech argues that the patent describes the database, not the licenses in the

database, as dynamic or modifiable. (*Id.* at 28; Tr. at 52–53, 57). Microsoft argues that the

licenses in the dynamic license database must be dynamic or modifiable. (D.I. 92 at 23, 26; Tr.

at 61). The specification disparages prior art licenses on the ground that they were static and not

modifiable. ('567 patent, 2:10–19, 2:58–61, 3:44–47). Additionally, the patent states that "the

terms and provisions of an eLicense implemented by an eLicense System 24 of the present

invention are not static but are dynamic and change with, for example, time, the choices of the

user, and the control and constraints selected by the publisher." (*Id.* at 37:1–5). Thus, the

specification makes clear that, pursuant to the invention of the '567 patent, the licenses in the

dynamic license database are themselves dynamic or modifiable.[3] (*See id.* at 13:11–13

(describing "dynamically creat[ing], acquir[ing], updat[ing], and modify[ing] eLicenses"), 26:1–

5 (stating that "license data is recreated dynamically")).

For the reasons stated above, "dynamic license database" is construed as "a database that

resides in the digital content file and that is programmed to accept modifiable licenses."

4.     "file"

    a.    *Plaintiff's proposed construction*:  plain and ordinary meaning (*i.e.*, "a set of
        information on a computer").

    b.    *Defendant's proposed construction*:  "an element of data storage in a file system,
        which has a name which is used by a file manager for operations on the data (e.g.,
        .exe files for executable files, .doc files for Word files, .xls for Excel spreadsheet
        files)"

    c.    *Court's construction*:  plain and ordinary meaning, *i.e.*, "a collection of data that
        is treated as a unit by a file system"

Microsoft and ViaTech disagree regarding whether the plain and ordinary meaning of

"file" is limited to an individual named entity in a file system, for example, a .doc or .exe file, or,

instead, can include multiple named entities in a file system.  (D.I. 92 at 33, 34).  Microsoft

argues that the intrinsic and extrinsic evidence makes clear that "file" means a collection of data

that has a name that can be referenced in file operations in a file system.  (*Id.*).  ViaTech argues

that the plain and ordinary meaning of "file" is "a set of information on a computer" and can

include multiple individual file system entries.  (*Id.* at 33 & n.21).

Intrinsic evidence suggests that "file" means a collection of data that is treated as a unit in

a file system.  The '567 patent specification explains that a digital content "file" may be either an

executable file or a data file.  ('567 patent, 15:1–2).  The specification explains that:

    Executable files are files whose primary content is executable program code of
    some form, such as application programs or object libraries. Data files, in turn are

---

[3] The '567 patent also states that the dynamic license database is "a dynamic database[.]" ('567 patent, 14:15–16).

> files whose primary content is not executable code but is primarily data of any form
> that is operated upon or with by external programs, utilities or functions. Data files
> may include, for example, document, image, spreadsheet or database files and files
> containing digitally formatted audio and image information, such as video and
> audio files, music and movies.

(*Id.* at 15:2–11).  The specification also refers to the Microsoft Windows "file tree structure" and

to "normal file input/output processes" within a Microsoft Windows environment, which

suggests that the term "file' is being used in its ordinary sense to mean a discrete, named entity.

(*See id.* at 23:42, 24:9–18).  The '567 patent specification never refers to a collection of files as a

single "file."  ViaTech cites a description in the '567 patent of an embodiment in which the

components of the file access control mechanism reside in separate files that each have a

"randomly generated file name."  (*See* D.I. 92 at 36 (citing '567 patent, 6:49–53, 16:5–10, 17:8–

10 & claim 19)).  ViaTech also cites a description of the invention providing that it "includes an

electronic license (eLicense) file control mechanism for use in creating and distributing files

containing digital content, such as computer programs . . . ."  (*Id.* (citing '567 patent, 9:49–62)).

That the file access control mechanism and computer programs can consist of many files does

not compel a construction in which a "file" need not be treated as a unit by a file system.

Extrinsic evidence also supports that "file" means a collection of data that is treated as a

unit in a file system.  The Free On-Line Dictionary Of Computing defines "file" as "[a]n element

of data storage in a file system" and explains that a file "has a name that it can be referred to by

in file operations."  (D.I. 93-4 at 11).  Merriam Webster's Collegiate Dictionary, 10th ed. defines

"file" as "a complete collection of data (as text or a program) treated by a computer as a unit esp.

for purposes of input and output.  (*Id.*).  Further, this Court construed "data file" to mean "a

collection of any type of text or binary data that retains cohesion when presented to a user."

*Intellectual Ventures I LLC v. Check Point Software Techs. Ltd.*, 2012 WL 6200337, at *3 (D.

Del. Dec. 12, 2012).  The Court rejected plaintiff's proposed construction of "data file" as "any type of text or binary data" and "agree[d] with [d]efendants that the plain meaning of 'file' at the time of invention would signify to a skilled artisan a collection of data of sufficient coherence so as to permit the performance of various operations, such as identifying a characteristic." *Id.* at *3–4. Each reference discussed above defines "file" as a collection of data that is treated as a unit.

For the reasons stated above, "file" is construed as having its plain and ordinary meaning, *i.e.*, "a collection of data that is treated as a unit by a file system."

5.     "file access control mechanism"

   a.     *Plaintiff's proposed construction*: "software component that controls access to the contents of the digital content file"

   b.     *Defendant's proposed construction*: "a mechanism that includes a dynamic license database and a license function mechanism and that is not dependent upon access to a clearinghouse to perform its file access control functions"

   c.     *Court's construction*: "software component that controls access to the contents of the digital content file entirely locally, that is, solely within the end user site"

There are two aspects of the construction of "file access control mechanism" in dispute. (*See* D.I. 92 at 41).  First, the parties dispute whether the file access control mechanism "includes a dynamic license database." (*See id.*).  Second, the parties dispute whether the construction of "file access control mechanism" should include the limitation that it is "not dependent upon access to a clearinghouse to perform its file access control functions." (*See id.* at 41, 42).

ViaTech argues that "file access control mechanism" should not be construed to mean a software component that "includes a dynamic license database" because "[t]he '567 patent claims clearly state that the dynamic license database is 'associated with,' and not 'included' or 'embedded' in, the digital content file." (*Id.*).  Claim 1 provides that the digital content file

14

comprises a file access control mechanism "and" the dynamic license database. ('567 patent, 40:65–41:21). Claims 28 and 31 provide that the embedded file access control mechanism "include[es]" the dynamic license database. (*Id.* at 47:49–48:1, 49:30–35). Because the asserted independent claims claim different relationships between the file access control mechanism and the dynamic license database, "file access control mechanism" should not be construed as a mechanism "that includes a dynamic license database." "File access control mechanism" also need not be construed as a mechanism that includes "a license functions mechanism" because the language of the asserted claims makes the relationship between those components clear. (*See id.* at 41:2–5, 47:49–50, 49:30–31).

Microsoft argues that the "file access control mechanism" should not be construed to include mechanisms that are dependent upon access to a clearinghouse to perform file access control functions. (D.I. 92 at 42). Microsoft contends that the limitation it proposes is supported by the claims, which require that the function of "control" be carried out by code embedded in the digital content file itself and therefore preclude dependence on a clearinghouse to perform that function. (*Id.*; *see, e.g.*, '567 patent, 41:2–11). Microsoft also argues that the specification supports including its proposed limitation because it disparages prior art systems that depended on "the use of an authentication certificate transmitted from a license clearing house to a user system, and that thereby ha[ve] no functional relationship to the licensed program." ('567 patent, 2:24–27; D.I. 92 at 42–43; *see also* '567 patent, 2:5–19, 2:52–56). Finally, Microsoft argues that the prosecution history compels including its proposed limitation. (D.I. 92 at 43). The PTO found the asserted claims allowable in a first office action. (*See* D.I. 93-4 at 110). However, the PTO rejected other claims to a "digital content file" (claims 22 and 23) that "includes an embedded file access control mechanism for controlling licensed use of the digital

content" on the ground that the prior art Gruse patent disclosed, among other things, digital content and an embedded file access control mechanism. (*See id.* at 42, 110). In response, ViaTech argued that "[i]n complete contrast from the Gruse et al. '538 system, the method of the present invention as recited in claims 22 and 23 does not use and is not dependent upon access to a clearinghouse site but instead performs all file content access and license control functions locally, that is, solely within the end user site." (*Id.* at 111). Microsoft argues that ViaTech's response is relevant to the meaning of "file access control mechanism" in the asserted claims because "ViaTech distinguished Gruse on the grounds that the [file access control mechanism] is not dependent upon access to a clearinghouse to perform file access control functions, and that argument informs the meaning [of] that claim term not only in claim 22, but in all other claims in which it appears." (D.I. 92 at 45).

ViaTech argues that "file access control mechanism" should not be construed to require that it is not dependent upon access to a clearinghouse. (*Id.* at 41). ViaTech points out that "[t]he specification does not describe a 'clearinghouse' as an element of the claimed methods." (*Id.* (citing '567 patent, 10:10–11:20, 14:31–20:29)). In fact, the claims "expressly state that [the file access control mechanism] components communicate license information to and from external systems." (*Id.* at 46 (citing '567 patent, 41:12–14, 43:14–30, 47:60–63, 49:40–50:30)). ViaTech also maintains that Microsoft's reliance on the prosecution history is unavailing because "[t]he asserted '567 patent claims were found patentable by the examiner before the statements Microsoft cites were presented to the USPTO." (*Id.* at 42 n.29).

"When an applicant tells the PTO that a prior art reference lies outside the scope of his claim, he is bound by that argument." *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 942 (Fed. Cir. 2013). A disclaimer made during prosecution with respect to a claim

limitation applies to limitations that are the same or "substantially the same" in the same or

related patents. *Id.* at 944. "It is[, however,] inappropriate to apply a narrowing disclaimer to

limitations that are materially different from the limitation to which it originally applied." *Id.* at

945.

> In disclaiming claim coverage in light of certain prior art, the applicant does not
> thereby act as a lexicographer, redefining individual words. The appropriate focus
> is on the scope of the claim element, not the meaning of particular words in
> isolation. This is why our cases evaluate the similarity between the earlier and later
> claim limitations, carrying disclaimer forward if there are only immaterial
> differences.

*Id.* at 944.

In distinguishing Gruse from claims 22 and 23, ViaTech stated that "in complete contrast

from the Gruse et al. '538 system, the licensed contents, the access control mechanism and the

license terms and provisions together comprise a single, integrated entity that . . . locally contains

and comprises all of the elements and functions necessary to control access to the contents of the

content." (D.I. 93-4 at 112). Claim 22 of the '567 patent, as originally rejected by the PTO and

as allowed over Gruse in light of ViaTech's response, recites "an embedded file access control

mechanism for controlling the licensed use of digital content." (*Id.* at 101; '567 patent, 45:53–

56). Asserted claim 31 recites a limitation identical to that in claim 22, "an embedded file access

control mechanism for controlling the licensed use of digital content." ('567 patent, 49:28–30).

Further, the asserted claims of the '567 patent all recite "an embedded file access control

mechanism." (*See, e.g., id.* at 41:2–3, 47:49–50, 49:28–30). There is no indication that ViaTech

intended to "take a different approach to claiming [the] invention" in the asserted claims as

compared to claims 22 and 23. *Regents of Univ. of Minn.*, 717 F.3d at 944. The claim limitation

at issue in the asserted claims is thus substantially the same as the limitation ViaTech relied on to

17

distinguish the patented invention from Gruse. As a result, ViaTech's disclaimer with respect to the limitation in claims 22 and 23 applies to the asserted claims.

Contrary to ViaTech's argument, construing "file access control mechanism" to exclude mechanisms that are dependent on access to a clearinghouse to perform file access control functions is not inconsistent with the asserted claims. (*See* D.I. 92 at 46). Although the asserted claims expressly state that the file access control mechanism components must have the ability to communicate license information to and from external systems, they also require that those external systems are not the file access control mechanism's only source of license information. This is consistent with ViaTech's statements during prosecution that the inventive aspect of the file access control mechanism is that it can operate independently of external clearinghouses. (*See* D.I. 93-4 at 111–12).

Thus, "file access control mechanism" is construed as "software component that controls access to the contents of the digital content file entirely locally, that is, solely within the end user site."

6.    "license monitor and control mechanism" terms[4]

a.    *Plaintiff's proposed construction:*[5] "software component that implements the terms and provisions of an electronic license"

If the Court construes the term as means-plus-function:

| Functions | Corresponding Structure |
|---|---|
| (1) communicating with a dynamic license database and (2) monitoring use of the digital content by a user to determine whether a use of the digital content by a user complies | 4:53–62, 13:59–14:2, 14:7–13, 14:44–15:54, 23:8–24 |

---

[4] The "license monitor and control mechanism" terms are "license monitor and control mechanism communicating with a dynamic license database [and/for] monitoring use of the digital content by a user to determine whether a use of the digital content by a user comp[li]es with the license defined in the dynamic license database" (claims 1 and 28), and "license monitor and control mechanism." (claim 31).

[5] (D.I. 92 at 56–57).

| with the license defined in the dynamic license database, as stated in claims 1 and 28 | |
|---|---|

b.   *Defendant's proposed construction*:[6]   means-plus-function

| Claims | Functions | Corresponding Structure |
|---|---|---|
| Claims 1 and 28 | (1) control access to the digital content file and<br><br>(2) monitor use of the digital content by a user to determine whether a use of the digital content by a user complies with the license defined in the dynamic license database, where<br><br>(3) the license monitor and control mechanism communicates with a dynamic license database | 13:59–65, 16:10–25, 17:18–23, 17:46–61, 18:61–19:5, and 19:40–20:3 |
| Claim 31 | (1) control access to the digital content file and<br><br>(2) monitor use of the digital content by a user | 13:59–65, 16:10–25, 17:18–23, 17:46–61, 18:61–19:5, 19:40–20:3 |

c.   *Court's construction*:

| Claims | Functions | Corresponding Structure |
|---|---|---|
| Claims 1, 28, and 31 | (1) communicating with a dynamic license database, and<br><br>(2) monitoring use of the digital content by a user to determine whether a use of the digital content by a user complies with the license defined in the dynamic license database | 4:53–62, 13:59–14:2, 14:7–13, 14:44–15:54, 16:10–25, 17:18–23, 17:46–61, 18:61–19:5, 19:40–20:3, 23:8–24 |

---

[6] (D.I. 92 at 49–50).

The parties dispute whether the license monitor and control mechanism terms should be construed under 35 U.S.C. § 112, ¶ 6 as means-plus-function limitations.  (D.I. 92 at 48, 49).

The license monitor and control mechanism terms are presumptively not subject to construction under § 112, ¶ 6 because they do not recite the word "means."  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  *Id.* at 1349.  "What is important is . . . that the term, as the name for structure, has a reasonably well understood meaning in the art."  *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996).

ViaTech argues that "license monitor and control mechanism" should not be construed under § 112, ¶ 6 because claim 31 of the '567 patent uses the term without an associated description of any corresponding function.  (D.I. 92 at 48).  However, that the claim does not recite function does not necessarily take the claim out of the ambit of § 112, ¶ 6.  Indeed, under *Williamson*, § 112, ¶ 6 applies if the claim "fails to recite sufficiently definite structure," regardless of whether the claim recites function.  792 F.3d at 1349.  ViaTech acknowledges that "license monitor and control mechanism" does not have a commonly understood meaning in the art as the name for structure.  (Tr. at 106).  *Cf. TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1348 (Fed. Cir. 2013) (noting that "'digital logic means' designates structure to skilled artisans").  ViaTech does not point to language in the claims that recites structure.  Instead, the language to which ViaTech points to argue that the term recites structure is found in the specification.  (*See* D.I. 92 at 49).  Thus, the asserted claims do not recite sufficiently definite

20

structure for the license monitor and control mechanism terms. "License monitor and control mechanism" is therefore subject to construction under § 112, ¶ 6.

Application of § 112, ¶ 6 proceeds in two steps. First, the court must identify the claimed function. *Williamson*, 792 F.3d at 1351. The identified function must be the function "explicitly recited in the claim." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Second, "the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function. Where there are multiple claimed functions, . . . the patentee must disclose adequate corresponding structure to perform all of the claimed functions." *Williamson*, 792 F.3d at 1351–52. "Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Id.* at 1352.

The claimed functions of the license monitor and control mechanism in claims 1 and 28 of the '567 patent are (1) communicating with a dynamic license database and (2) monitoring use of the digital content by a user to determine whether a use of the digital content by a user complies with the license defined in the dynamic license database. (*See* '567 patent, 41:6–11, 47:51–56). The claimed functions of the license monitor and control mechanism in claim 31 of the '567 patent are "license monitoring and control." (*Id.* at 49:32). The functions claimed in claims 1 and 28 have the same meaning as the functions claimed in claim 31, despite using different language.[7] *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("Different claims with different words can, of course, define different subject matter within the ambit of the invention. On the other hand, claim drafters can also use different terms to define the exact same subject matter. Indeed this court has acknowledged that two

---

[7] ViaTech seems to agree with this proposition. (D.I. 92 at 56). Microsoft proposes similar, but not exactly the same, functions for claim 31 as for claims 1 and 28. (*Id.* at 49–50, 53).

claims with different terminology can define the exact same subject matter."); *Micro Chemical, Inc.*, 194 F.3d at 1258 (implicitly recognizing that functions claimed in separate claims using different language may nevertheless "have the same meaning"); *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990) ("It is not unusual that separate claims may define the invention using different terminology, especially where (as here) independent claims are involved."). None of the asserted independent claims recite the function of the license monitor and control mechanism as "control[ling] access to the digital content file." (*See* D.I. 92 at 49). Instead, that function is described as a function of "a license control mechanism." (*See* '567 patent, 40:65–67). Microsoft does not argue that the "license control mechanism" is the "license monitor and control mechanism."

ViaTech argues that the parts of the specification that describe an embodiment of the invention using dynamic code libraries that are functionally embedded at runtime are not corresponding structure because they are merely exemplary. (D.I. 92 at 57 (citing 16:10–25, 17:18–23, 17:46–61, 18:61–19:5, 19:40–20:3)). Microsoft responds that the structures to which ViaTech objects are corresponding structure because they are the only structures disclosed for controlling access to the digital content. (D.I. 92 at 58–59). Because "controlling access to the digital content file" is not a claimed function, the proper construction of "license monitor and control mechanism" does not include structure merely because it corresponds to that function. The disputed structure, however, discloses alternative algorithms for monitoring use of the digital content by a user to determine whether a use of the digital content by a user complies with the license defined in the dynamic license database. (*See* '567 patent, 16:10–25, 17:18–23, 17:46–61, 18:61–19:5, 19:40–20:3). "A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures." *Micro Chemical, Inc.*,

22

194 F.3d at 1258. Claim construction under § 112, ¶ 6 requires identifying all structures, including all disclosed embodiments, that perform the claimed function. *Id.* at 1258–59. ViaTech's argument that identifying all structures that perform the claimed functions unduly narrows the claim is thus unfounded—the additional structures Microsoft identifies do not "improperly narrow the scope of the claims" because they actually broaden the scope of the claims by providing additional corresponding structure that satisfies the claims. (*See* D.I. 92 at 57).

The "license monitor and control mechanism" terms are therefore construed under § 112, ¶ 6 as set forth above.

7.  "monitoring use"

    a.  *Plaintiff's proposed construction*:  plain and ordinary meaning (i.e., "detecting use")

    b.  *Defendant's proposed construction*:  "maintain regular surveillance over user activity via tracking of file input/output calls"

    c.  *Court's construction*: plain and ordinary meaning

Claims 1 and 28 of the '567 patent describe a function of the license monitor and control mechanism as "monitoring use of the digital content by a user." ('567 patent, 41:7–8, 47:52–53). The parties dispute whether "monitoring use" requires detection of use, which could be a discrete event, or instead requires regular surveillance via tracking of file input/output calls. (*See* D.I. 92 at 59, 60). ViaTech argues that the plain and ordinary meaning of "monitoring use" is "detecting use" and that "detecting use" "is consistent with the patent's description of the file access control mechanism FACM 16 components being invoked upon 'an attempt by a user system to access the digital content.'" (D.I. 92 at 59 (citing '567 patent, 4:53–62, 5:4–20, 8:1–6, 22:50–55)). ViaTech contends that the specification consistently states that the file access control mechanism

"monitor[s] use merely by 'intercepting an attempt to access the digital content' and then either allowing or not allowing the user to proceed, without describing any continued monitoring." (*Id.* at 61 (quoting '567 patent, 6:54–58)). Microsoft argues that the plain and ordinary meaning of "monitoring use" means continuous surveillance or evaluation. (*See id.* at 60). Microsoft maintains that there is no support for ViaTech's position that "monitoring use" means "detecting use" but that the file access control mechanism is able to detect uses because of its monitoring function. (*Id.* at 61, 62).

The term "monitoring use" should be given its plain and ordinary meaning, which requires surveillance or evaluation over some period of time. "Monitoring use" thus does not mean "detecting use." The specification does not contemplate that "monitoring" occurs only at discrete time points, as would be the case under ViaTech's construction as "detecting" uses by, for example, intercepting them. (*See id.* at 61). For example, the specification uses the term "monitoring" to mean surveillance or evaluation over a period of time because it describes the eLicense Dldb 14, which is a repository for license data, as possibly including "cumulative hours of use monitoring." ('567 patent, 20:59–21:2). Further, the dictionary definition cited by ViaTech does not suggest that "monitoring" means "detecting." (*See* D.I. 92 at 60–61). Instead, it defines "monitor" to mean "to watch, keep track of, or check usu. for a special purpose," which suggests that monitoring means continuously surveilling or evaluating activity over some period rather than merely intercepting activity at discrete points. (Merriam-Webster's Collegiate Dictionary 752 (10th ed. 1998) (D.I. 93-2 at 15)).

Microsoft argues that the specification supports including "via tracking of file input/output calls" as part of the construction of "monitoring use." (D.I. 92 at 60, 62). The passages on which Microsoft relies describe embodiments and prior art systems that "monitor"

24

or "intercept" file input/output calls. (*Id.* at 60 (citing '567 patent, 1:34–37, 8:1–4, 19:60–64)).

ViaTech argues that "monitoring use" is not limited to "tracking of file input/output calls"

because the patent describes some communications in the system as implemented through

processes other than "conventional file input/output processes." (*Id.* at 62). Microsoft responds

that those communications are "unrelated to the file input/output calls made by a user." (*Id.*).

Still, Microsoft has not proven that the meaning of "monitoring use" is limited to tracking file

input/output calls and excludes tracking communication paths other than conventional file/input

output processes. *See Cadence Pharms. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1369 (Fed.

Cir. 2015) ("[E]ven if all of the embodiments discussed in the patent included a specific

limitation, it would not be proper to import from the patent's written description limitations that

are not found in the claims themselves." (internal quotation marks omitted)).

Thus, "monitoring use" is construed as having its plain and ordinary meaning, which

requires surveillance or evaluation over some period of time.

8.    "adaptive fingerprint"

    a.    *Plaintiff's proposed construction*: "a fingerprint that identifies a system that has
          changed or been modified from an originally licensed configuration"

    b.    *Defendant's proposed construction*: "a fingerprint that can be adjusted or
          changed to reflect changes to a user system"

    c.    *Court's construction*: decline to construe

I decline to construe this term because it appears in the claims only as part of the longer

term, "adaptive fingerprint security mechanism," which I construe below. I do not at this time

reach the parties' dispute regarding whether an "adaptive fingerprint" must adapt.[8] (*See* D.I. 92

at 76).

---

[8] Because "adaptive fingerprint" is not itself a claim limitation, I do not see how the parties' dispute in this regard is
a dispute about the scope of the asserted claims as written. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,

9.   "adaptive fingerprint security mechanism" terms[9]

   a.   *Plaintiff's proposed construction*: "software component that uses a fingerprint to identify a system that has changed or been modified from an originally licensed configuration and provides selective levels of adaptability to modifications and changes"

   If the Court construes the term as means-plus-function:[10]

| Functions | Corresponding Structure |
| --- | --- |
| (1) responding to an attempted access of the of the digital contents for obtaining current system fingerprint information from the user system, | 5:4–13, 24:52–25:5, 25:12–46 |
| (2) comparing the current system fingerprint information with the system fingerprint information in the dynamic license database, and | |
| (3) accessing a user system and determining fingerprint information identifying the user system | |

   b.   *Defendant's proposed construction*:[11]  means-plus-function

| Claims | Functions | Corresponding Structure |
| --- | --- | --- |
| Claim 5 | (1) responding to an attempted access of the of the digital contents for obtaining current system fingerprint information from the user system and | 5:4–31, 14:13–23, 25:21–26:4 |
| | (2) comparing the current system fingerprint information with the | |

---

521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court . . . must resolve that dispute.").

[9] The "adaptive fingerprint security mechanism" terms are "adaptive fingerprint security mechanism responsive to an attempted access of the digital contents for obtaining current system fingerprint information from the user system and comparing the current system fingerprint information with the system fingerprint information in the dynamic license database" (claim 5), "adaptive fingerprint security mechanism for accessing a user system and determining fingerprint information identifying the user system" (claim 28), and "adaptive fingerprint security mechanism" (claim 31).

[10] (D.I. 92 at 81–82).

[11] (D.I. 92 at 80).

| | | |
|---|---|---|
| | system fingerprint information in the dynamic license, (3) in order to provide adaptive fingerprint security | |
| Claim 28 | determining fingerprint information identifying the user system in order to provide adaptive fingerprint security | 5:4–31, 14:13–23, 25:21–26:4 |
| Claim 31 | providing adaptive fingerprint security | 5:4–31, 14:13–23, 25:21–26:4 |

c.   *Court's construction*:

| Claims | Functions | Corresponding Structure |
|---|---|---|
| Claim 5 | (1) responding to an attempted access of the digital contents for obtaining current system fingerprint information from the user system and (2) comparing the current system fingerprint information with the system fingerprint information in the dynamic license database | 5:4–13, 24:41–45, 24:52–25:5, 25:12–46 |
| Claim 28 | (1) accessing a user system and (2) determining fingerprint information identifying the user system | 5:4–13, 24:41–45, 24:52–25:5, 25:12–46 |
| Claim 31 | providing adaptive fingerprint security | 5:4–13, 24:41–45, 24:52–25:5, 25:12–46 |

The parties dispute whether the adaptive fingerprint security mechanism terms should be construed as means-plus-function limitations under § 112, ¶ 6. (D.I. 92 at 79, 80). The adaptive fingerprint security mechanism terms are subject to construction under § 112, ¶ 6. As with respect to the "license function and control mechanism" terms, the fact that asserted claim 31 of the '567 patent does not recite function beyond its label for the claimed mechanism does not take the claims out of the ambit of § 112, ¶ 6. The claims do not recite structure for the adaptive fingerprint security mechanism terms—the structure that ViaTech identifies is found in the

27

specification, not in the claims. (*See id.* at 79). ViaTech points to no extrinsic evidence that "adaptive fingerprint security mechanism" recites structure well known to those of skill in the art. (*See id.* at 79–80, 81–82). Thus, the claims "fail[] to 'recite sufficiently definite structure'" and are subject to construction under § 112, ¶ 6. *Williamson*, 792 F.3d at 1349.

The functions of the adaptive fingerprint security mechanism recited in claim 5 are responding to an attempted access of the digital contents for obtaining current system fingerprint information from the user system and comparing the current system fingerprint information with the system fingerprint information in the dynamic license database. ('567 patent, 41:59–64). The functions of the adaptive fingerprint security mechanism recited in claim 28 are accessing a user system and determining fingerprint information identifying the user system. (*Id.* at 47:57–59). The functions recited above are the claimed functions of the adaptive fingerprint security mechanism terms in claims 5 and 28. *See, e.g.*, *Williamson*, 792 F.3d at 1350, 1352 (construing present participles following nonce words as claimed functions under § 112, ¶ 6); *see also Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1361 (Fed. Cir. 2004).

The function of the adaptive fingerprint security mechanism recited in claim 31 is providing adaptive fingerprint security. (*See* '567 patent, 49:32–33). ViaTech argues that "providing adaptive fingerprint security" is not a function of the adaptive fingerprint security mechanism because the patent describes the license monitor and control mechanism, not the adaptive fingerprint security mechanism, as providing adaptive fingerprint security. (D.I. 92 at 79–80). The claims that ViaTech cites state that the license monitor and control mechanism "respon[ds]" to the comparison of the current system fingerprint information with the system fingerprint information in the dynamic license database that is carried out by the adaptive fingerprint security mechanism. ('567 patent, 41:66–42:7, 42:11–20). That claim 31 recites no

28

function for the adaptive fingerprint security mechanism aside from the words of the term itself suggests that its function is to provide adaptive fingerprint security. Providing adaptive fingerprint security is therefore the claimed function of the adaptive fingerprint security mechanism in claim 31.[12]

The parties agree that the specification describes a single structure that performs the claimed functions of the adaptive fingerprint security mechanism. (D.I. 92 at 80, 82). There is some overlap in the corresponding structure identified by ViaTech and Microsoft. (*See id.*). ViaTech argues, however, that Microsoft's construction improperly includes algorithmic steps carried out by the license monitor and control mechanism, specifically, "when the modifications and changes fall within the predetermined range of tolerance, both allowing access to the digital content and writing the current system fingerprint into the dynamic license database in replacement of the prior system fingerprint." (D.I. 92 at 82 (citing '567 patent, 5:13–31, 14:13–23, 25:47–26:6)). I agree with ViaTech. The structure recited at 5:13–31, 14:13–23 and 25:47–26:6 of the patent does not correspond to the claimed functions of the adaptive fingerprint security mechanism because it recites steps of an algorithm that are not linked to the claimed functions of responding to an attempt to access the digital content by obtaining current system fingerprint information from the user system and comparing the current system fingerprint information with the system fingerprint information in the dynamic license database. *See Williamson*, 792 F.3d at 1352 ("Structure disclosed in the specification qualifies as

---

[12] I construed the "license monitor and control mechanism" term in claim 31 as claiming the same functions as the license monitor and control mechanism terms that appeared in claims 1 and 28. *See supra* p.21. Analogous treatment with respect to the adaptive fingerprint security mechanism terms is inappropriate, however, because the functions of the adaptive fingerprint security mechanism in claim 5 appear materially different from the functions in claim 28. Thus, there is no suggestion that the adaptive fingerprint security mechanism claimed in each asserted independent claim performs precisely the same functions. While I conclude, as stated above, that providing adaptive fingerprint security is the function of the adaptive fingerprint security mechanism claimed in claim 31, the record at this time does not permit me to expound further on that function.

'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim.").

The "adaptive fingerprint security mechanism" terms are therefore construed under § 112, ¶ 6 as set forth above.

10.    preambles

a.    *Plaintiff's proposed construction*:  only limiting for claim 31

b.    *Defendant's proposed construction*:  limiting

c.    *Court's construction*: The preamble of claim 31 is limiting.  The term "digital content file," in the preambles of claims 1 and 28 is limiting.  The preambles of the asserted claims are otherwise not limiting.[13]

A claim preamble is not construed as a limitation "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (internal quotation marks omitted).  A preamble is construed as a limitation "if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Id.* (internal quotation marks omitted).  Additionally, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).  An entire preamble is not necessarily limiting because a portion of it is limiting. *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015).

The parties agree that the preamble of claim 31 is limiting.  (D.I. 92 at 83).  The parties also agree that the term "digital content file," as it appears in the preamble of each asserted claim, is limiting.  (*See id.* at 85 & n.69).  The parties dispute whether the language, "a license

---

[13] Of course, if language in the preamble of an independent claim is limiting, that language is also a limitation in the dependent claims that depend from the independent claim.

control mechanism for controlling the licensed use of digital content," which appears in the

preambles of claims 1–7 and claims 13–15, and "a license control mechanism for controlling the

licensed use of digital content of the digital content file," which appears in the preambles of

claims 28–30, should be construed as limiting.  (*Id.* at 84).

"[A] license control mechanism for controlling the licensed use of digital content" and "a

license control mechanism for controlling the licensed use of digital content of the digital content

file" are not claim limitations.  "[A] license control mechanism . . ." is not recited in the bodies

of the asserted claims and does not provide antecedent basis for terms appearing in the bodies of

the claims.  The specification does not describe the "license control mechanism" as an essential

component of the claimed inventions.  Instead, the specification uses "license control

mechanism" as a label for the components that perform the functions of the claimed inventions.

(*See, e.g.*, '567 patent, 8:7–36).  The specification and claims disclose that "controlling the

licensed use of digital content" is performed by software components recited in the bodies of the

claims, including the file access control mechanism, the license control utility, the license

monitor and control mechanism, the license functions mechanism, and the dynamic license

database.  ('567 patent, 4:49–51, 4:63–66, 5:49–51, 6:9–11, 7:5–6, 7:17–22, 8:34–36, 8:64–66,

41:2–21, 41:59–42:7, 47:46–48:10).  The bodies of the claims are therefore "structurally

complete" without the disputed preamble language.

For the reasons stated above, the preamble of claim 31 is limiting.  The term "digital

content file" in the preambles of claims 1 and 28 is limiting.  The preambles of the asserted

claims are otherwise not limiting.

## V.   CONCLUSION

Within five days the parties shall submit a proposed order consistent with this

Memorandum Opinion and suitable for submission to the jury.