# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VIATECH TECH. INC.,

        Plaintiff,

v.

MICROSOFT CORP.,

        Defendant.

No. 14-cv-1226 (RGA)

## MEMORANDUM OPINION

James D. Taylor, Jr., Esq., Allison J. McCowan, Esq., Saul Ewing LLP, Wilmington, Del.; Michael J. Lennon, Esq., Sheila Mortazavi, Esq. (argued), Georg C. Reitboeck, Esq. (argued), Michael S. Turner, Esq. (argued), Andrews Kurth Kenyon LLP, New York, N.Y., attorneys for Plaintiff.

Martina Tyreus Hufnal, Esq., Santosh V. Coutinho, Esq., Christopher A. Winter, Esq., Nitika Gupta, Esq., Fish & Richardson P.C., Wilmington, Del.; Frank E. Scherkenbach, Esq. (argued), Kurt L. Glitzenstein, Esq., Steven R. Katz, Esq. (argued), Chet D. Campbell, Esq., Whitney A. Reichel, Esq. (argued), Fish & Richardson P.C., Boston, Mass., attorneys for Defendant.

June 12, 2017

*Richard G. Andrews*
**ANDREWS, U.S. DISTRICT JUDGE:**

Plaintiff ViaTech has sued Defendant Microsoft for infringement of U.S.

Patent No. 6,920,567. The '567 Patent is directed to enforcing software licenses. The

accused products include several versions of Windows[1] and Office[2] software.

Plaintiff has asserted fifteen claims, including one independent apparatus claim

(claim 1), nine dependent apparatus claims (claims 2–7 and 13–15), two

independent method claims (claims 28 and 31), and three dependent method claims

(claims 29, 30, and 32). Defendant has responded with invalidity defenses and

counterclaims. (D.I. 61).

Plaintiff filed two motions for summary judgment: one for summary

judgment of infringement (D.I. 226) and the other for summary judgment of validity

(D.I. 232). Defendant filed three motions for summary judgment: one for summary

judgment of invalidity (D.I. 209), one for summary judgment of no willful

infringement and no pre-suit damages (D.I. 214), and one for summary judgment of

non-infringement (D.I. 218). Also pending are three *Daubert* motions (D.I. 212, 221,

224). Trial is scheduled for June 19, 2017. (D.I. 63).

For the following reasons, I am granting Defendant's motion (D.I. 218) for

summary judgment of non-infringement and denying Plaintiff's motion (D.I. 226)

for summary judgment of infringement. I am also denying in part and dismissing in

---

[1] Windows Vista, Windows 7, Windows 8, Windows 8.1, and Windows 10. (D.I. 229 at 5).
[2] Office 2010, Office 2013, Office 2016, and Office 365. (D.I. 229 at 5).

2

part Defendant's motion (D.I. 209) for summary judgment of invalidity and denying Plaintiffs motion (D.I. 232) for summary judgment of validity.

## I. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the

3

opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## II. INFRINGEMENT

I am granting summary judgment for Defendant because Plaintiff has failed to produce sufficient evidence to create a genuine dispute over whether the accused products include a "dynamic license database" that "resides in the digital content file." This issue is appropriate for disposition on summary judgment because the parties' experts, Dr. Benjamin Goldberg for Plaintiff and Dr. Stephen Wicker for Defendant, agree on the attributes of the accused products. (*See* Goldberg Reply at ¶ 10; D.I. 261 at 5).[3] The only disagreement is whether those attributes fall within the scope of the asserted claims.

---

[3] The following documents are cited in this opinion. The infringement report of Plaintiff's expert Dr. Benjamin Goldberg is cited as "Goldberg Report" and is available at D.I. 230-1 Ex. 2. Dr. Goldberg's reply report is cited as "Goldberg Reply" and is available at D.I. 230-1 Ex. 5. Deposition testimony of Dr. Goldberg is cited as "Goldberg Tr." and is available at D.I. 230-1 Ex. 7. The infringement report of Defendant's expert Dr. Stephen Wicker is cited as "Wicker Report" and is available at D.I. 230-1

4

Each of the asserted claims requires a "digital content file" that includes a

"dynamic license database." Claim 1 is representative as to this limitation. It reads:

1. A *digital content file* including a license control mechanism for controlling
the licensed use of digital content, comprising:

   a digital content, and

   an embedded file access control mechanism embedded in the *digital
   content file*, including

   a license functions mechanism embedded in the *digital content
   file* and including

   a license monitor and control mechanism communicating
   with a *dynamic license database* and monitoring use of the
   digital content by a user to determine whether a use of the
   digital content by a user complies with the license defined
   in the *dynamic license database*, and

   a license control utility providing communications between
   a user system and an external system to communicate
   license definition information between the user system and
   the external system, including

   a graphical user interface associated with the license
   control utility to provide communication between a
   user and user accessible functions of the license
   functions mechanism, and

   the *dynamic license database* wherein the *dynamic license database* is
   associated with the *digital content file* for storing information
   controlling operations of the file access control mechanism and license
   information controlling licensed use of the digital content.

---

Ex. 4. The invalidity report of Dr. Wicker is cited as "Wicker Invalidity" and is available at D.I. 228-
2.

('567 Patent, col. 40, 1. 65–col. 41, 1. 25 (emphasis added)). The other independent claims read in relevant part: "A method for distributing a digital content file... comprising... preparing a licensable digital content file, containing... an embedded file access control mechanism, including... a license control utility... including,... the dynamic license database..." (*id.* at col. 47, 1. 43–col. 48, 1. 29), and "A method for providing a license for use of digital content in a digital content file residing in a user system wherein the digital content file includes... a dynamic license database...." (*id.* at col. 49, 1. 26–col. 50, 1. 30).

In my *Markman* opinion, I adopted two relevant constructions. First, I construed "dynamic license database" to be "a database that resides in the digital content file and that is programmed to accept modifiable licenses." (D.I. 139 at 10). Second, I construed "file" as having its plain and ordinary meaning which I set out as "a collection of data that is treated as a unit by a file system." (*Id.* at 12).

## A. Literal Infringement

For literal infringement, Plaintiff must prove by a preponderance of the evidence that "every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). I am granting summary judgment for Defendant on literal infringement because Plaintiff cannot prove that Defendant's products include a "dynamic license database" that "resides in the digital content file."

6

### i. *Summary of the Accused Products*

Plaintiff argues that the "digital content file" is the Windows software[4] itself as it exists pre-installation on an optical disk or in a disk image file. (D.I. 229 at 8–9; D.I. 268 at 8).[5] In that form, Plaintiff argues, it "can be mounted by the file system on a user's computer in order to install the software." (D.I. 229 at 8–9; D.I. 268 at 8).

Plaintiff further argues that the "dynamic license database" is a combination of several files including the trusted store, the token store, and the cache store. (Goldberg Report at ¶ 65).[6] These components are controlled by the Software Protection Platform ("SPP") (Goldberg Report at ¶ 67–72; Goldberg Reply at ¶ 14), and they "store data defining the terms and conditions of a license...." (Goldberg Report at ¶ 67). The trusted store, which is a file named data.dat, stores the product keys. (*Id.*; Goldberg Tr. at 236). The token store, a file named tokens.dat, stores the license files. (Goldberg Report at ¶ 67; Goldberg Tr. at 235–36). The cache store "is a

---

[4] There are also accused Office products. While the Office products operate differently for the "embedded file control mechanism" term, they do not operate in a materially different way for the "dynamic license database" term, which is the focus of this opinion. Thus, I will only discuss Windows, but the same analysis applies to the accused Office products.

[5] I do not read Plaintiff's brief to argue that the collection of files that constitutes Windows in its post-installation form is a "file" because it only makes that argument in a footnote to its brief. *Robocast, Inc. v. Apple Inc.*, 2014 WL 2622233, at *1 (D. Del. June 11, 2014); *cf. SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). At oral argument, however, Plaintiff asserted that its brief does raise that argument. (D.I. 325 at 52). Even if the footnote sufficed to raise the argument, Plaintiff's position would be clearly contrary to my rejection of their claim construction argument. In the *Markman* opinion, I construed "file" to be "a unit" because the patent "never refers to a collection of files as a single 'file.'" (D.I. 139 at 13). Windows, after installation, is many files such as taskeng.exe, winlogon.exe., and explore.exe. (Wicker Report at p. 31; *see also* Goldberg Reply at ¶ 18 (disagreeing with Dr. Wicker's conclusion but not on the underlying facts)).
[6] According to Plaintiff, the dynamic license database also includes the trusted timer.

7

memory location that stores the results of the license evaluation." (Wicker Report at p. 48).[7]

The trusted store, token store, and cache store "are used by the Windows operating system software, but are not themselves executable code." (*Id.*). Instead, the trusted store and token store are data files, while the cache store is a memory location. (*Id.*).[8]

Dr. Wicker, Defendant's expert, explains that "prior to, and at the time of, installation, the files and cache store... do not exist. Rather, they are created later when the installed software is executed." (Wicker Report at p. 30). "When SPP is first run, SPP will look to see if the trusted store and token store exist, and if not, it will create them. The cache store is created in memory after Windows boots and is likewise not in the installation media." (*Id.*).

Plaintiff points to no place in the report of its expert Dr. Goldberg where he rebuts Dr. Wicker's explanation of how these files are created and their status at the time of installation. In fact, Dr. Goldberg appears to confirm it when he states

---

[7] Dr. Goldberg and Dr. Wicker agree on the operation of the license database except for a small and non-material disagreement about where the cache store resides. Dr. Goldberg states that the cache store does not reside only in memory. (Goldberg Reply at ¶ 55 n. 24). Instead, he explains "[t]he information from the Cache Store is periodically copied to the hard disk drive or solid state drive of a user system for future use." (*Id.*). In his reply, he does not actually contest, however, Dr. Wicker's statement that the cache store is created in memory. (*See id.* at ¶¶ 54–62).

[8] Dr. Wicker provided this explanation but Dr. Goldberg did not rebut it or otherwise disagree with it. (*See* Goldberg Reply at ¶¶ 54–56). Plaintiff artfully states that the pre-installation software contains "executable code that is programmed to save that license data in files it creates on a user system." (D.I. 268 at ¶ 15). The materials cited by Plaintiff to support that assertion, however, do not actually state that the trusted store, token store, and cache store are themselves executable code. (See id. at 15 (referencing id. at 13 n. 18)).

8

"[t]he installable versions of Windows/Office each contain code *for creating* the Trusted Store and... Token Store... upon installation." (Goldberg Report at ¶ 73 (emphasis added); *see also* Goldberg Tr. at 65 ("Once... the token store, the trusted store, etc., are created...."); Goldberg Reply at ¶ 11).

Any license information contained in the pre-installation software is stored in a BLOB (Goldberg Tr. at 64), not in the token store. "A BLOB typically is some data that generally is not intelligible by just looking at it, you need to view it through some sort of program or programmatically." (*Id.* at 64–65).

The licenses are put into the token store after installation occurs. "Once... the token store, the trusted store, etc., are created, then SPP has a way of taking license data and putting them into those—into the appropriate portions of those database components. (*Id.* at 65).

### ii. *The Accused Software Does Not Infringe in Any One State*

Plaintiff cannot establish the accused software infringes in any one state because Plaintiff cannot prove the accused products meet the "license database" and the "file" limitations at the same time.

At claim construction, Plaintiff argued that "file" could mean a collection of files, and not just a discrete file. (D.I. 92 at 33, 36–37). I rejected this position, explaining that the patent "never refers to a collection of files as a single 'file.'" (D.I. 139 at 13). My construction of "file" places Plaintiff's infringement theory in a bind. Post-installation, Windows is a collection of files, not a single file. Pre-installation, Windows is a "file." Post-installation, the files Plaintiff points to as the "license

9

database"—the token store, the trusted store, and the cache store—exist. Pre-installation, they do not. Plaintiffs infringement position requires me to treat Windows in one form for one part of the claim and in another form for the other. I cannot do so.

*iii.* Ericsson *and* Finjan *Are Not Relevant*

In arguing infringement, Plaintiff relies on two cases: *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1203–05 (Fed. Cir. 2010) and *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1215–17 (Fed. Cir. 2014). (D.I. 229 at 23; D.I. 268 at 17 n. 27). Those cases are inapposite because they address accused products that were capable of being operated in an infringing manner.

In *Finjan*, the accused product was sold with the infringing capability, but it had to be unlocked to be used. *Finjan* involved patents covering proactive scanning software, that is, software for "techniques directed to detecting and defeating previously unknown, Internet-based threats to computers, such as viruses." 626 F.3d at 1201. Defendants sold a product that included three software modules that performed proactive scanning. *Id.* at 1202. Those modules were "locked" when Defendants' products were sold. *Id.* Customers had to purchase an additional product key in order to unlock the infringing modules. *Id.*

In *Finjan* the "code for proactive scanning was already present in Defendants' accused products when sold." *Id.* at 1205 (internal quotation marks omitted). The software code did not have to be modified for the locked modules to be used. *Id.* The court found Defendants' products infringed because the claim language only

10

required the accused product to be able to perform the claimed capability, not that it actively perform the capability. *Id.*

In *Ericsson*, the accused product infringed some of the time, but not all of the time. 773 F.3d at 1215. *Ericsson* involved the transmission of data over wireless internet. *See id.* at 1208–09. Data is transmitted in pieces called packets. *Id.* at 1209. The packets include a payload, the data being transmitted, and headers that assist the receiving device in prioritizing the packets. One asserted patent included a claim limitation that required a header with a value identifying the type of content being transmitted. *Id.* at 1210. The accused products included a traffic identifier field and, for some uses of the accused product, the value in that field corresponded with the content type; for some, it did not. *Id.* at 1211, 1215. The court held this was sufficient to establish infringement.

*Finjan* and *Ericsson* do not rescue Plaintiff for two reasons.

First, assuming *arguendo* that the asserted claim language requires only software capable of having a license database and that the disk image file has that capability, the accused product would still not be capable of being operated in an infringing mode. In both *Finjan* and *Ericsson* the accused product was capable of operating in a way that met all of the claim limitations. In *Finjan*, once the software was unlocked, it infringed. In *Ericsson*, when the header did correspond with the payload type, the other claim limitations were still met. Here, once the "license database" is created, the product still does not infringe because there is no "file."

11

Second, claim 1 requires more than capability in the relevant part.[9] Claim 1 includes capability claiming insofar as the "license database" must be capable of controlling the operations of the file access control mechanism and the licensed use of the digital content. Claim 1 does not, however, only require software that is capable of having a "license database." The "file" must comprise the "license database."

The disk image file does not have the "license database." Instead, the program that creates the trusted store, token store, and cache store exists in the disk image file. In *Ericsson*, there was no dispute that the accused product had the claimed "processor" that was capable of providing a header that corresponded with the payload type. In *Finjan*, the software components for performing the claimed capabilities were present in the software as sold. Here, the trusted store, token store, and cache store are not present in the disk image file. Thus, again, *Ericsson* and *Finjan* do not save Plaintiff.

Having found Plaintiff lacks any theory of infringement where the accused products meet all of the claimed limitations at the same time, I grant summary judgment of no literal infringement.

---

[9] The asserted method claims also require more than capability. Both require a file having a license database.

12

## B. Doctrine of Equivalents

Defendant requests summary judgment of no infringement under the doctrine of equivalents because Plaintiff "failed to assert infringement under the doctrine and [Plaintiff's] expert has failed to provide a proper equivalents analysis...." (D.I. 219 at 22). Plaintiff responds in two ways.

First, Plaintiff essentially argues that if it is wrong on infringement, then it is a near miss, so infringement under the doctrine of equivalents is appropriate. (*See* D.I. 268 at 24). Infringement under the doctrine of equivalents occurs where there is no literal infringement because of an "unimportant and insubstantial change to the claimed invention." *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989) (internal quotation mark omitted). To prove infringement under the doctrine of equivalents, a plaintiff must establish "substantial identity" of "*function* performed, *means* by which function is performed, and *result* achieved." *Id.*

In *Lear*, the Federal Circuit overturned a jury verdict of infringement under the doctrine of equivalents because the plaintiff failed to provide any independent evidence or analysis of substantial identity of function, means, and results. *Id.* at 1425–26. The court explained that those three "elements must be presented in the form of particularized testimony and linking argument." *Id.* at 1426. Each element must be individually addressed with "*evidence* and *argument*...." *Id.* at 1425. "The evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Id.* "[E]vidence and argument on literal

13

infringement, that may also bear on equivalence," is insufficient on its own to sustain a finding of infringement under the doctrine of equivalents. *Id.*

Prior to summary judgment briefing, Plaintiff had not expressed a clear interest in pursuing a doctrine of equivalents claim.[10] For example, Dr. Goldberg states his opinion relates to whether Defendant's products "include each of the elements of asserted claims 1–7 and 13–15... [and] whether Microsoft performs each of the method steps described in claims 28–30... and... claims 31–32...." (Goldberg Report at ¶ 6). He makes no mention of the doctrine of equivalents. Only in his reply report does he state, "I see no reason why the opinions rendered in my Opening Expert Report and in this Reply Expert Report would not be relevant to... infringement under the doctrine of equivalents...." (Goldberg Reply at ¶ 8). That is the full extent of either report's mention of the doctrine of equivalents. Further, in its answer to interrogatories seeking Plaintiff's infringement contentions, Plaintiff makes no mention of infringement under the doctrine of equivalents. (D.I. 220-8 at 3–4).

Plaintiff has produced no evidence from which a factfinder could find infringement under the doctrine of equivalents. In the summary judgment briefing, Plaintiff dumped, in a footnote and without any analysis, citations to about 100 paragraphs from Dr. Goldberg's reports. (*See* D.I. 268 at 24 n. 40). Failing to make a proper doctrine of equivalents argument is a waiver in and of itself. *SmithKline*

---

[10] Plaintiff still has not expressed a clear doctrine of equivalents theory.

14

*Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). Nevertheless,

having reviewed those cited paragraphs, none of them provide a basis for Dr.

Goldberg to opine that there is substantial identity of function, means, and results

as required for Plaintiff to assert the doctrine of equivalents.

In a deposition, Dr. Goldberg asserted that he conducted the analysis

necessary to support a finding under the doctrine of equivalents. He gives an

example relevant here. He points to paragraph thirty-two from his expert reply.

(Goldberg Tr. at 62–63). In that paragraph, Dr. Goldberg states in relevant part:

> Regardless of whether the Trusted Store, Token Store, Trusted Timer, and
> Cache Store components are stored in their final form on the installer disk, or
> whether they are stored in a modified form, when the Windows and Office
> software is installed and run on the user system, the Trusted Store, Token
> Store, Trusted Timer, and Cache Store components are created and stored in
> the same final form.

This is the closest his expert reply comes to providing a doctrine of equivalents

analysis. It still falls short for three reasons.

For one, the context of this paragraph makes clear that Dr. Goldberg is still

expanding on his literal infringement theory. For two, even if this opinion could be

used to support a substantial uniformity of results, it offers no support for a

factfinder to find substantial uniformity of means or function. For three, it contains

none of the required "linking" testimony.

Second, Plaintiff asks for a chance to present a doctrine of equivalents

argument. The time to do so has elapsed. Trial is mere weeks away and Plaintiff

15

just now raises the issue. *See Laurie v. Nat'l Passenger R.R. Corp.*, 105 F. App'x 387, 392-93 (3d Cir. 2004).

Plaintiff argues it should be allowed the opportunity because Defendant's position is predicated on a new claim construction. I disagree. It is the claim construction I issued last June that defeats Plaintiff's literal infringement case.

Thus, I am granting summary judgment of no infringement under the doctrine of equivalents.

## III. INVALIDITY

Defendant filed a motion for summary judgment of invalidity on the basis of obviousness and indefiniteness. (D.I. 209). Plaintiff filed a cross-motion for summary judgment of validity. (D.I. 232). I am denying Plaintiff's motion and Defendant's motion on the basis of indefiniteness. I am dismissing Defendant's motion for summary judgment of obviousness and its counterclaims as moot.

### A. Plaintiff's Motion

Defendant asserts a counterclaim and the affirmative defense that the '567 Patent is invalid as obvious over seven prior art references, including the Microsoft product Brazilian Publisher and U.S. Patent No. 6,243,468. (*See* Wicker Invalidity). A patent claim is invalid as obvious under 35 U.S.C. § 103 if the novel aspect of the claimed invention "would have been obvious... to a person having ordinary skill in the art...." *Id.* § 103(a); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406–07 (2007). Obviousness is a question of law that depends on the following factual inquiries: (1) the scope and content of the prior art; (2) the differences between the

claims and the prior art; (3) the level of ordinary skill in the relevant art; and (4) any objective indicia of nonobviousness. *See KSR*, 550 U.S. at 406; *see also Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012). To prove obviousness, a party must show that a skilled artisan would have been motivated to combine the prior art teachings with a reasonable expectation of success. *See Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1291 (Fed. Cir. 2013).

Plaintiff moves for summary judgment because it argues Defendant's obviousness case fails in two ways. First, Plaintiff argues Defendant has failed to produce sufficient evidence that it would have been obvious to implement a file access control mechanism entirely locally. (D.I. 233 at 19–22). Second, Plaintiff argues Defendant has failed to produce sufficient evidence that it would have been obvious to have a dynamic license database that resides in the digital content file. (D.I. 233 at 22–23). Both elements are required by the claims as I construed them. (D.I. 139 at 10, 14).

While Dr. Wicker does not point to prior art references where these claim limitations occur, he does provide analysis of why a person of ordinary skill in the art would know how and be motivated to modify the prior art references to include these limitations.

For the file access control mechanism, Dr. Wicker explains why a skilled artisan would be motivated to implement the control mechanism entirely locally. He explains it "would simplify the system by allowing it to operate without an

17

activation server and increase customer satisfaction (particularly at a time when internet access was slow)." (Wicker Invalidity at p. 72; *see also id.* at p. 107 (performing the same analysis with another prior art reference)). He also explains how the control mechanism in the '468 Patent could be modified to accomplish the goal. (*Id.* at p. 72).

For the dynamic license database, Dr. Wicker explains why a skilled artisan would be motivated to locate the database in the digital content file. He explains "a database in the file has the advantage of necessarily traveling with the file (because it is inside it)." (Wicker Invalidity at p. 81).

Dr. Wicker's opinion on obviousness is sufficient because he offers more than bald assertions; he offers reasoned analysis. Dr. Wicker is not required to point to some specific teaching in the prior art to support his opinion. *KSR, Int'l,* 550 U.S. at 418. His education, research, and experience (*see* Wicker Invalidity at pp. 1–3), adequately support his opinion.

In its reply brief, Plaintiff raises other issues with Defendant's obviousness case. It argues that the prior art does not disclose a license database that accepts modifiable licenses and that Brazilian Publisher is not prior art. (D.I. 294 at 5–7, 12–13). Because these arguments were not raised in the opening brief (*see* D.I. 233 at 17–23), they were waived. *Novosteel SA v. U.S. Bethlehem Steel Corp.,* 284 F.3d 1261, 1273–74 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do

not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

Thus, there are genuine disputes defeating Plaintiff's motion for summary judgment.

## B. Defendant's Motion

Defendant moves for summary judgment of invalidity on two grounds: indefiniteness and obviousness.

### i. *Indefiniteness*

Defendant argues the asserted claims are indefinite because of the claim limitation:

> the dynamic license database wherein the dynamic license database is associated with the digital content file for storing *information controlling operations of the file access control mechanism* and *license information controlling licensed use of the digital content.*

('567 Patent, col. 41, ll. 21–25) (emphasis added). Defendant focuses on the claim's requirement of both information that controls the operations of the file access control mechanism and information that controls licensed use of the digital content. Defendant asserts "there is no way to distinguish these two types of information." Thus, Defendant argues, the claim is indefinite. (D.I. 210 at 23).

I do not read the claim language as necessitating two informations performing distinct functions rather than a single information performing both functions. Further, Defendant fails to establish its burden of proving the issue by clear and convincing evidence. In its opening brief, Defendant generically references the specification and makes a single citation to a sixty-five page declaration

19

submitted by Dr. Wicker. (D.I. 210 at 22–23 (citing D.I. 222-1)). Buried in that declaration is one relevant paragraph containing a conclusory assertion that "[o]ne of ordinary skill in the art would not have been able to determine with reasonable certainty the scope of each of these phrases," accompanied by a description of the specification. (D.I. 222-1 at ¶ 47).

Having failed to establish that the asserted claims are indefinite by clear and convincing evidence, Defendant's motion for summary judgment of invalidity is denied in part.

### ii. *Obviousness*

Defendant's obviousness case relies on its product Brazilian Publisher. At oral argument, it stipulated there was a genuine dispute over the prior art status of Brazilian Publisher, but asked me to rule that, if Brazilian Publisher is prior art, Defendant made a *prima facie* case of obviousness that was unrebutted. While Defendant makes a strong case, such a ruling would leave a piecemeal presentation for the jury. Having granted summary judgment of non-infringement, I am dismissing the motion for summary judgment of obviousness and Defendant's counterclaims of invalidity as moot because proceeding to a jury trial would be inefficient and wasteful. *See Phonometrics, Inc. v. N. Telecom Inc.,* 133 F.3d 1459, 1468 (Fed. Cir. 1998).

## IV. CONCLUSION

Every claim requires a "digital content file" that includes a "dynamic license database." I have granted summary judgment of no literal infringement and no

20

infringement under the doctrine of equivalents.[11] Thus, I grant Defendant's motion (D.I. 218) for summary judgment of non-infringement and deny Plaintiff's motion (D.I. 226) for summary judgment of infringement. Plaintiff's motion (D.I. 232) for summary judgment of validity is denied. Defendant's motion (D.I. 209) for summary judgment of invalidity on the basis of indefiniteness is denied and on the basis of obviousness is dismissed as moot. Defendant's motion (D.I. 214) for summary judgment of no willful infringement, its motion (D.I. 221) to exclude Dr. Goldberg's testimony, and the two *Daubert* motions (D.I. 212, 224) related to damages are dismissed as moot.

An order consistent with this opinion will follow.

---

[11] Plaintiff has also asserted indirect infringement. Plaintiff has made no argument unique to indirect infringement. Because indirect infringement requires direct infringement to occur, this claim falls as well. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004).